UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NAF HOLDINGS, LLC,              :
                                :
        Plaintiff,              :
                                :  CIVIL ACTION NO. 10 CIV. 5762 (RJS)
    v.                          :
                                :
LI & FUNG (TRADING) LIMITED,    :  JURY TRIAL DEMANDED
                                :
        Defendant.              :

# COMPLAINT

Plaintiff NAF Holdings, LLC, by its undersigned attorneys, complaining of the Defendant Li & Fung (Trading) Limited, respectfully alleges as follows:

## Parties

1.  Plaintiff NAF Holdings, LLC ("NAF") is a Delaware limited liability company with its principal place of business at 459 Lincoln Avenue, Highland Park, New Jersey 08904.

2.  Defendant Li & Fung (Trading) Limited ("Defendant") is a Hong Kong corporation with its principal place of business at LiFung Tower, 888 Cheung Sha Nun Road, Kowloon, Hong Kong.

## Jurisdiction, Venue and Governing Law

3.  Jurisdiction over this matter is based upon 28 U.S.C. § 1332(a)(2) inasmuch as the claims made herein exceed the sum of $75,000, exclusive of

interest and costs, and are between a citizen of a state and a citizen of a foreign state.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(d) inasmuch as Defendant is an alien.

5. Pursuant to an agreement dated December 15, 2008, the parties hereto agreed that said agreement would be governed by and construed in accordance with, the laws of the State of New York. Moreover, the parties hereto agreed to submit to the exclusive jurisdiction of the federal or state courts in the State of New York for the purpose of enforcing any claim arising thereunder.

## Background Factual Allegations

6. In 2008, NAF was exploring the acquisition of Hampshire Group, Limited, a Delaware corporation ("Hampshire"). At that time, Hampshire was a provider of women's and men's sweaters, wovens and knits, as well as a designer and marketer of branded apparel in the United States.

7. In contemplation of the acquisition of Hampshire, NAF, by and through its managing principal, Efrem Gerszberg, approached Defendant to determine whether Defendant would agree to provide sourcing-related services for Hampshire throughout the world. These sourcing services included, but were not limited to, locating factories, creating samples, pricing goods, monitoring production orders, quality control and ensuring timely shipment of goods.

Defendant and its related entities make up the Li & Fung Group, a long-standing, powerful multinational conglomerate which provides export sourcing, manufacturing, distribution and retailing services in more than forty (40) countries throughout the world.

8. On November 18, 2008 NAF, along with its advisors had a meeting with Rick Darling, President of Li & Fung USA, Marc Compagnon, Executive Vice President of Defendant, as well as other executives of Defendant. In that meeting it was made clear that in order for NAF to proceed with the transaction, Defendant would need to provide open terms and replace any existing letters of credit issued in favor of Hampshire's Vendors at the time of closing. At that meeting, Defendant agreed to provide open 60 day terms.

9. On December 15, 2008, NAF and Defendant entered into a Buying Agency Agreement ("Agreement"), a true and correct copy of which is attached hereto as Exhibit A. In the Agreement, Defendant agreed to serve as Hampshire's exclusive buying agent in Hong Kong, Macau, Singapore, Taiwan, China, Sri Lanka, Malaysia, India, Nepal, Pakistan, Turkey, South Africa, Indonesia, Fiji, Philippines, Korea, Thailand, Myanmar, Cambodia, Bangladesh, Jamaica, Nicaragua, Honduras, El Salvador, Vietnam, Portugal and the Dominican Republic ("Territories").

