UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NAF HOLDINGS LLC,

                              Plaintiff,

                    -v-

LI & FUNG (TRADING) LIMITED,

                              Defendant.

No. 10 Civ. 05762 (PAE)

---

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**SALANS LLP**
John J. Hay
Deric Gerlach
Ulyana Bardyn

620 Fifth Avenue
New York, New York 10020
212-632-5500

*Attorneys for Defendant*
  *Li & Fung (Trading) Limited*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.  PRELIMINARY STATEMENT .................................................................................... 1

II. STATEMENT OF UNDISPUTED FACTS ................................................................... 2

III.  ARGUMENT ........................................................................................................... 14

        A.      Summary Judgment Standard ........................................................................... 14

        B.      The Action Should be Dismissed Because Plaintiff Cannot Prove
                 That Trading Caused Plaintiff's Alleged Injury ............................................... 15

                 1.  Plaintiff Lacks Article III Standing to Assert Its Claim ........................... 15

                 2.  The Complaint Should be Dismissed Because It Fails to State a Claim ...18

        C.      The Complaint Should be Dismissed Because NAF Lacks Standing to
                 Bring Claims for Damages Predicated on Injuries Suffered by a
                 Corporation it Owns ......................................................................................... 20

        D.      The Complaint Should be Dismissed Because Trading Properly
                 Terminated the BAA .......................................................................................... 23

CONCLUSION ................................................................................................................... 25

NewYork 1535084.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

Allen v. Wright, 468 U.S. 737 (1984)...........................................................................15

Allianz Insurance Co. v. Lerner, 305 F. Supp. 2d 191 (E.D.N.Y. 2004)...........................19

Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986) ................................................14, 15

Arar v. Ashcroft, 532 F.3d 157 (2d Cir. 2008) ..................................................................16

Bartfield v. Murphy, 578 F. Supp. 2d 638 (S.D.N.Y. 2008) .............................................20

In re Beck Industrial, Inc., 479 F.2d 410 (2d Cir. 1973) ...................................................20

Boise Cascade Corp. v. Wheeler, 419 F. Supp. 98 (S.D.N.Y. 1976) ...............................20

Celotex v. Catrett, 477 U.S. 317 (1986) ..........................................................................14

Cifarelli v. Village of Babylon, 93 F.3d 47 (2d Cir. 1996)................................................14

Diamond v. Charles, 476 U.S. 54 (1986)...........................................................................16

Diesel Props S.R.L. v. Greystone Bus. Credit II LLC,
    631 F.3d 42 (2d Cir. 2011)........................................................................................18, 19

Franconero v. Universal Music Corp., No. 02 Civ. 1963,
    2011 U.S. Dist. LEXIS 15259 (S.D.N.Y. Feb. 11, 2011).............................................19

Gallo v. Prudential Services Ltd., 22 F.3d 1219 (2d Cir. 1994) ........................................14

Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14 (2d Cir. 1995) .........14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ......................................................15

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ........14, 15

Mickle v. Christie's Inc., 207 F. Supp. 2d 237 (S.D.N.Y. 2002).......................................24

National Market Share Inc. v. Sterling National Bank,
    392 F.3d 520 (2d Cir. 2004)......................................................................................18, 19

NewYork 1535084.1

Northeastern Fla. Chapter of the Associated General Contractors of America v.
     City of Jacksonville, 508 U.S. 656 (1993) ...................................................15

Silveira Industrial Ltd. v. Actus Lend Lease LLC,
     No. 7:06-Civ-265, 2008 U.S. Dist. LEXIS 104127 (N.D.N.Y. Dec. 24, 2008) ..........24

In re Stillwater Capital Partners Inc. Litigation,
     No. 1:11-2275, 2012 U.S. Dist. LEXIS 47106 (S.D.N.Y. Apr. 3, 2012) ...................21

TD Waterhouse Investor Services Inc. v. Integrated Fund Services Inc.,
     No. 01 Civ. 8986, 2005 U.S. Dist. LEXIS 5 (S.D.N.Y. Jan. 3, 2005)...................18, 19

Taylor v. Federal Deposit Insurance Co., 132 F.3d 753(D.C. Cir. 1997) ........................16

Tractebel Energy Marketing Inc. v. AEP Power Marketing Inc.,
     487 F.3d 89 (2d Cir. 2007)...................................................................................18

Union Cosmetic Castle Inc. v. Amorepacific Cosmetics USA Inc.,
     454 F. Supp. 2d 62 (E.D.N.Y. 2006) ...................................................................16

In re United States Catholic Conference, 885 F.2d 1020 (2d Cir. 1989) .........................15

W.R. Huff Asset Management Co. LLC v. Deloitte & Touche LLP,
     549 F.3d 100 (2d Cir. 2008)..................................................................................15

W. World Insurance Co. v. Stack Oil Inc., 922 F.2d 118 (2d Cir. 1990) .........................14

Woodland Designs PLC v. Nautica Apparel Inc.,
     No. 11 Civ. 4708, 2012 U.S. Dist. LEXIS 17108 (S.D.N.Y. Feb. 10, 2012) .............23

Ziemba v. Rell, 409 F.3d 553 (2d Cir. 2005)...................................................................16

**STATE CASES**

In re J.P. Morgan Chase & Co. Shareholder Litigation,
     906 A.2d 808 (Del. Ch. 2005) .............................................................................22

In re J.P. Morgan Chase & Co. Shareholder Litig.,
     906 A.2d 766 (Del. 2006) ................................................................................ 20-23

Massena Towne Center Associates v. Sear-Brown Group Inc.,
     680 N.Y.S.2d 349 (N.Y. App. Div. 4th Dep't 1998)...................................................19

Mosca v. Normille, 715 N.Y.S.2d 129 (N.Y. App. Div. 4th Dep't 2000).........................19

Tooley v. Donaldson, Lufkin, & Jenrette Inc., 845 A.2d 1031 (Del. 2004).........20, 21, 23

iii

Wakeman v. Wheeler & Wilson Manufacturing Co., 101 N.Y. 205 (1886) ....................18

Weinberger v. Lorenzo,
    No. 10692, 1990 Del. Ch. LEXIS 169 (Del. Ch. Oct. 11, 1990) ...............................20

## STATUTES AND RULES

Fed. R. Civ. P. 56 .............................................................................................................14

iv

Defendant Li & Fung (Trading) Limited ("Trading"), by and through its undersigned counsel, Salans LLP, respectfully submits this memorandum of law in support of its motion for summary judgment dismissing the claim asserted by Plaintiff NAF Holdings LLC ("NAF").[1]

## I. PRELIMINARY STATEMENT

In this action, NAF asserts that Trading breached an alleged buying agency agreement ("BAA").  Plaintiff's purported damages, however, arise (allegedly) from a **different contract**, the Merger Agreement (as defined below), concluded between **different parties**, i.e., NAF's direct and indirect subsidiaries and a third party, Hampshire Group Limited ("Hampshire"). NAF alleges that Trading's wrongful termination of the BAA caused it to terminate its acquisition of Hampshire, and that as a result, Trading is liable to NAF for damages representing the loss of the value of Hampshire, which NAF alleges to be about $50 million.  NAF's claims should be dismissed as a matter of law because NAF seeks to recover from Trading alleged losses that (a) are directly attributable to NAF's own business decisions or misjudgments and, in any event, (b) flow to third parties.  The law does not countenance such result.  Further, because NAF breached the BAA, Trading had the right to terminate the BAA with immediate effect.  In sum, summary judgment should be granted for the following reasons:

First, there is no evidence that Trading's termination of the BAA proximately caused NAF any damage because NAF cannot show that the alleged breach caused it to terminate the acquisition of Hampshire.  On the contrary, the undisputed evidence shows NAF's willingness to proceed with the acquisition of Hampshire in the absence of the BAA and its ability to do so. NAF could have completed the acquisition if it wanted to, but, for its own business reasons (i.e., based in large part on Hampshire's alleged intervening breaches of the Merger Agreement), it

---

[1] Also submitted in connection with the instant motion is the August 15, 2012 Declaration of John J. Hay ("Hay Decl.").