10. As part of its obligations as NAF's exclusive buying agent, Defendant agreed to provide the following services:

> 5.1.1 To familiarize itself with the Principal's needs and survey the potential markets to obtain the best available Products.
>
> 5.1.2 To make periodic visits to the locations where Products ordered by the Principal ("Ordered Products") are being manufactured in order to inspect the quality of the Ordered Products and to provide production progress reports to the Principal;
>
> 5.1.3 To assist the Principal in the negotiation of the most favourable prices and other terms on which the Products can be purchased. In this connection, the Agent shall visit Vendors, obtain samples of the Products, submit samples to the Principal and quote prices at which the Products can be purchased;
>
> 5.1.4 To the extent that the Products require quota and quota is not included in the Vendors' prices, to attend to the acquisition of quota in a manner dictated by, and in the best interests of, the Principal;
>
> 5.1.5 To place Contracts in accordance with the written instructions of the Principal;
>
> 5.1.6 In the event that Ordered Products do not conform in quality or specifications to the Contract in question, to notify the Principal immediately and require the Vendor in question to cease and desist any production until such time as a resolution is agreed upon to bring the said Ordered Products to conforming quality and specification standards;
>
> 5.1.7 To help facilitate the obtaining of the documentation necessary for importation of Ordered Products into the relevant country;

      5.1.8    To assist the Principal in the return of all Ordered Products to the Vendor deemed to be defective. In addition, the Agent shall, in accordance with the Principal's instructions, negotiate for and on behalf of the Principal in the recovery of any monies due to the Principal from the Vendor in question as a result of defective Ordered Products, shortage, etc.;

      5.1.9    No later than February 1, 2009 to provide Principal with a list of employees and offices which Agent does not intend to assume into its ongoing operations performed under this Agreement

Agreement at ¶ 5.

    11.    In exchange for performing the above-referenced services, NAF agreed to pay Defendant a commission equal to six percent (6%) of any Vendors' F.O.B. prices for any products ordered and shipped on account of Defendant's services.

    12.    In accordance with the Agreement, for new purchase orders after the effective date of the Agreement, Defendant agreed to provide to NAF invoices which were to be settled on an open account basis, with sixty (60) day terms. Agreement at ¶ 7.2.1.

    13.    For purchase orders placed before the effective date of the Agreement, Defendant expressly agreed to release and replace any such letters of credit. In exchange for doing so, NAF agreed to pay Defendant a reduced commission of

three percent (3%) for sourcing-related services provided by others, not Defendant. Agreement at ¶ 7.2.2.

14. Significantly, the Agreement did not require NAF to provide to Defendant any security, such as a letter of credit, to insure NAF's payment or performance obligations set forth in the Agreement.

15. The Agreement also called for nine (9) months notice in the event any party wished to terminate the Agreement. Agreement at ¶ 14.

16. After securing Defendant as NAF's exclusive buying agent, Mr. Gerszberg obtained a $40,000,000.00 financing commitment from Wells Fargo Trade Capital, LLC ("Wells Fargo") to refinance Hampshire's existing indebtedness and to finance Hampshire's post-acquisition operations. Specifically, by letter dated February 12, 2010, Wells Fargo confirmed its offer to be the sole and exclusive administrative agent for a $40,000,000.00 senior factoring and revolving credit facility. One of the conditions precedent for the Wells Fargo financing was for Defendant to serve as Hampshire's sourcing agent. Defendant was informed that in order for NAF to move forward with the transaction, it needed an executed sourcing agreement in order to satisfy the conditions of the financing.

17. Effective February 23, 2009 and in reliance upon the Agreement, NAF and Hampshire entered into an Agreement and Plan of Merger ("Merger

Agreement") wherein NAF, through a merger, would acquire Hampshire. The Merger Agreement was announced to the investing public by Hampshire in a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on February 24, 2009.

18.  In March 2008, Defendant met with key Hampshire employees, visited Hampshire's sourcing offices in China, analyzed Hampshire's purchase orders and otherwise prepared to assume its role as Hampshire's exclusive buying agent.

19.  Upon information and belief, following the execution of the Agreement, Defendant had significant business issues arise related to taking on risk on behalf clients, including but not limited to Ecko Unlimited and KB Toys. Apparently, these instances caused Defendant to question whether it should continue to accept risk in transactions, as opposed to its historical role of serving only as agent on behalf of its clients.

20.  In light of the foregoing and in breach of the clear and unambiguous terms of the Agreement, on March 18, 2009, Defendant notified NAF by email that Defendant would not issue standby letters of credit because it has "no basis to take on a risk".