1

elected to terminate the transaction.  Because NAF cannot prove causation, its claim both violates the Constitutional requirement for standing and fails to establish an essential element of a breach of contract cause of action.

Second, NAF also lacks standing to bring a claim against Trading because the damages it seeks were incurred, if at all, not by NAF but rather by its indirect subsidiary, NAF Acquisition Corp., which is the entity that would have acquired Hampshire.  A shareholder -- even a sole shareholder -- cannot bring a claim that properly belongs to the company it owns.  Here, the only injury identified by NAF that it allegedly suffered as a result of Trading's termination is the alleged loss of the value of Hampshire resulting from the failed acquisition.  But that alleged harm was not suffered by NAF -- it was not acquiring Hampshire.  NAF therefore lacks standing to bring a claim based on that harm.

Third, the alleged BAA gave Trading the unilateral right to terminate the agreement, with immediate effect, under certain circumstances including two that are relevant here:  (1) the failure by NAF to provide security upon the occurrence of a material adverse change to Hampshire; and (2) the failure by NAF to promptly notify Trading of circumstances that would give Trading reasonable grounds to believe that a material adverse change had occurred.  Here, indisputable evidence, including NAF's own contemporaneous statements, establish that a material adverse change did occur, but NAF refused, despite due request by Trading, to provide security, giving Trading grounds for terminating the BAA.  In addition, NAF failed to provide prompt notice to Trading of facts that NAF was aware of that evidenced that a material adverse change in Hampshire's financial status had occurred.  That failure also permitted Trading to terminate the BAA.

## II.  STATEMENT OF UNDISPUTED FACTS

Plaintiff NAF is a Delaware limited liability company.  (Hay Decl. Ex. H, Def. Ex. 3 ¶1;

2

Hay Decl. Ex. H (Gerszberg Dep.) 26:15-24; Hay Decl. Ex. A¶(1).)  It is a holding company owned by an individual, Efrem Gerszberg ("Gerszberg").  (Hay Decl. Ex. H (Gerszberg Dep.) 24:10-17.)  NAF was formed for the purpose of buying Hampshire, a public company that is in the apparel business.  (Hay Decl. Ex. H (Gerszberg Dep.) 24:25-25:11.)  However, NAF is not a party to the Merger Agreement pursuant to which Hampshire was to be acquired.  (See Hay Decl. Ex. H, Def. Ex. 27 at 1; Hay Decl. Ex. H (Gerszberg Dep.) 171:20-23.)

NAF Holdings II LLC ("NAF II") is a Delaware limited liability company owned by NAF.  (See Hay Decl. Ex. H (Gerszberg Dep.) 171:24-172:2, 300:2-13; Hay Decl. Ex. H, Def. Ex. 27 at 1.)  It is not a party to this litigation, but it was a party to the Merger Agreement relating to Hampshire.  (See Hay Decl. Ex. H, Def. Ex. 3 at 1; Hay Decl. Ex. H, Def. Ex. 27 at 1.)

NAF Acquisition Corp. ("NAF Acquisition") is a Delaware company and is a subsidiary of NAF II.  (See Hay Decl. Ex. H, Def. Ex. 27 at 1; Hay Decl. Ex. H (Gerszberg Dep.) 300:2-13.)  It is not a party to this litigation.  (See Hay Decl. Ex. H, Def. Ex. 3.)  It too was a party to the Merger Agreement relating to Hampshire.  (See Hay Dec. Ex. H, Def. Ex. 27 at 1.)  In this brief, NAF Acquisition and NAF II are collectively referred to as the "NAF Subsidiaries."

Trading is a Hong Kong company in the business of providing sourcing services to its customers, chiefly apparel companies.  (Hay Decl. Ex. H, Def. Ex. 3 ¶2; Hay Decl. Ex. B ¶2; Hay Decl. Ex. C.)  It has relationships with factories worldwide.  (Hay Decl. Ex. C.)  As a sourcing agent, Trading identifies factories that meet its customers' needs and assists in placing its customers' orders with the factories.  (Id.)  Trading also acts as the paying agent/intermediary between its customers and the factories and assists its customers in negotiating terms with the factories, monitoring production orders, and providing inspection and quality assurance services.

3

(E.g., Hay Decl. Ex. A ¶¶5, 7.3.)  Trading provides these services for a fee, which is usually a percentage of the amount of the customers' purchase orders.  (E.g., id. ¶7.1.)

In 2008, Hampshire's business was in decline.  (Hay Decl. Ex. H (Gerszberg Dep.) 225:17-227:2.)  However, Hampshire did have certain cash on hand, about $40 million, which it utilized for operations.  (Hay Decl. Ex. H, Def. Ex. 40 at 0001-02; Hay Decl. Ex. H (Gerszberg Dep.) 251:5-253:11.)  Gerszberg's plan was to buy Hampshire from its shareholders through a tender offer.  (Hay Decl. Ex. H, Def. Ex. 40 at 0001-02.)  He planned to obtain a bridge loan for the purchase, which would be repaid from the Hampshire cash immediately after the closing of the acquisition.  (Id.)  To make this scheme work, Gerszberg needed to obtain both a bridge loan for the acquisition and a loan commitment from a bank to help finance Hampshire's operations after the acquisition.  (Id.)[2]

In August 2008, NAF approached Trading to be Hampshire's sourcing agent post-acquisition.  (Hay Decl. Ex. H (Gerszberg Dep.) 45:3-48:19.)  At the time, Hampshire sourced its own goods, but NAF believed that Trading could help negotiate better prices and terms for payment with Hampshire's factories.  (See Hay Decl. Ex. H, Def. Ex. 8 at 1504; Hay Decl. Ex. H, Def. Ex. 24 at 59-61; Hay Decl. Ex. H (Gerszberg Dep.) 75:15-76:2, 155:24-156:9.)

On or about October 23, 2008, Gerszberg sent Hampshire's Board of Directors a letter of intent by which he offered to buy Hampshire through a public tender offer, at $8 per share.  (Hay Decl. Ex. H, Def. Ex. 5; Hay Decl. Ex. H (Gerszberg Dep.) 65:11-67:4.)  Approximately two weeks later, Hampshire and Gerszberg entered into a letter agreement whereby Gerszberg could proceed with his diligence in contemplation of acquiring Hampshire, but Hampshire was not precluded from entertaining offers from other potential buyers.  (Hay Decl. Ex. H, Def. Ex. 7;

---

[2] Gerszberg was able to obtain a bridge loan and, as described below, he also successfully obtained a loan to support Hampshire's operations post-acquisition.

Hay Decl. Ex. H (Gerszberg Dep.) 74:3-75:7.)