21.  Thereafter, by email dated March 23, 2009, Defendant notified NAF that it required NAF to tender a cash deposit of $5,000,000.00 to Defendant's bank

account at least three (3) days prior to the closing contemplated by the Merger Agreement; and that without such cash deposit, Defendant would not issue a necessary standby letter of credit. Moreover, in that email, Defendant demanded that NAF issue to Defendant a standby letter of credit in the amount of $11,500,000.00 as security against future orders for which Defendant may have to provide a letter of credit to a Vendor for a purchase order issued pursuant to the Agreement. Thereafter, Defendant sent NAF a redline of the executed Agreement with additional significant material changes. As set forth above, neither the cash deposit nor the standby letter of credit were required pursuant to the original, executed Agreement.

22. While NAF made a good faith effort to accommodate Defendant's belated post-Agreement demands, Defendant summarily rejected those efforts. In fact, Defendant even refused to meet with NAF to discuss the Agreement.

23. On March 30, 2010 Defendant notified NAF via email of its intent not to do business with NAF. Moreover, at or before that time, Defendant furtively notified NAF's lender, Wells Fargo, of its decision to renege on the Agreement.

24. Ultimately, due to Defendant's eleventh-hour demands, NAF was forced to abandon its efforts to acquire Hampshire.

25. Defendant's breach of the Agreement caused NAF to suffer significant damages.

## COUNT I
## NAF v. Defendant
## (Breach of Contract)

26.     The preceding paragraphs of this Complaint are incorporated herein by reference as if fully set forth.

27.     As set forth more fully above, on December 15, 2008, NAF and Defendant entered into a written, binding, and enforceable Agreement whereby Defendant agreed to serve as Hampshire's exclusive buying agent in the Territories, in exchange for NAF paying the commissions aforementioned.

28.     As set forth more fully above, NAF performed and complied with all the terms and conditions required of it pursuant to the Agreement.

29.     Defendant failed to perform and comply with its obligations under the Agreement by doing or failing to do, inter alia, the following:

- refusing to issue standby letters of credit;

- requiring NAF to tender a cash deposit of $5,000,000.00 to Defendant's bank account at least three (3) days prior to the closing of the contemplated merger, which was not part of the Agreement;

- requiring NAF to issue to Defendant a standby letter of credit in the amount of $11,500,000.00 for security against future orders for which Defendant may have to provide a letter of credit to a Vendor for a purchase order issued pursuant to the Agreement, which was not part of the Agreement; and

- by notifying NAF on March 30, 2010, that Defendant will not do business with NAF as enumerated in the Agreement.

30. Notwithstanding Defendant's affirmative obligation to serve as NAF's exclusive buying agent pursuant to all of the terms and conditions in the Agreement, Defendant wrongfully failed and/or refused act or otherwise serve as NAF's exclusive buying agent.

31. By reason of the foregoing, Defendant has breached the Agreement by failing and/or refusing to act or otherwise serve as NAF's exclusive buying agent.

32. As a direct and proximate result of Defendant's breach of the Agreement, which terminated the Hampshire acquisition efforts, NAF has sustained damages in an indeterminate sum of not less than $30,000,000.00.

33. Plaintiff demands a trial by jury in this matter.

WHEREFORE, NAF demands judgment in its favor and against Defendant in an indeterminate sum of not less than $30,000,000.00 for compensatory damages suffered by NAF as a result of Defendant's breach of contract, as well as an award of costs, pre-judgment and post-judgment interest, and such other relief and further relief that the Court deems just and proper.

                                                Respectfully submitted,

                                                \S\
                                   _____
                                   Steven Halperin (sth-8723)
                                   HALPERIN & HALPERIN, P.C.
                                   18 East 48th Street
                                   New York, NY 10017
                                   (212) 935-2600
                                   (212) 935-2390 - fax
                                           and
                                   George A. Reihner
                                   WRIGHT & REIHNER, P.C.
                                   148 Adams Avenue
                                   Scranton, Pennsylvania 18503
                                   (570) 961-1166
                                   (570) 961-1199 - fax

DATED:  July 29, 2010