As part of the discussions between NAF and Trading, NAF sent Trading financial information from Hampshire based on NAF's diligence of Hampshire.  That information stated that Hampshire historically had sales of over $280 million per year, and that for 2009 NAF projected gross sales, post-acquisition, to be $246 million.  (Hay Decl. Ex. H, Def. Ex. 8 at 1504, 1507; Hay Decl. Ex. H, Def. Ex. 11; Hay Decl. Ex. H (Gerszberg Dep.) 84:23-25.)

In December 2008, NAF and Trading began negotiating a buying agent agreement, whereby Trading would act as the exclusive sourcing agent for Hampshire after NAF acquired Hampshire.  (Hay Decl. Ex. H (Gerszberg Dep.) 47:3-49:21.)  Trading believed that the BAA would not be binding until after the acquisition closed.  (See, Hay Decl. Ex. I (Compagnon Dep.) 49:5-51:1; Hay Decl. Ex. B at p. 6.)  NAF claims that the parties entered into a binding and enforceable BAA.  (E.g., Hay Decl. Ex. H, Def. Ex. 3 ¶9.)[3]

Clause 14.4 of the alleged BAA allows Trading to terminate the agreement "with immediate effect" if NAF was at any time in breach of its obligations under Clause 8 of the BAA.  (See Hay Decl. Ex. A cl. 14.4.)

Clause 8 provides, in pertinent part, that

8.3     The Principal [NAF] undertakes as follows:

. . .

8.3.4   to discuss potential adjustment to the payment terms, including terms that the Principal provide the Agent [Trading] with an irrevocable standby letter of credit of sufficient amount to cover, or advance payments in full, for any goods ordered or to be ordered, and any other terms if, in the sole discretion of the

---

[3] While it is Trading's position that the BAA was never finalized by the parties and, accordingly, could not have been breached by Trading, that is a question of fact, the resolution of which is not necessary for the purposes of this Motion.  Therefore, for the purposes of this Motion only, we will assume that the BAA was fully and duly concluded.  Trading reserves all rights to assert defenses as to the validity of the BAA at a later stage, if necessary.

5

Agent, the Principal's financial statements indicate a Material Adverse Change
. . . . ;

8.3.5    to promptly notify the Agent of any situation occurring which in the
opinion of the Agent would give reasonable grounds to believe that a Material
Adverse Change; further, to discuss potential adjustment to the payment terms
and any other terms. . . .;[4]

(Hay Decl. Ex. A cl. 8.)

Also in December 2008, Gerszberg received a loan commitment letter from Wells Fargo

Trade Capital LLC ("Wells") for a $75 million credit facility to fund Hampshire's operations

post-closing.  (Hay Decl. Ex. H (Gerszberg Dep.) 92:13-93:10; Hay Decl. Ex. H, Def. Ex. 13.)

The $75 million commitment letter contemplated a $37.5 million loan by Wells and $37.5

million of third-party financing, to be arranged by NAF.  (Hay Decl. Ex. H (Gerszberg Dep.)

97:11-18.)  Because he could not obtain the additional financing (id. 98:3-7), Gerszberg went

back to Wells with another arrangement in which he proposed to complete the acquisition with

only a $40 million credit facility (funded mainly by Wells) to finance Hampshire's operations.

(Hay Decl. Ex. H (Gerszberg Dep.) 148:21-149:5, 154:24-155:9.)  In February 2009, Wells

provided a new loan commitment letter for the $40 million credit facility.  (See Hay Decl. Ex. H,

Def. Ex. 25; Hay Decl. Ex. H (Gerszberg Dep.) 162:17-23.)  This commitment, like the

December 2008 commitment, was conditioned upon the existence of a buying agency agreement

---

[4] Clause 8 of the BAA also provides:

8.1    For the purposes of this Clause 8:

"**Material Adverse Effect**" means a material adverse effect on:

(a)    the business, operations, property, condition (financial or otherwise) or
prospects of the Principal taken as a whole;

. . .

"**Material Adverse Change**" means any event or circumstance occurs which the Agent
reasonably might have a Material Adverse Effect on the ability of Principal to perform or comply
with its obligations under this Agreement.

6

with Trading.  (See Hay Decl. Ex. H, Def. Ex. 13 at 6 (¶14); Hay Decl. Ex. H, Def. Ex. 25 at 505 (¶14).)

On or about February 13, 2009, Gerszberg sent a proposal to Hampshire's Board ("Feb. 13 letter") to buy Hampshire's outstanding stock at a significantly lower price than it had offered in October of 2008: whereas Gerszberg had previously offered to pay $8 per share, he was now offering to pay only $5.55 per share, a 30% reduction.  (See Hay Decl. Ex. H, Def. Ex. 26; Hay Decl. Ex. H (Gerszberg Dep.) 164:20-24.)  In the Feb. 13 letter, Gerszberg explained that he had reduced his offer price because of the "alarming" and "significant" erosion of Hampshire's sales, from over $280 million in 2008 to between $225 and $235 million projected for 2009.  (Id.) Gerszberg identified a number of other issues that, according to Gerszberg, justified the lower offer price, including that Hampshire had missed its projections, which had been provided to NAF only two months earlier, by $3 million. (Id.)  NAF did not provide a copy of the Feb. 13 letter to Trading (Hay Decl. Ex. H (Gerszberg Dep.) 265:4-19), and there is no evidence that NAF otherwise provided notice to Trading that such a significant drop in projected sales had occurred.  (Hay Decl. Ex. H (Gerszberg Dep.) 264:9-265:3.)

In addition, Trading subsequently discovered that NAF was aware of other information concerning Hampshire's deteriorating financial condition which evidenced a material adverse change, but which NAF never disclosed to Trading.  In particular:

(1)     On or about February 5, 2009, NAF was advised by Hampshire that its operational loss for the year ending December 31, 2008 would increase to $6.1 million (Hay Decl. Ex. H, Def. Ex. 42 at 10; Hay Decl. Ex. H (Gerszberg Dep.) 285:19-24);

(2)     On or about February 5, 2009, Hampshire advised NAF that Hampshire was potentially in breach of certain covenants under its credit facility (Hay Decl. Ex. H, Def. Ex. 42 at 16; Hay Decl. Ex. H (Gerszberg Dep.) 292:22-293:19);

(3)     NAF received draft financial statements from Hampshire in early February 2009 showing a larger than expected net loss by Hampshire for 2008 (Hay Decl. Ex. H, Def. Ex. 60 at 11265; Hay Decl. Ex. H (Gerszberg Dep.) 389:14-23); and

(4)     In February 2009, NAF was told by Hampshire that its total assets for 2008 were $122,165,000 (Hay Decl. Ex. H, Def. Ex. 60 at 11265) which was a substantial reduction from Hampshire's earlier estimate of $136,018,000 (Hay Decl. Ex. H, Def. Ex. 36 at 1106; Hay Decl. Ex. H (Gerszberg Dep.) 192:9-14).

On or about February 23, 2009, NAF Subsidiaries entered into a merger agreement with Hampshire ("Merger Agreement").  (See Hay Decl. Ex. H, Def. Ex. 27 at 1.)  The Merger Agreement included a number of representations, including that there was a $40 million loan commitment from Wells and a sourcing agreement between NAF and Trading.  (Id. §5.6(e).)  NAF, however, was not a party to the Merger Agreement.  (Id. at 1.)  The per share price for the tender offer was $5.55, which equates to a price of $30,353,865 for all shares of Hampshire.

After NAF advised Trading that the Merger Agreement had been executed, Trading began due diligence relating to how it would take over Hampshire's sourcing operations, assuming the acquisition closed.  (Hay Decl. Ex. I (Compagnon Dep.) 133:4-20; See generally, Hay Decl. Ex. I (Compagnon Dep.), Pl. Ex. 20.)  In March of 2009, NAF provided Trading with information concerning Hampshire's financial condition and the projections for its business after the acquisition.  (Hay Decl. Ex. H (Gerszberg Dep.) 293:25-294:22; Hay Decl. Ex. H, Def. Ex. 43.)  That information evidenced a significant deterioration in Hampshire's financial condition compared with the Hampshire financial information NAF had provided to Trading prior to the BAA negotiation, including information that Hampshire's financials for 2008 had declined drastically.  Specifically, the information showed for 2008 a net loss of $29,897,000 for Hampshire.  (Hay Decl. Ex. H, Def. Ex. 43 at 0464, 0475.)  In addition, NAF provided projected gross sales information for a twelve month period, which showed a projected decline of over $15 million in sales compared with the projections NAF had provided Trading in November 2008.  (Compare Hay Decl. Ex. H, Def. Ex. 8 at 1507 (projected total gross sales of approximately $245,840,000) with Hay Decl. Ex. H, Def. Ex. 43 at 0471 (projected total gross sales of

8

approximately $230,385,000).)

Given this significant deterioration in financial circumstances, on March 23, Trading sent NAF an email requesting certain security.  (Hay Decl. Ex. H (Gerszberg Dep.) 317:8-17; Hay Decl. Ex. J, Pl. Ex. 11.)  Among other things, Trading asked for a cash deposit of $5 million and a standby letter of credit, opened in Trading's favor, in the amount of $11.5 million.  (Hay Decl. Ex. J, Pl. Ex. 11 ¶¶1, 5(i).)[5]  NAF responded two days later by email, in which it insisted that Trading perform its obligations under the BAA without NAF providing any of the security requested by Trading.  (Hay Decl. Ex. H (Gerszberg Dep.) 343:4-344:14; Hay Decl. Ex. H, Def. Ex. 51.)  NAF refused to provide the security requested by Trading.  (Id.)  On March 30, Trading ended its relationship with NAF, effectively terminating the BAA.  (Hay Decl. Ex. H (Gerszberg Dep.) 346:17-347:13; Hay Decl. Ex. I, Pl. Ex. 26 at 45; Hay Decl. Ex. I (Compagnon Dep.) 213:24-215:5.)[6]

After Trading's relationship with NAF ended, NAF continued, unabatedly, making merger-related arrangements.  Under the Merger Agreement, the expiration date to acquire Hampshire's shares was March 27, 2009.  (Hay Decl. Ex. H (Gerszberg Dep.) 363:7-25; Hay Decl. Ex. H, Def. Ex. 52.)  As of that date, an insufficient number of Hampshire's outstanding shares had been tendered for the merger to go forward.  (Hay Decl. Ex. H (Gerszberg Dep.) 364:13-19; Hay Decl. Ex. H, Def. Ex. 52.)  The expiration date of the offer was extended first

---

[5] The $11.5 million standby letter of credit was to secure letters of credit to approximately one-third of Hampshire's vendors for projected orders of $35 million, while the $5 million cash deposit was to secure $13 million in existing letters of credit NAF wanted Trading to issue.  (See Hay Decl. Ex. I, Pl. Ex. 21 at 0781; Hay Decl. Ex. I (Compagnon Dep.) 175:13-176:3.)

[6] Although not relevant for purposes of this Motion, at that same time, Trading became aware that NAF had otherwise breached the BAA by secretly meeting with the Hampshire factories and entering into agreements with those factories excluding Trading from the transactions with the factories, in violation of the exclusivity provision of the alleged BAA.

until March 31 and then until April 17.[7]  (Hay Decl. Ex. H (Gerszberg Dep.) 367:6-14; Hay Decl.

Ex. H, Def. Ex. 54.)  As of April 17, sufficient shares had been tendered, but Hampshire had

insufficient cash on hand to complete the transaction pursuant to the terms of the Merger

Agreement.  (Hay Decl. Ex. H (Gerszberg Dep.) 367:17-370:12; Hay Decl. Ex. H, Def. Ex. 55,

Hay Decl. Ex. H, Def. Ex. 27 §9.1(89), Annex I §I(b).)  At that time, the NAF Subsidiaries

agreed to extend the tender offer yet again, until April 24.  (Hay Decl. Ex. H (Gerszberg Dep.)

367:22-369:24; Hay Decl. Ex. H, Def. Ex. 55.)

In connection with this last extension, on April 20, 2009, the Merger Agreement was

amended ("Amendment") in various respects.  (Hay Decl. Ex. H (Gerszberg Dep.) 371:23-

372:12; Hay Decl. Ex. H, Def. Ex. 56.)  Of pertinence here, the Amendment reaffirmed all

representations by the NAF Subsidiaries, as of the date of the Amendment, relating to the

subsidiaries' financing commitments, except the representation that a sourcing agreement with

Trading was in full force and effect.  (See Hay Decl. Ex. H, Def. Ex. 56 §1; Hay Decl. Ex. H,

Def. Ex. 27 §§5.6(a)-(f).)  The NAF Subsidiaries also represented that (even though Trading was

no longer going to be Hampshire's buying agent post-acquisition), they knew of no fact or

circumstance that would lead them to believe that they would be unable to get financing from

Wells.  (Hay Decl. Ex. H (Gerszberg Dep.) 378:16-22; Hay Decl. Ex. H, Def. Ex. 56 §1; Hay

Decl. Ex. H, Def. Ex. 27, §5.6(d).)[8]

In fact, Gerszberg was able to obtain financing from Wells, notwithstanding the fact that

Trading was no longer going to be Hampshire's buying agent.  (Hay Decl. Ex. H (Gerszberg

---

[7] The tender offer was extended -- twice -- on March 30, 2009.  The first extension extended the tender offer until March 31, 2009; the second revised the expiration time contained in the first, extending the time until 5 p.m.  (See Hay Decl. Ex. D at 4.)

[8] The termination date of the Merger Agreement was also changed, from June 23, 2009, to April 26, 2009.  (Hay Decl. Ex. H (Gerszberg Dep.) 369:9-370:24; Hay Decl. Ex. H, Def. Ex. 56 ¶2(c).)

10

Dep.) 376:5-377:4, 410:18-24, 415:18-417:7, 424:6-8, 504:10-505:8; Hay Decl. Ex. H, Def. Ex. 75 at 1.)  In April 2009, Gerszberg submitted a financing proposal to Wells seeking a $40 million loan commitment without participation by Trading in the transaction.  (See Hay Decl. Ex. H (Gerszberg Dep.), Def. Ex 74 at 3842-44.)  To replace Trading's industry expertise, Gerszberg recruited an individual named Ruby Azrak who was an "operator" in the apparel business.  (Hay Decl. Ex. H (Gerszberg Dep.) 482:4-13, 484:5-25; Hay Decl. Ex. H, Def. Ex. 74 at 3844; Hay Decl. Ex. H, Def. Ex. 75 at p. 2 of 6.)  To replace the financing terms that, according to NAF, Trading had agreed to provide, Gerszberg convinced Hampshire's suppliers to provide 60 day open order terms directly to Hampshire (Hay Decl. Ex. H (Gerszberg Dep.) 487:10-488:4, 490:4-7; Hay Decl. Ex. H, Def. Ex. 74 at 3830-41), and to release some of the letters of credit Hampshire had issued.  (Hay Decl. Ex. H (Gerszberg Dep.) 354:4-356:18).

On April 24, Wells informed NAF that the financing (without Trading's involvement) was approved and Wells was ready to close the deal.  (Hay Decl. Ex. H (Gerszberg Dep.) 507:9-509:20; Hay Decl. Ex. H, Def. Ex. 76 at 5.)  Wells advised NAF, however, that due to Hampshire's deteriorating financial condition, it would require NAF to provide side collateral and pay a higher rate on the credit facility than originally contemplated.  (Hay Decl. Ex. H, Def. Ex. 76 at 10, Apr. 24, 2009, email from Peter Austin to Efrem Gerszberg.)  Wells's loan approval is established not only by the contemporary documents (Hay Decl. Ex. H, Def. Ex. 76 at 4, 5, 10, 27) but also by sworn testimony of Peter Austin, the account executive at Wells who acted as liaison between Wells and Gerszberg concerning the loan commitment.  (Hay Decl. Ex. G ¶¶4-8.)

Despite having received all of the financing commitments it needed to complete the acquisition of Hampshire and securing all other aspects of the transaction, NAF terminated the

11

Merger Agreement two days later, on April 26.  (Hay Decl. Ex. H (Gerszberg Dep.) 382:8-17;

Hay Decl. Ex. H, Def. Ex. 57.)  At the time, Gerszberg unequivocally stated in several written

communications that the reason for the termination was Hampshire's breach of certain covenants

set forth in the Merger Agreement and Hampshire's eroding financial condition; he never

mentioned the alleged breach by Trading of the BAA in any of these communications.

> -- First, by letter dated April 26, 2009, written on behalf of the NAF Subsidiaries,
> Gerszberg informed Hampshire that the NAF Subsidiaries terminated the Merger
> Agreement "as a result of" one or more material breaches of covenants set forth in the
> Merger Agreement that were not curable by Hampshire's exercise of reasonable efforts
> prior to the date of the closing of the tender offer.  (See Hay Decl. Ex. H, Def. Ex. 57.)

> -- Second, in a Securities and Exchange Commission ("SEC") filing dated May 20, 2009
> (the "SEC Filing"), the NAF Subsidiaries stated that the reasons for terminating the
> Merger Agreement were that Hampshire had breached certain covenants contained in the
> Merger Agreement including the covenant that there would not be a "Company Material
> Adverse Effect," and the material deterioration of Hampshire's financial condition, which
> made the transaction "unattractive" to the Purchaser.  (Hay Decl. Ex. H, Def. Ex. 60 at
> 11264-65.)

> -- Third, NAF threatened to commence a lawsuit against Hampshire for breach of the
> Merger Agreement and, in fact, collected a settlement payment from Hampshire in
> satisfaction of its threatened claims.  (See Hay Decl. Ex. H, Def. Ex. 63; Hay Decl. Ex.
> H, Def. Ex. 64; Hay Decl. Ex. H (Gerszberg Dep.) 419:5-22, 424:13-425:21.)  In its draft
> complaint against Hampshire, which served as a basis for settlement with Hampshire,
> NAF alleged, inter alia, (a) breaches of the Merger Agreement by Hampshire (Hay Decl.
> Ex. H, Def. Ex. 63 ¶¶74-82), (b) Hampshire's fraudulent inducement of NAF to enter into
> and terminate the Merger Agreement based on the allegedly false financial information
> provided by Hampshire to NAF (id. ¶¶83-106), and (c) Hampshire's defamation of NAF
> and Gerszberg by publishing a statement that NAF's attempt to terminate the Merger
> Agreement was caused by NAF's lack of financing (which statement, NAF maintained,
> was false) (id. ¶¶107-113).

Gerszberg has also testified as NAF's 30(b)(6) witness that NAF could have closed on

the Merger Agreement if it chose to do so.  (Hay Decl. Ex. H (Gerszberg Dep.) 416:11-417:22,

430:24-431:19.)  Gerszberg further testified that although Hampshire's alleged breaches of the

Merger Agreement were the legal reasons that allowed NAF to terminate the agreement, NAF

also had business reasons for not consummating the deal.  (Hay Decl. Ex. H (Gerszberg Dep.)

394:20-397:16.)

On September 28, 2009, the NAF Subsidiaries and Gerszberg settled their claims against Hampshire by concluding a settlement agreement ("Settlement Agreement").  (See Hay Decl. Ex. H, Def. Ex. 64.)  Pursuant to the Settlement Agreement, Hampshire paid the NAF Subsidiaries $833,000 in exchange for a release by Gerszberg and these entities (and NAF) of all claims against Hampshire and an agreement by the NAF Subsidiaries and Gerszberg (but not NAF), not to sue any person involved in the anticipated merger transaction.  (See Hay Decl. Ex. H, Def. Ex. 64 at 13810 (§1), 13811 (§2), 13813 (§7).)

After successfully extracting over $800,000 from Hampshire, NAF set its sights on Trading by commencing this action, now claiming that the reason the acquisition did not close was not Hampshire's breaches -- as it had previously maintained -- but instead Trading's alleged breach of the BAA.

Other than the report and testimony of its damage expert, NAF has not proffered any evidence of damages.  (Hay Decl. Ex. L ¶2.)  NAF's damage expert asserts that the damages incurred by NAF as a result of the failed acquisition are approximately $49 million, based on a determination of the value of Hampshire to NAF, taking into account the acquisition cost.[9]  (Hay

_____

[9] In essence, NAF's expert determined that the value of Hampshire to NAF was $83 million which, after deducting $34 million as acquisition costs, yielded damages of $49 million. (See Hay Decl. Ex. K (Pfeiffer Dep.) 79:8-80:6; Hay Decl. Ex. E at 27.)  Trading disputes NAF's expert's valuation of Hampshire which is over 2.5 times the purchase price for Hampshire agreed to by the parties to the Merger Agreement.  In contrast, Trading's expert applied a fair market analysis in valuing Hampshire, which yielded a value for Hampshire of approximately $30 million (Hay Decl. Ex. F ¶ 30), which is consistent with the value that the parties to the Merger Agreement ascribed to Hampshire (e.g., Hay Decl. Ex. F ¶30 (showing purchase price of $30,054,032 based on 5.469 million shares at $5.55 per share)); and the valuation analysis performed by an independent third party hired by the Hampshire Board to do a "fairness opinion," which found the tender offer price to be "fair" for the shareholders (Hay Decl. Ex. H, Def. Ex. 42 at 15, 19-23, B1-B2).  Based upon a valuation for Hampshire of approximately $30 million, and taking into account the acquisition costs, neither NAF (nor NAF Acquisition)

Decl. Ex. E at 27; Hay Decl. Ex. K (Pfeiffer Dep.) 79:8-80:6.)  Significantly, NAF's expert did not distinguish between the damage to NAF and the damage to the NAF Subsidiaries.  For his purposes, it did not matter; the damages were the same.  (Hay Decl. Ex. K (Pfeiffer Dep.) 65:7-68:15.)

## III.  ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a disputed issue of material fact.  Celotex v. Catrett, 477 U.S. 317, 323 (1986); see also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  Once such a showing has been made, the non-moving party must come forward with specific facts showing that there is a genuine issue of fact for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

On a summary judgment motion, all inferences and ambiguities are resolved in the non-movant's favor.  Gallo v. Prudential Servs. Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).  The moving party's burden is satisfied, however, if it can point to an absence of evidence to support an essential element of the non-moving party's claim. Where reasonable minds could not differ as to the import of the proffered evidence, summary judgment is proper.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250-51 (1986) (noting summary judgment standard mirrors a directed verdict standard).  Moreover, "conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."  Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.

---

would have incurred any damage based on the failure to acquire Hampshire.  Trading intends to address the issues relating to NAF's expert's analysis at a later time, if necessary.

1996) (citing <u>W. World Ins. Co. v. Stack Oil Inc.</u>, 922 F. 2d 118, 121 (2d Cir. 1990)).

Further, not every disputed factual issue is material in light of the substantive law

governing the case.  Instead, "[o]nly disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."  <u>Anderson</u>, 477

U.S. at 248.  Moreover, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  <u>Matsushita Elec.</u>, 475 U.S. at 586.  To withstand a

summary judgment motion, sufficient evidence must exist as would allow a reasonable jury to

return a verdict for the non-movant.

**B.**     **The Action Should be Dismissed Because Plaintiff Cannot Prove That Trading**
        **Caused Plaintiff's Alleged Injury**

NAF's ability to prove that Trading caused its alleged injury is a prerequisite to

establishing standing under Article III of the Constitution as well as an essential element of

NAF's breach of contract cause of action.  Because NAF cannot prove that Trading's termination

of the BAA caused the failure to complete the acquisition of Hampshire, NAF's claim should be

dismissed both for lack of standing and for failure to state a claim.

1.     <u>Plaintiff Lacks Article III Standing to Assert Its Claim</u>

Under Article III of the U.S. Constitution, standing is a precondition to federal subject

matter jurisdiction.  <u>In re United States Catholic Conference</u>, 885 F.2d 1020, 1023 (2d Cir.

1989).  To assert standing, a plaintiff must demonstrate that it (i) has suffered a personal injury

or threat of injury; (ii) the injury fairly can be traced to the action challenged; and (iii) the injury

can be redressed through the requested relief.  <u>Northeastern Fla. Chapter of the Associated Gen.</u>

<u>Contractors of Am. v. City of Jacksonville</u>, 508 U.S. 656, 663-64 (1993); <u>Lujan v. Defenders of</u>

<u>Wildlife</u>, 504 U.S. 555, 560 (1992).

More specifically, to establish standing a plaintiff must prove a "'fairly traceable'

15

connection between the asserted injury-in-fact and the alleged actions of the defendant." W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008). An injury that is either self-inflicted or caused by a third party affords no basis for standing. Allen v. Wright, 468 U.S. 737, 757 (1984) (finding that "[t]he line of causation between [] conduct [and alleged injury] is attenuated at best [] and results from the independent action of some third-party not before the court") (internal quotations omitted); see also, Diamond v. Charles, 476 U.S. 54, 70 (1986) (fees awarded against plaintiff, who chose to intervene in lawsuit, did not confer standing to appeal). Consequently, federal courts do not hesitate in dismissing such legally insufficient claims.

By way of example, this Court's decision in Union Cosmetic Castle Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62 (E.D.N.Y. 2006), is particularly instructive. In that case, the Court found that the plaintiffs lacked standing to assert claims because the plaintiffs' injury was "largely the result of their own business decisions." Id. at 71. In doing so, the Court reasoned:

> The plaintiffs' allegations clearly indicate that they were given several opportunities, beginning in 2004, to enter into the exclusive dealing agreements proposed by the [] Defendants. Their free choice to reject the [] Defendants' offer, presumably made under the belief that doing so would best protect the plaintiffs' business interests, acts as an intervening cause of the plaintiffs' present commercial woes. Article III of the federal Constitution does not grant the plaintiffs access to the federal courts in order to second-guess their poor business judgment.

Id.; see also, Taylor v. Fed. Deposit Ins. Co., 132 F.3d 753, 766 (D.C. Cir. 1997) (employee lacked standing to bring an action for reinstatement against the former employer as he voluntarily terminated his own employment); Ziemba v. Rell, 409 F.3d 553, 555 (2d Cir. 2005) (no standing where alleged injury was "'highly indirect' and result[ed] from both the plaintiffs' own actions and the independent actions of third parties not before the court"); Arar v. Ashcroft,

16

532 F.3d 157, 191 (2d Cir. 2008) (injury claimed not "fairly traceable" to conduct complained of by plaintiff), aff'd in relevant part, 585 F.3d 559, 563 (2d Cir. 2009).

In this case, the constitutionally required showing of "causation" is not satisfied.  NAF's complained-of injury (loss sustained as a result of the termination of its acquisition of Hampshire), is **not** a fairly traceable result of the complained-of conduct of Trading (the alleged breach of the BAA).

Indeed, following the termination of the BAA, all parties directly involved in the Merger Transaction demonstrated their intention to proceed with the Merger Transaction despite the termination of the BAA, by taking affirmative steps to complete the transaction in the absence of Trading's participation.  As a result, NAF could have consummated the transaction if it chose to do so, but instead it voluntarily decided not to proceed with the acquisition, as demonstrated by the following uncontested facts:

> First, following the termination of the BAA, NAF demonstrated its intent to proceed with the Merger Transaction by voluntarily agreeing to extend the expiration date of the tender offer on several occasions, and by modifying the terms of their tender.  (See pp. 9-10 above.)

> Second, Gerszberg arranged for various individuals and entities to substitute for Trading in the transaction.  For example, he arranged for a substitution of the apparel industry expertise that Trading would have offered and directly arranged for Hampshire's vendors to provide Hampshire the 60 day terms that NAF alleges Trading had agreed to provide.  (See p. 11 above.)

> Third, on April 20, 2009, NAF and Hampshire amended the Merger Agreement, which, inter alia, eliminated any representation that a sourcing agreement with Trading still existed, further confirming that neither NAF nor Hampshire believed that Trading's participation in the Hampshire acquisition was necessary for the deal to go forward.  (See p. 10 above.)

> Fourth, on April 24, 2009, Wells confirmed its willingness to finance the transaction without Trading's involvement.  (See p. 11 above.)

> Fifth, NAF's 30(b)(6) witness testified that NAF had obtained the financial commitment required to close the transaction.  (See p. 12 above.)

Sixth, in spite of having every opportunity to proceed with the merger, on April 26, 2009, the NAF Subsidiaries notified Hampshire of their termination of the Merger Agreement.  (See pp. 11-12 above.)  In their April 26, 2009 letter to Hampshire, they justified termination because of "one or more material breaches of covenants and agreements on the part of [Hampshire]."  (Hay Decl. Ex. H, Def. Ex. 57.)

Seventh, in the SEC Filing made by the NAF Subsidiaries on May 20, 2009 (less than a month after the voluntary termination), Gerszberg swore that the acquisition was terminated because of Hampshire's breaches of the Merger Agreement "and because the financing of the transaction became unattractive to Purchaser as a result of the material deterioration of the financial condition of Hampshire . . . ."  (Hay Decl. Ex. H, Def. Ex. 60 at 11265; see p. 12 above.)  No mention was made of Trading's alleged breach/termination of the BAA as a basis for termination of the Hampshire acquisition.

Based upon the above, NAF cannot prove that Trading caused the termination of the Merger Agreement.  For that reason, NAF does not have Article III standing to bring its claim.

2.      The Complaint Should be Dismissed Because It Fails to State a Claim

In addition to being required to establish standing, causation is also an essential element of a claim for damages resulting from breach of contract.  Damages must be "directly and proximately caused" by the breach.  Nat'l Mkt. Share Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (citing Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209 (1886)).  They must not "be so remote as not to be directly traceable to the breach, or . . . the result of other intervening causes."  Id. at 526 (citation omitted).  Further, the fact that damages were caused by the breach must be "reasonably certain."  Tractebel Energy Mktg. Inc. v. AEP Power Mktg. Inc., 487 F.3d 89, 110 (2d Cir. 2007) (citation omitted).

In particular, courts will not hold a defendant liable for plaintiff's loss where a plaintiff's own acts or business decisions were the proximate cause of its loss.  E.g., Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 50 (2d Cir. 2011) (affirming judgment at bench trial to dismiss breach of contract claim because court below had found that plaintiff's "own actions and business decisions" constituted "an intervening cause of [plaintiff's] losses") (citation

18

omitted); <u>TD Waterhouse Investor Servs. Inc. v. Integrated Fund Servs. Inc.</u>, No. 01 Civ. 8986, 2005 U.S. Dist. LEXIS 5, at *19 (S.D.N.Y. Jan. 3, 2005) (after bench trial, court concluded that plaintiff not allowed to "foist" the cost of its business decision, reached after "weigh[ing] the costs and benefits of each possible solution," on defendant), <u>aff'd</u>, <u>Nat'l Investor Servs. Corp. v. Integrated Fund Servs. Inc.</u>, 145 F. App'x 696 (2d Cir. 2005); <u>see also</u> <u>Nat'l Mkt. Share</u>, 392 F.3d at 525 (upholding finding that, though defendant had breached, it could not be held liable for plaintiff's loss where intervening action of plaintiff's principal was cause of plaintiff's damages).

A defendant is entitled to judgment as a matter of law where the undisputed facts show that a defendant's act or omission was not the proximate cause of a plaintiff's alleged injury. <u>E.g.</u>, <u>Franconero v. Universal Music Corp.</u>, No. 02 Civ. 1963, 2011 U.S. Dist. LEXIS 15259, at *15-16 (S.D.N.Y. Feb. 11, 2011); <u>Allianz Ins. Co. v. Lerner</u>, 305 F. Supp. 2d 191, 197-98 (E.D.N.Y. 2004), <u>aff'd in relevant part</u>, 416 F.3d 109 (2d Cir. 2005); <u>Mosca v. Normille</u>, 715 N.Y.S.2d 129, 130 (N.Y. App. Div. 4th Dep't 2000); <u>Massena Towne Center Assocs. v. Sear-Brown Group Inc.</u>, 680 N.Y.S.2d 349, 350 (N.Y. App. Div. 4th Dep't 1998).

Here, NAF cannot show that Trading's alleged breach of the BAA prevented the acquisition of Hampshire by the NAF Subsidiaries. Rather, as described at pp. 11-12 above, incontrovertible evidence demonstrates that NAF **voluntarily** walked away from the deal for its own business reasons. (<u>See</u> p. 11 above.) NAF could have completed the acquisition: it had the financial commitment to do so. (<u>See</u> p. 11 above.) Its withdrawal was the result of its **own business decision**. Like the plaintiffs in <u>Diesel Props</u> and <u>TD Waterhouse</u>, NAF is precluded as a matter of law from foisting the cost of its business decision on Trading. NAF's determination not to complete the acquisition of Hampshire even though it could have done so is an intervening

19

cause of the deal's termination, and, as a matter of law, Trading cannot be held accountable for losses allegedly incurred by NAF as a result.

**C.**     **The Complaint Should be Dismissed Because NAF Lacks Standing to Bring Claims for Damages Predicated on Injuries Suffered by a Subsidiary**

NAF's claim for breach of contract fails because it did not suffer any damages as a result of Trading's purported breach of the BAA.  Instead, NAF attempts to impute the purported damage its subsidiaries allegedly suffered as a result of the failed Hampshire acquisition to itself. That is simply not legally permissible.

A shareholder lacks standing to sue in its own right for injuries suffered by a subsidiary; instead, "the plaintiff must be injured directly or independently of the subject corporation" in order to sue individually.  Weinberger v. Lorenzo, No. 10692, 1990 Del. Ch. LEXIS 169, at *7 (Del. Ch. Oct. 11, 1990).  The rule precluding a parent corporation from asserting a claim that belongs to a subsidiary is based in the well-established principle that a parent corporation may not pierce the corporate veil set up for its own benefit.  See Boise Cascade Corp. v. Wheeler, 419 F. Supp. 98, 102 (S.D.N.Y. 1976), aff'd without opinion, 556 F.2d 554 (2d Cir. 1977).  A parent corporation cannot create a subsidiary corporation and then ignore the separate corporate existence of that subsidiary whenever that would be advantageous.  In re Beck Indus. Inc., 479 F.2d 410, 418 (2d Cir. 1973).

In two recent decisions, Tooley v. Donaldson, Lufkin, & Jenrette Inc., 845 A.2d 1031 (Del. 2004), and In re J.P. Morgan Chase & Co. Shareholder Litig., 906 A.2d 766 (Del. 2006), the Delaware Supreme Court set out the standard to be applied by courts when determining whether a claim is direct or derivative, and therefore, whether a shareholder has standing to bring that claim on its own behalf.[10]  Those decisions make clear that simply alleging the breach of a

---

[10] Whether a shareholder claim is direct or derivative -- and thus whether the shareholder

duty owed to a shareholder does not in and of itself confer standing on the shareholder to bring a direct claim. While the breach of a duty owed to the shareholder is necessary for a direct shareholder claim, it is not sufficient. The claim must also seek damages for an injury to the shareholder (i.e., NAF) that is <u>independent</u> of the harm suffered by the corporation (i.e., NAF Acquisition/NAF II). <u>See</u> <u>Tooley</u>, 845 A.2d at 1036; <u>J.P. Morgan</u>, 906 A.2d at 771-72.

In <u>Tooley</u>, the Delaware Supreme Court defined the precise standard for determining whether a claim can be brought by a shareholder directly:

> We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn <u>solely</u> on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

<u>Tooley</u>, 845 A.2d at 1033 (emphasis in the original). The Court elaborated:

> That is, a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder **and that he or she can prevail without showing an injury to the corporation.**

<u>Id.</u> at 1039 (emphasis added).

More recently, the Delaware Supreme Court in <u>J.P. Morgan</u> held that plaintiff shareholders of J.P. Morgan did not have standing to bring a claim against the company's

---

has standing to bring the claim on its own behalf -- is governed by state corporate law. <u>See</u>, <u>e.g.</u>, <u>Bartfield v. Murphy</u>, 578 F. Supp. 2d 638, 645 (S.D.N.Y. 2008) ("For the purposes of determining whether Plaintiffs have standing to bring a direct rather than an indirect, or derivative claim against Defendants for fraud, the law of the state of incorporation applies." (internal quotation marks omitted)). Under the internal affairs doctrine, which is recognized by both New York and federal choice-of-law rules, the law of the state of incorporation of the relevant corporation -- in this case, NAF Acquisition and/or NAF II -- controls. <u>See</u>, <u>e.g.</u>, <u>In re Stillwater Capital Partners Inc. Litig.</u>, No. 1:11-2275, 2012 U.S. Dist. LEXIS 47106, at *17-18 (S.D.N.Y. Apr. 3, 2012). All of the NAF companies were organized in Delaware, which means that this Court, in determining whether NAF has standing to bring its claims, should apply Delaware law.

directors for failing to disclose material information in seeking shareholders' approval to acquire Bank One -- specifically, that the bank could have been acquired for significantly less than was actually paid.  J.P. Morgan, 906 A.2d at 768-69.  The shareholders sued to recover the value of the premium paid for Bank One over the amount for which it could have been acquired.  Id.

The Chancery Court in J.P. Morgan acknowledged that plaintiffs had alleged a fiduciary duty owed directly by the director-defendants to the shareholder-plaintiff that would have been breached if plaintiffs' allegations were proven true.  In re J.P. Morgan Chase & Co. Shareolder Litig., 906 A.2d 808, 825 (Del. Ch. 2005).  Nevertheless, the Chancery Court held that the disclosure claim could not proceed:

> [T]he injury alleged in the complaint is properly regarded as injury to the corporation, not to the class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. . . .  **[T]he claim for actual damages, if there is one, belongs to the corporation and can only be pursued by the corporation, directly or derivatively.**

Id. at 826 (emphasis added).

The Delaware Supreme Court affirmed.  Endorsing the reasoning of the Chancery Court, it concluded that the shareholders were improperly conflating the issues of whether they had alleged a direct duty owed to them and whether the monetary damages they were seeking flowed directly from the alleged violation of that duty:

> To say it differently, what the plaintiffs are claiming -- implicitly but not straightforwardly -- is that where a disclosure violation arises from a corporate transaction in which the shareholders suffer a dilution of the economic and voting power of their shares, the shareholders automatically become entitled to recover the identical damages on their disclosure claim, that the corporation would be entitled to recover on its underlying (derivative) claim.

J.P. Morgan, 906 A.2d at 772-73.  The Delaware Supreme Court found this argument flawed. First, while the damages claimed had a logical relationship to the harm suffered by J.P. Morgan, the damages did not flow, logically or directly, from the injury alleged to the shareholders.  Id. at

22

773.  Second, there was no basis for conflating the shareholders' claim for violation of the duty of disclosure owed to them with the damages that flowed -- not from that tort -- but rather from the corporation's overpayment for Bank One.  Id.

Here, as in J.P. Morgan, NAF asserts a claim based on the breach of obligations allegedly owed to NAF (in this case, contractual obligations).  Under J.P. Morgan and Tooley, however, the alleged breach of an obligation owed to NAF is not sufficient to give NAF standing to bring a claim against Trading for losses that were suffered, if at all, by the NAF Subsidiaries.  NAF must also show that it suffered an injury independent of any injury suffered by its subsidiaries.

The only damage alleged by NAF in the instant case is based upon the loss of value of Hampshire arising from the failed acquisition.  NAF, however, was never going to own Hampshire so it cannot claim damage from the loss of the company; under the Merger Agreement it was NAF Acquisition that would purchase Hampshire.  Because NAF can point to no damage suffered by NAF that is independent of any harm allegedly suffered by the NAF Subsidiaries, it lacks standing to bring this claim against Trading and the Complaint must be dismissed.[11]

## D.    The Complaint Should be Dismissed Because Trading Properly Terminated the BAA

While Trading disputes whether the BAA ever came into effect and became binding on Trading, even assuming that it did, Clause 14 of the BAA grants Trading the unconditional right to terminate the BAA with immediate effect if, at any time, NAF breaches any of its obligations under Clause 8 of the BAA.  (See pp. 5-6 above.)  As demonstrated below, NAF breached Clause 8 of the BAA, thereby justifying immediate termination of the BAA by Trading.

---

[11] Nor can NAF claim damages based upon a reduction in value of its subsidiaries.  First, there is no evidence of such loss.  Second, the reduction in value of those subsidiaries is not sufficient as a matter of law.  See J.P. Morgan, 906 A.2d at 772.

Under New York law, a "written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." Woodland Designs PLC v. Nautica Apparel Inc., No. 11 Civ. 4708, 2012 U.S. Dist. LEXIS 17108, at *5 (S.D.N.Y. Feb. 10, 2012) (internal quotation marks and citation omitted). In particular, a contract giving one party the right to terminate will be enforced according to its language. Id. at *6; see also Silveira Indus. Ltd. v. Actus Lend Lease LLC, No. 7:06-Civ-265, 2008 U.S. Dist. LEXIS 104127, at *15 (N.D.N.Y. Dec. 24, 2008) (summary judgment in favor of defendant is appropriate where defendant validly terminated parties' agreement under its express terms).

Here, one of NAF's obligations under Clause 8 was to adjust the payment terms of the BAA, including providing an irrevocable standby letter of credit, if, in Trading's "sole discretion," there was a Material Adverse Change in Hampshire's business.[12] As discussed at pp. 8-9 above, a Material Adverse Change in Hampshire's business did occur which would have a concomitant impact on NAF's prospects for acquiring and successfully operating Hampshire. Indeed, NAF stated in its sworn SEC Filing that a material adverse change to Hampshire's business had occurred, thereby justifying its termination of the tender offer relating to the acquisition of Hampshire. Further, when Trading asked NAF to provide Trading with additional security, as Clause 8.3.4 of the BAA entitled it to do, NAF refused. That refusal gave Trading the right to terminate the BAA with immediate effect pursuant to Clause 14.4 of the BAA. (See

---

[12] "Agreements conferring upon one party an indefinite right to condition performance upon a determination that is based on an act of personal discernment or sole discretion are uniformly upheld -- subject to a duty on the part of the party so empowered to exercise honest judgment -- if the contract as a whole unambiguously expresses the parties' intent to grant such unilateral, subjective authority consistent with their justified expectations and the subject matter and common purpose of their bargain." Mickle v. Christie's Inc., 207 F. Supp. 2d 237, 246 (S.D.N.Y. 2002).

Hay Decl. Ex. A cl. 8.3.4, 14.4.)

In addition, NAF breached its obligations under Clause 8.3.5 to promptly notify Trading of any situation which would provide reasonable grounds that a Material Adverse Change had occurred.  As described more fully at pp. 7-8 above, in February 2009, NAF received information from Hampshire that clearly demonstrated a significant erosion to Hampshire's business and financial condition.  NAF was informed by Hampshire that its projected revenues for 2008 and 2009 were being substantially reduced; that Hampshire would be experiencing a significantly larger operating loss for 2008; that Hampshire's assets for 2008 would be less than projected; and that Hampshire was potentially in violation of its commitment under its credit facility.  This information was not promptly disclosed to Trading; indeed, in most cases it was never disclosed.  Such failure to promptly disclose was in clear breach of NAF's obligations under Clause 8.3.5.  This additional breach gave Trading the right to terminate the BAA pursuant to Clause 14.4 of the BAA.  (See id. cl. 8.3.5, 14.4.)

## CONCLUSION

For the reasons stated above, summary judgment should be granted Trading, and NAF's claim against Trading dismissed with prejudice.

Dated:     August 15, 2012
           New York, New York

                         Respectfully submitted,

                         SALANS LLP
                             Rockefeller Center
                             620 Fifth Avenue
                             New York, NY 10020-2457
                             (212) 632-5500


                         By:  /s/ John J. Hay
                             John J. Hay
                             *Attorneys for Defendant Li & Fung (Trading) Limited*

                              25