UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NAF HOLDINGS, LLC,                          :
                                            :
                    Plaintiff,              :      1:10 – CV-05762 - PAE
                                            :
         v.                                 :
                                            :
LI & FUNG (TRADING) LIMITED,                :
                                            :
                    Defendant.              :

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**WRIGHT & REIHNER, P.C.**
George A. Reihner
148 Adams Avenue
Scranton, PA 18503
(570) 961-1166

and

**HALPERIN & HALPERIN, P.C.**
Steven T. Halperin
18 East 48th Street - Suite 2200
New York, NY  10017
(212) 935-2600


Attorneys for Plaintiff NAF Holdings, LLC

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………ii, iii

I.    SUMMARY OF ARGUMENT. ………………………………………………1

II.   STATEMENT OF FACTS…………………………………………………2

III.  ARGUMENT…………………………………………………………16

    A.    A Jury Can Easily Conclude That Trading Caused NAF's Injuries…………16

    B.    NAF Has Standing To Assert Its Breach of Contract Claim Against Trading.23

    C.    NAF Did Not Breach, And Trading Did Not Properly Terminate, The BAA.26

IV.   CONCLUSION………………………………………………………….30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39 (2d Cir. 2005) .......... 29

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.*, 727 F. Supp. 2d 256 (S.D.N.Y. 2010) ................................................................................................. 18

*Astra Oil Trading NV v. PRSI Trading Co. LP*, 794 F. Supp. 2d 462 (S.D. N.Y. 2011) ................................................................................................................ 25

*Bernstein v. Mount Ararat Cemetery, Inc.*, 2012 U.S. Dist. LEXIS 127633 (E.D.N.Y. Sept. 7, 2012) ................................................................................... 17

*Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273 (2008) .............. 22

*Corallo v. Merrick Central Carburetor, Inc.*, 733 F.2d 248 (2d Cir. 1984) ..................... 29

*DMJ Associates, LLC v. Capasso*, 288 F. Supp. 2d 262 (E.D.N.Y. 2003) ....................... 22

*Diesel Properties S.R.I. v. Greystone Business Credit II LLC*, 631 F.3d 42 (2d Cir. 2011) ....................................................................................................... 20

*Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59 (1978) .............. 22

*Elandia International v. Ah Koy*, 2010 U.S. Dist. LEXIS 53193 (S.D. Fla. Feb. 22, 2010) ......................................................................................................... 25

*Hospital Authority of Rockdale County v. GS Capital Partners V Fund, L.P.*, 2011 U.S. Dist. LEXIS 5184 (S.D.N.Y. Jan. 20, 2011) ................................ 19

*Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250 (5th Cir. 1980) ......................................................................................................... 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................... 22

*Mary Jo. C. v. New York State and Local Retirement System*, 2011 U.S. Dist. LEXIS 49567 (E.D.N.Y. May 5, 2011) ................................................... 21

*Silveira Industries, Ltd. v. Actus Lend Lease, LLC*, 2008 U.S. Dist. LEXIS 104127 (N.D. N.Y. 2008) ................................................................................ 29

*Soundview Associates v. Town of Riverhead*, 2012 U.S. Dist. LEXIS 140963 (E.D.N.Y. Sept. 28, 2012) ............................................................................... 17

*Steger v. General Electric Co.*, 318 F.3d 1066 (11th Cir. 2003) ......................................25

*TD Waterhouse Investor Services, Inc v. Integrated Fund Serv., Inc.*, 2005 U.S. Dist. LEXIS 5 (S.D.N.Y. Jan. 3, 2005)..........................................................20

*U.S. Bank National Associate v. Ables & Hall Builders*,  696 F. Supp. 2d 428 (S.D.N.Y. 2010) ........................................................................17

*Union Cosmetic Castle, Inc. v. Amorepacific, Cosmetics USA, Inc.*, 454 F. Supp. 2d 62 (E.D.N.Y. 2006) .............................................................18

## STATE CASES

<u>*1000 Northern of New York Co. v. Great Neck Medical Assoc.*</u>, 7 A.D.3d 592, 593; 775 N.Y.S.2d 884, 884 (N.Y. App. Div. 2004) ....................................28

*Abiele Contr. v. New York City Sch. Construction Authority*, 256 A.D.2d 494, 682 N.Y.S.2d 419 (2d Dep't 1998) ...............................................................29

*Boston Concessions Group, Inc. v. Criterion Center Corp.*, 250 A.D.2d 435, 673 N.Y.S.2d 111 (1st Dep't 1998)..............................................................29

*Federated Associate v. Pergament Distributing, Inc.*, 240 A.D.2d; 659 N.Y.S.2d 1002 (N.Y. App. Div. 1997)  ..........................................................28

*Leon v. Lukash*, 121 A.D.2d 693, 694; 504 N.Y.S.2d 455, 455 (N.Y. App. Div. 1986) ........................................................................................27

*Lumbermens Mutual Casualty Co. v. Commonwealth of Pa.*, 856 N.Y.S.2d 499, 1 ( N.Y. Sup. Ct. 2008 ) .........................................................................25

## FEDERAL STATUTES

Fed.R.Civ.P. 17(a)………………………………………………………………25

Plaintiff NAF Holdings, LLC ("NAF"), by its undersigned counsel, respectfully submits this memorandum of law in opposition to the motion for summary judgment filed by Defendant Li & Fung (Trading) Limited ("Trading"). In addition to this memorandum, NAF also submits in opposition to Trading's motion the declaration of George A. Reihner, dated October 29, 2012 and NAF's counter-statement in response to Trading's Rule 56.1 statement of undisputed facts.

## I.  SUMMARY OF ARGUMENT

This is a breach of contract action between Trading and NAF, not Trading and a NAF affiliate. When Trading reneged on the valuable buying agency agreement it executed with NAF on December 15, 2008, a reasonable factfinder could determine that Trading did so to accommodate the interests of its affiliate, LF USA, Inc. ("LF USA"). Specifically, LF USA, a U.S.-based merger and acquisition company in the Li & Fung conglomerate, wanted to acquire Hampshire Group Ltd. ("Hampshire") despite the sworn testimony of LF USA's officers' to the contrary. Based on clear and unambiguous documentary evidence of record, the testimony of LF USA's officers regarding LF USA's 2009 interest in acquiring Hampshire was false. Moreover, a reasonable factfinder could determine that Trading reneged on the agreement for the express purpose of frustrating NAF and its affiliates' acquisition of Hampshire. As set forth more fully below, Trading's causation and standing-related arguments have no basis in law and are supported by alleged material facts which are both incomplete and disputed.

The meritless nature of Trading's motion, however, is best illustrated when Trading's argument that it terminated the agreement at issue because NAF suffered a Material Adverse Change is examined. To support its argument, Trading knowingly misrepresents the terms of the agreement at issue. More significantly, Trading relies on numerous factual assertions regarding Hampshire's financial decline to support its Material Adverse Change defense. Trading,

however, fails to advise this Court, that Trading's President was aware of Hampshire's declining financial condition in February, 2008 and he had no problem with same.

## II.  STATEMENT OF FACTS

In 2007 and 2008, Trading's affiliate, LF USA, Inc. ("LF USA") investigated and pursued Hampshire as a potential acquisition target. (GAR Dec., Ex G, 19:13-17).  At that time, Hampshire, a publicly-owned Delaware corporation, was a provider of women's and men's sweaters, wovens and knits, as well as a designer and marketer of branded apparel in the United States.   (GAR Dec., Ex P).   LF USA's Chief Operating Officer, Ronald Ventricelli ("Ventricelli"), testified that LF USA lost interest in Hampshire due, at least in part, to the fact that Hampshire was a public company with declining sales and was burdened by a costly, long term lease.  (GAR Dec., Ex G, 7:4-16; 21:2-6).  Ventricelli also testified that LF USA had no interest in Hampshire from that point in time until 2010 when Hampshire's President, Heath Golden, allegedly approached LF USA to determine whether LF USA had any interest in acquiring Hampshire.  (GAR Dec., Ex G, 78:12-25).   During that nearly two year period, Ventricelli testified that LF USA had no interest in and did not monitor or track Hampshire (GAR Dec., Ex G, 24:19-24).  As will be set forth more fully below, nothing could be further from the truth.

In the summer of 2008, NAF, through its managing principal, Efrem Gerszberg ("Gerszberg"), was also exploring the possibility of acquiring Hampshire.   As part of that process, Gerszberg approached Trading to determine if Trading would provide sourcing–related services for Hampshire.  (GAR Dec., Ex H, 47:8-25, 48:1-7; GAR Dec., Ex I, 47:14-25; GAR Dec., Ex K, 110:3-7; Ex N, N24; Ex O, O1).  By the time Gerszberg approached Trading, LF USA had allegedly rejected Hampshire as an acquisition target.  (GAR Dec., Ex G, 31-32:1-17).

On November 18, 2008, NAF and its advisors met with Trading's Executive Vice President, Marc Compagnon ("Compagnon") and his advisors, including LF USA President Richard Darling ("Darling") and Ventricelli to discuss Trading's interest in sourcing for Hampshire. This was the first meeting between and among the parties. (GAR Dec., Ex H, 45:11-25; 31:2-16; Ex N, N24). Prior to and at that meeting, Gerszberg made clear to Trading that NAF needed open, sixty (60) day terms for Hampshire's post-acquisition orders. (GAR Dec., Ex H, 33:1-16; 36:19-25; Ex O, O2; O4). Gerszberg also made clear that NAF needed Trading to replace Hampshire's existing letters of credit. (GAR Dec., Ex H, 33:1-16; 36:19-25). These financial terms were essential to NAF's business plan. (GAR Ex O, O5; O10). Specifically, to facilitate the purchase of the Hampshire shares, NAF intended to secure a bridge loan which NAF would re-pay the day following the merger utilizing Hampshire's excess cash. (GAR Dec., Ex H, 127:6-24). Then, to support Hampshire's post-merger operations, NAF intended to supplement Hampshire's cash on hand with a working line of credit. (GAR Dec., Ex H, 149:1-5; Ex O, O6). Ultimately, NAF secured a tender financing bridge loan commitment from Keba, LLC ("Keba") and a commitment for a $40 Million working line of credit from Wells Fargo Trading Capital ("Wells"). (GAR Dec., Ex H, 127:6-24; Ex O, O10). A sourcing agreement with Trading was a condition precedent to Wells' obligation to fund NAF's line of credit. (GAR Dec., Ex O, O3). Similarly, a commitment letter and agreement to fund by Wells was a condition precedent for Keba's funding of NAF's bridge loan. (GAR Dec., Ex Q). While Trading elected to characterize NAF's business plan as a "scheme" in its moving papers, Trading's self-serving opinion was baseless. As a condition of Wells and Keba lending to NAF, Wells and Keba required a solvency opinion for post-merger Hampshire. (GAR Dec., Ex Q).

Trading received a favorable solvency opinion from National Securities on or about March 26, 2009.  (GAR Dec., Ex M, ¶ 5).

At the November 18, 2008 meeting, Compagnon indicated that Trading could provide NAF with sixty (60) day open terms and that Trading would be willing to replace the letters of credit securing pre-merger Hampshire's factory orders.[1]  (GAR Dec., Ex H, 33:3-16; 36:19-25; 37:21-25; 38:1-23; Ex O, O3).  Shortly after that meeting, Gerszberg provided detailed financial projections to Trading.  Those projections were based on open, sixty (60) day terms.  (GAR Dec., Ex O, O4).  Hampshire never objected to, questioned or challenged NAF's projections being based on sixty (60) day open terms.  (GAR Dec., Ex M, ¶ 6).  In NAF's November, 2008 projections -- which were based on Hampshire's publicly available data -- NAF projected gross sales of $246 Million for post-merger Hampshire and net sales of $212 Million for 2009.  (GAR Dec., Ex O, O4).

In December 2008, NAF and Trading negotiated the terms of their buying agency agreement.[2]  (GAR Dec., Ex I, 49:5-25; 50:1-3; 82-87; GAR Dec., Ex H, 172: 23-25; 173:1-11; Ex O; O8; O9).  Those negotiations culminated on December 15, 2008 when Compagnon executed the BAA and, through his assistant, forwarded same to Gerszberg for execution.  One BAA was sent to Gerszberg by electronic mail in pdf format; the originals were sent by courier.  (GAR Dec., Ex H, 114:11-18; Ex N, N24).  Upon receiving the original BAAs from Compagnon, Gerszberg executed and returned same to Trading.  (GAR Dec., Ex H, 113:9-12).

---

[1] In contrast to Trading's March, 2009 posturing with NAF, Trading's willingness to provide sixty (60) day open terms to post-merger Hampshire was consistent with arrangements that Trading had with many of its customers. Trading's Executive Vice President of Finance and Accounting, Edward Yim ("Yim"), estimated that Trading had approximately 500 clients on open terms.   (GAR Dec., Ex J, 43:23-25; 44:1-25; 46:1-7; 97:17-24)  Moreover, Compagnon and Yim admitted that Trading would have had no problem obtaining sixty (60) day open terms from its factories for post-merger Hampshire orders.  (GAR Dec., Ex J, 45:2-7; Ex I, 26:2-18).

[2] Trading's sourcing agreements with clients are called buying agency agreements.  The buying agency agreement entered into by Trading and NAF in December, 2008 will be referred to herein as "BAA".

LF denies receipt of NAF's original signature BAAs.[3]  Trading's denial, however, was not asserted prior to the filing of this civil action.  Rather, Compagnon assumed Gerszberg had signed and returned the BAAs and indicated that he acted as if the BAA had been fully executed and returned.  (GAR Dec., Ex I, 64: 10-1; 65-66).

In the BAA, the terms of payment for Trading's sourcing services are contained in Clause 7.  With respect to any Hampshire orders pending before Trading commenced its role as Hampshire's buying agent, NAF agreed to provide Trading a fee equal to three percent (3%) of the FOB value of the Ordered Products.  (LF 858; GAR Dec., Ex H, 177:18-25; 178-182:8; Ex N, N7).  The only specifically-referenced obligation that Trading had to perform for those pending orders -- for sourcing services done in whole or in part by Hampshire -- was to replace or obtain releases of the existing Hampshire letters of credit.  (GAR Dec., Ex A, Clause 7.2.2(a)).  Had Trading wanted NAF to issue a standby letter of credit to secure Trading's replacement of Hampshire's pre-merger letters of credit, the obligation to do so would have been set forth in the BAA.  (GAR Dec., Ex J, 22:12-25).  The BAA, at Section 7.3 also provided NAF with sixty (60) day open terms,  with no obligation to provide Trading with a standby letter of credit. (GAR Dec., Ex H, 90:3-16, Ex N, N7).

In late December, 2008 through mid-January, 2009, NAF explored an outsourcing relationship with LF USA.  (GAR Dec., Ex G, 38:3-25; 39:1-23; 1412-1415; GAR Dec., Ex H, 100:8-25; 101:1-25; 102:1; Ex O, O1).  This relationship, if consummated, would have involved services by LF USA in addition to the sourcing services rendered by Trading under the BAA.

---

[3] As noted by Trading in its moving papers, the issue of whether the parties entered into a binding BAA is a question of fact.  With that said, Trading's contention that the BAA would not be binding until NAF acquired Hampshire cannot be reconciled with the express terms of the BAA that was prepared with respect to the exclusivity provision in the BAA, Section 23.  (GAR Dec., Ex A).  If, as Trading contends, the BAA only took effect upon NAF's successful merger with Hampshire, Section 23 of the BAA modifying the length of the exclusivity period contained therein would be meaningless.  The exclusivity provision has meaning only with respect to the time between the execution of the BAA and the acquisition of Hampshire, or lack thereof, by NAF.

During these discussions, NAF provided financial projections to Ventricelli which showed projected net sales for Hampshire of $198 Million.  (GAR Dec., Ex N, N31).  Although LF USA and NAF did not reach an agreement to provide the above-referenced outsourcing services, Compagnon, by email dated January 16, 2009, advised NAF that Trading would continue to support Hampshire's sourcing-related needs.  (GAR Dec., Ex N, N1).

By letter dated February 12, 2009, Wells Fargo confirmed its offer to be the sole and exclusive administrative agent for a $40 Million senior factoring and revolving credit facility for post-merger NAF.  (GAR Dec., Ex Q).  By this time, NAF also had a binding commitment from Keba, its bridge loan lender.  (GAR Dec., Ex Q).  In reliance on the aforementioned commitments, and NAF's executed BAA with Trading, NAF, through its wholly-owned affiliate, NAF Holdings 2, LLC ("NAF 2") and NAF 2's wholly owned NAF Acquisition Corp. entered into an Agreement and Plan of Merger ("Merger Agreement") with Hampshire, effective February 23, 2009.[4]  (GAR Dec., Ex O, O10).

In reliance on the financing commitments and the Merger Agreement, Gerszberg advised Trading that NAF anticipated taking over full operational control of Hampshire in approximately forty (40) days.  (GAR Dec., Ex N, N9).  In that email, Gerszberg advised Trading's Compagnon and Sean Coxall ("Coxall") that:

> Your contract and the commitment to us was a critical piece in assembling this deal with Wells Fargo and Hampshire.

(GAR Dec., Ex N, N9).  Trading never questioned, denied or challenged Gerszberg's representation that NAF and Trading had entered into the BAA.  (GAR Dec., Ex I, 63:13-25; 64:1-21).  Finally, in his February 24, 2009 email, Gerszberg advised Trading that Hampshire

---

[4] The Merger Agreement was announced to the investing public by Hampshire via a Form 8-K filed with the U.S. Securities and Exchange Commission the following day, February 24, 2009.  (GAR Dec., Ex Y).

was on track to have gross sales of $225 Million - $230 Million. (GAR Dec., Ex N, N9). Using the same formula that was utilized in NAF's November, 2009 projections, NAF's updated financials projected Hampshire's net sales to be in the range between $188 Million and $193 Million. (Id.). Trading received further confirmation of Hampshire's updated financial projections via Hampshire's March 3, 2009 14D-9 filing with the U.S. Securities and Exchange Commission wherein Hampshire projected net sales of $193 Million. (GAR Dec., Ex P).

In contrast to Ventricelli's sworn testimony that LF USA had no interest in Hampshire and was not monitoring Hampshire, on the very day that the Merger Agreement was publicly disclosed, February 24, 2009, Darling received an email from an investment banker through whom LF USA had completed numerous acquisitions indicating that "[n]ow that [Hampshire] is no longer public, it could be a future Li & Fung deal. We will keep our eye on it." (GAR Dec., Ex N, N10). Darling forwarded the email to Compagnon and Bruce Rockowitz ("Rockowitz"), Compagnon and Darling's boss, at 9:16 p.m. on February 24, 2009. (Id.). The press release attached to the email referenced an agreement between NAF and an international sourcing agent. (GAR Dec., Ex N, N10). Trading never disputed or otherwise challenged the sourcing relationship characterized in the press release. (GAR Dec., Ex M, ¶ 8).

Beginning on February 25, 2009, Trading's operational personnel began the process of transitioning Trading into Hampshire's buying agent. (GAR Dec., N, N23). Trading did not state or otherwise suggest to NAF that the BAA needed to be agreed upon or executed. (GAR Dec., Ex N, N11; GAR Dec., Ex M, ¶ 11). On March 13, 2009, Trading's finance and accounting department suggested that Trading's obligation to replace or obtain releases of Hampshire's existing letters be resolved as follows:

[t]he issue can be settled by getting an undertaking from Hampshire and
[Trading] issuing an undertaking to HSBC.[5]

Without a contractual obligation to do so, NAF agreed to provide the requested
undertaking -- a written promise to pay.    (GAR Dec., Ex H, 304:5-18).   NAF's lawyers
promptly forwarded drafts thereof to Trading.   (GAR Dec., Ex N, N4; N5).   Unfortunately for
Trading, HSBC US was unwilling to accept Trading and HSBC HK's offer to provide an
undertaking rather than a letter of credit.   Specifically, on March 17, 2009, Trading learned from
its contact at HSBC HK, Kenneth Chan, that HSBC US was expecting Trading to provide
standby letters of credit from HSBC HK to replace the letters of credit that HSBC US had issued
on behalf of Hampshire.   (GAR Dec., Ex N, N6).   Within thirty (30) minutes of Trading's receipt
of the foregoing email, Edward Yim ("Yim"), Trading's Senior Vice President, was advised by
his subordinate in the department, Ester Yuen ("Yuen"), that:

> "We never mentioned to issue standby LC to HSBC US, only
> undertaking from [Trading] will be given".

(GAR Dec., Ex N, N6; N12).   Yim adopted that position as well.   (GAR Dec., Ex J, 70:10-25;
71:1-21).   The problem with Yuen and Yim's position is the fact that Trading had expressly
agreed in December 2008 as follows:

> (a)     For purchase orders that were placed before the effective date of
> the Agreement, the Agent (Trading) shall perform the services and
> assume the responsibilities pursuant to terms of this Agreement
> (which will include the release of the current LC's or replacement
> of the existing LC's) in consideration for the Principal (NAF)
> paying a reduced buying commission equal to 3% of the sum of the
> FOB value of the Ordered Products.

---

[5] HSBC US was Hampshire's bank in the United States.   (GAR Dec., Ex P).   HSBC US had issued the letters of
credit which Trading was obligated to replace or obtain a release thereof.   HSBC HK was Trading's bank in Hong
Kong.   Because Yim had extensive experience dealing with HSBC HK, Compagnon brought Yim into the pending
transaction.   (GAR Dec., Ex J, 65:11-14).   Clearly, it was Trading's belief that the existing Hampshire letters of
credit issue could be resolved via undertakings without the need to post letters of credit.   (GAR Dec., Ex J, 63:11-
25; 64:1-25; 65:1-16; 54:9-25; 55:1-10).

(GAR Dec., Ex A, 7.2.2(a)).   Yim and Yuen's position was understandable given the fact that Compagnon never told them that Compagnon had an executed BAA with NAF requiring the foregoing.   (GAR Dec., Ex J, 55:7-25; 56:1-20).   In fact, Compagnon gave Yim an unexecuted version of the BAA and told him that a deal with NAF was still under study by Trading.   (GAR Dec., Ex J, 55:7-25; 56:1-20).   Yim believed that his work with respect to NAF was merely "a feasibility study".   (GAR Dec., Ex J, 72:19-25; 73:1-8; 91:11-18).

HSBC US's position created an issue for Trading.   During discovery, NAF learned that only Rockowitz or William Fung, the head of the Li & Fung organization, can approve a BAA wherein a new client is not going to provide a standby letter of credit to Trading for factory orders placed on the client's behalf.   (GAR Dec., Ex J, 80:14-25; 81:1-6).   However, Compagnon did not secure the consent of Rockowitz or Fung before executing the BAA with NAF.   (GAR Dec., Ex I, 36:1-25; 37; 38; 39:1-4).   For reasons then unknown to NAF, on March 19, 2009, Compagnon, in direct contradiction of the BAA, advised NAF that NAF would have to put up a standby letter of credit because:

> "Trading cannot put up a standby as we have no basis to take on risk (however small it may be) and would need probably the same collateral anyway."[6]

(GAR Dec., Ex N, N12).

In response to the March 19, 2009 email, Gerszberg placed a call to Compagnon wherein he advised Compagnon that the BAA obligated Trading to replace the letters of credit but did not obligate NAF to issue security to Trading.   (GAR Dec., Ex H, 308:22-25; 309:1-8).   Moreover, Gerszberg told Compagnon that NAF could not obtain or provide the requested standby letter of

---

[6] Compagnon's representation that Trading has no basis to "take on risk" is belied by two (2) significant realities. One, Trading signed a BAA and NAF in which it accepted the alleged risk in exchange for the payment set forth in Section 7.2.2(a).   Second, Trading routinely accepts risk by offering hundreds of client's open, unsecured terms. (GAR Dec., Ex J, 43:23-25; 44:1-22; 96:14-25; 97; 98; 99:1-22).   Trading also pays factories on behalf of customers and thereby incurs risk.   (GAR Dec., Ex J, 83:18-25; 84:1-21; 105:20-25; 106; 107; 108; 109:1-9).

credit by the projected closing date of March 30, 2009.  (GAR Dec., Ex H, 361:3-16; 335:8-25; 336:1-6).  In that conversation, Compagnon assured Gerszberg that the matter could be resolved by consigning goods to the bank instead of Hampshire.  (GAR Dec., Ex H, 311:17-23; 316:17-25; Ex O, O11).  Gerszberg agreed to the requested concession.   (GAR Dec., Ex N, N27).

Compagnon followed-up his conversation with Gerszberg with an email wherein he referenced the consignment option.  (GAR Dec., Ex O, O11).  He also told Gerszberg that Yim would be sending an email to NAF which would provide "some options to help us get this done." (GAR Dec., Ex O, O11).  That email, however never arrived.  In its place was an email from Yim which completely and materially changed the terms of the BAA.  Attached to Yim's letter was an unsigned copy of the BAA that Compagnon executed on December 14, 2008 with material changes to the BAA  noted in red-lined format.  (GAR Dec., Ex N, N8).  This red-lined version was sent even though Compagnon intended for the December, 2008 BAA to control the NAF/Trading relationship.  (GAR Dec., Ex I, 57:13-22).  Yim's post-BAA demands included but were not limited to:

- requiring NAF to provide $5 Million in cash collateral to Trading to serve as security against the standby letter of credit that Trading is going to issue to HSBC US; and
- requiring NAF to provide an $11.5 Million standby letter of credit to Trading as security against future orders based on the Hampshire sales projections provided by NAF.[7]

(GAR Dec., Ex N, N8).

---

[7]  Yim's post-BAA, pre-closing demands required NAF to provide $16.5 Million of additional security to Trading in a matter of five (5) days.  While Trading now argues that the additional security was requested, as per the BAA, due to a Material Adverse Change in NAF's financial condition (which did not occur), Yim was not aware that Hampshire's or NAF's financial projections had deteriorated.  He was not aware because the only financial information he had regarding NAF or Hampshire was that provided by NAF on March 18, 2009 and he had never heard of NAF or Hampshire prior to March, 2009.  (GAR Dec., Ex J, 18:17-25; 19:1).  Moreover, Trading's various email communications regarding the $16.5 Million of additional security make clear that Yim's demands were not made for the purpose of asserting a Material Adverse Change pursuant to the BAA.  (GAR Dec., Ex J, 6:8-17; Ex N, N12).

Rather than stand on the BAA, as executed, and risk losing the Hampshire deal, Gerszberg attempted to accommodate Trading's belated, post-contractual demands. (GAR Dec., Ex H, 316:17-25; 318:23-25; 319:1-16). In his email and telephonic communications with Trading, Compagnon made clear to Gerszberg that the issue was risk -- and the elimination thereof by Trading.[8]  (GAR Dec., H, 309:9-12; Ex N, N13). In response thereto, Gerszberg asked if NAF could provide the $5 Million in cash collateral on the day following the merger. (GAR Dec., Ex N, N13). He also asked if the $11.5 Million standby letter of credit would be required if NAF could get Hampshire's factories to convert to open, sixty (60) day terms. (GAR Dec., Ex N, N13). NAF's concessions provided good faith and pragmatic solutions to Trading's stated concerns about risk. By email dated March 23, 2009, Compagnon responded to Gerszberg's proposals as follows:

> a. NAF is asking us to give a bridge loan and "Under normal circumstances we may be willing but given our position with Ecko it is beyond our fiduciary duty." Ecko is a company owned by Gerszberg's brother;
> b. Demand the BAA become a 3 year contract; and
> c. Informing Gerszberg that, "As far as the 11.5 mill standby is concerned, of course the fewer lc's needed to open the lower amount. But you can't be naïve that the 30-35 mill orders already placed and not covered by Hampshire LCs are all going to be converted to open terms overnight.

(GAR Dec., Ex N, N21). Campagnon's comment about Gerszberg's naivety about open terms was in stark contrast to Compagnon's November, 2008 representation, (GAR Dec., Ex I, 354:18-25; 355:1-12), as well as his deposition testimony wherein he stated that obtaining sixty (60) day open terms for new orders would be no problem. (GAR Dec., Ex I, 36:2-18).

---

[8] Compagnon also made clear that Trading's position with respect to NAF was being influenced by Tradings' relationship with Ecko Unlimited, Gerszberg's brother's company. Specifically, Ecko Unlimited owed Trading more than $100 Million of delinquent debt as of March, 2009. (GAR Dec., Ex J, 105:7-25; 106:1-21). Shortly before Trading asserted its post-BAA demands, Ecko Unlimited missed its first payment with respect to this past due debt and Trading's relations with Ecko Unlimited had soured. (GAR Dec., Ex I, 207:17-25; 208:1-19).

Due to the urgency of the situation, Gerszberg flew to Hong Kong to meet with representatives of Hampshire's factories.  Beginning early in the morning of March 25, 2009, Gerszberg began his factory meetings.  When he left Hong Kong the following day, Hampshire's factories began to release $10 Million of the $13.5 Million of outstanding letters of credit.  Also, all but one of the factories agreed to accept sixty (60) day open terms, thereby substantially eliminating Trading's alleged risk concerns.  (GAR Dec., Ex H, 354:10-25; 355; 356:1-10).

Despite Gerszberg eliminating much of Trading's alleged risk concerns and without waiting for Gerszberg's response to Yim's March 23, 2009 demand, on March 25, 2009 at 8:56 a.m., Trading personnel were advised that the NAF transaction had been cancelled.  (GAR Dec., Ex N, N14).  For whatever reason, Trading did not inform NAF of its internal decision.  (GAR Dec., Ex H, 505:6-24).  Instead, LF USA advised Wells of that fact.  Specifically, Darling directed Ventricelli to "very confidentially" let Wells know that neither LF USA nor Trading were going forward with NAF.  (GAR Dec., Ex N, N2).  Darling directed Ventricelli to contact Wells on Friday, March 27, 2009 because NAF's acquisition of Hampshire was scheduled to close on Monday, March 30, 2009.  (Id.).  Darling cautioned Ventricelli not to share his communications with Wells Fargo with anyone.[9]  (Id.).  Ventricelli did as instructed.  (Id.)  Wells then advised NAF's accountants of Trading's decision.  (GAR Dec., Ex H, 505:6-18).

Before NAF learned of Trading's March 25, 2009 decision to renege on the BAA, Gerszberg responded to Yim's March 23, 2009 email wherein Trading demanded $16.5 Million

---

[9] By this time, LF USA had (allegedly) rejected Hampshire as an acquisition target and had decided not to proceed with Hampshire on a proposed outsourcing agreement.  Trading and LF USA claim that their actions with respect to Wells Fargo were to remedy misstatements that Gerszberg allegedly made to Wells Fargo.  NAF contends that it made no misrepresentations to Wells Fargo.  (GAR Dec., Ex H., 350:10-16).  Moreover, Gerszberg had provided a copy of the BAA to Wells and therefore Wells verified on their own the terms of the contract.  (GAR Dec., Ex M). The BAA provided that Trading would release or replace Hampshire's pre-merger letters of credit and NAF advised Wells Fargo of same.  (GAR Dec., Ex H, 350:10-16).  NAF further contends that LF USA made the furtive call to Wells Fargo to ensure that Wells Fargo would not close on the NAF/Hampshire credit line.  (GAR Dec., Ex M).  LF USA did so to preserve Hampshire as a target for acquisition by LF USA.

of additional security.  (GAR Dec., Ex O, O12).  In his response, Gerszberg requested, inter alia, that Trading honor the executed BAA.  (GAR Dec., Ex H, 343:21-25; 344:1-14; Ex O, O12).  At this time, Darling interjected himself into the NAF/Trading relationship by advising Compagnon not to respond.  (GAR Dec., Ex N, N16).

In a last ditch effort to get Trading to honor the December 2008 BAA, on March 30, 2008, Gerszberg flew to Atlanta to meet with Compagnon.  (GAR Dec., Ex H, 347:4-12; Ex I, 214:7-16; Ex N, N17).  Compagnon refused to meet with Gerszberg even though he was able to eliminate the financial risk that Compagnon had previously expressed to Gerszberg.  (GAR Dec., Ex H 354:10-25; 355:1-25; 356:1-19; Ex N, N16).

Trading's late March 30, 2009 email to Gerszberg clearly and unequivocally provided that Trading would not do business with NAF.  (GAR Dec., Ex N, N18).  Trading also made clear that it's decision was based on Gerszberg's alleged misrepresentations to Wells Fargo and Gerszberg's China factory visits wherein he obtained the release of the letters of credit that Trading did not want to replace.  (Id.).  No mention was made of NAF or Hampshire's declining sales projections.  (Id.).  Gerszberg contends he did nothing inappropriate with Wells Fargo or Hampshire's factories in China.  (GAR Dec., Ex H, 349:5-25; 350; 351:1-7).

With Trading out of the picture, NAF attempted to resurrect a transaction wherein NAF could nonetheless acquire Hampshire.  These efforts included, but were not limited to, extending the expiration date under the Merger Agreement and seeking a buying agent other than Trading.  (GAR Dec., Ex S).

With the help of Wells, NAF found a potential partner to replace Trading.  Although Wells had orally advised NAF that it would proceed with financing NAF's post-merger working line of credit without Trading serving as NAF's buying agent, Wells did not provide a

13

commitment letter to NAF with respect to that financing. (GAR Dec., Ex L). In fact, Wells advised NAF that it would not issue a commitment letter until Monday, April 27, 2009. (Id.). More importantly, Wells advised NAF that the earliest it could close would be Wednesday, April 29, 2009, two (2) business days after the merger transaction had to be completed and funded. (Id.). Significantly, when Wells made that representation, Wells had not even circulated to NAF a draft of the financing documents for review, comment and negotiation. (GAR Dec., Ex M, ¶ 9).

To further complicate the situation, as of NAF's April 27, 2009 deadline to accept the tendered shares, NAF did not have the monies from Keba to pay for them. (GAR Dec., Ex R). In the absence of an in-place working line of credit, Keba was unwilling to tender the bridge loan proceeds to NAF. (GAR Dec., Ex R). While Trading argues that NAF had all necessary financing commitments and voluntarily elected to abandon the Hampshire merger transaction, there is substantial evidence to the contrary. (GAR Dec., Ex L). In short, NAF terminated the modified transaction with Hampshire because NAF could not finance the acquisition. (GAR Dec., Ex H, 431:8-19). The legal reasons upon which NAF relied to support its decision are set forth in public filings and noted in Trading's moving papers. The factual reasons that NAF elected to exercise those legal rights was because Trading breached the BAA and NAF's efforts to mitigate its harm by pursuing an alternative arrangement to acquire Hampshire could not be finalized because of the above-referenced financing issues. (GAR Dec., Ex H 431:8-19; Ex L).

Although they did not communicate with NAF after March 30, 2009, and in contrast to sworn deposition testimony, Trading and LF USA personnel closely followed NAF's Hampshire-related activities. For example, on Saturday evening April 18, 2009, Darling sent an email to two (2) investment bankers with whom LF USA had completed numerous merger and

acquisition transactions, Andy Postal and Allan Ellinger, inquiring as wheteher Hampshire's Board had agreed to extend the deadline on the NAF/Hampshire transaction. (Px-47, GAR Dec., Ex K, 200-204: 1-14). After receipt of a substantive response, Darling instructed Postal and Ellinger to keep him advised of the NAF/Hampshire transaction. (GAR Dec., Ex N, N25). Later, when Darling advised Compagnon, Rockowitz and Ventricelli that, inter alia, NAF had received the required number of shares to complete the Hampshire merger without Trading, (GAR Dec., Ex N, N26), Compagnon's response was both brief and pointed:

Shit.  Too bad.

(GAR Ex N, N33).

On Sunday, April 26, 2009, NAF cancelled the Merger Agreement. (GAR Dec., Ex O, O13). Ellinger promptly advised Darling and Ventricelli of that fact. (GAR Dec., Ex N, N27). At 10:57 p.m. that evening, Darling directed Ellinger to call him first thing in the morning. (GAR Dec., Ex N, N28). The next morning, Darling advised Compagnon that the NAF/Hampshire deal had fallen apart. (GAR Dec., Ex N, N19). Compagnon promptly responded to Darling's email with the following message:

Could be an excellent opportunity.

(Id.). Darling responded by telling Compagnon to "stay tuned". (Id.)

NAF and Gerszberg faced bankruptcy and other liabilities if either Keba or NAF did not provide the requested credit facilities.

The rationale for Trading's reneging on the December, 2008 BAA became clear to NAF after this action was filed. Specifically, during discovery, NAF learned that within one (1) business day of NAF terminating the Merger Agreement, Darling contacted Compagnon's assistant, Kavinthy Chu, to obtain the projections that NAF had provided to Trading regarding

Hampshire.  (GAR Dec., Ex N, N20).  Upon receipt of NAF's proprietary financial information, Darling promptly forwarded the Hampshire-related projections to investment bankers Postal and Ellinger with whom he had been discussing Hampshire.  (GAR Dec., Ex N, N21).  NAF also learned that within one (1) week of NAF's termination of the Merger Agreement, Hampshire's President, Heath Golden, and Compagnon had "a number of conversations… in Hong Kong … in connection with our now aborted sale to [Gerszberg].  (GAR Dec., Ex N, N22).  Golden was also in communication during that period with Darling.  (Id.).

While Ventricelli denied under oath having any interest in Hampshire in 2009, Postal testified about their numerous mid-summer 2009 communications with LF USA and Hampshire.  (GAR Dec., Ex N, N28; N29; N30; Ex X).  Those communications culminated on August 7, 2009 when Ellinger and Postal advised Hampshire of LF USA's current interest in acquiring Hampshire.  (GAR Dec., Ex N, N30; N32).  Postal would not have made that representation to Hampshire without  knowing that LF USA wanted to acquire Hampshire.  At that time, however, Hampshire was not interested in a merger with LF USA. .  (GAR Dec., Ex N, N30; N32).  During the pendency of this civil action, LF USA acquired certain of Hampshire's women's line for an amount in excess of $14 Million.  (GAR Dec., Ex K, 88:14-25; 89:1-18; Ex N, N3; N30; N32).

## III. ARGUMENT[10]

### A.    A Jury Can Easily Conclude That Trading Caused NAF's Injuries.

Trading first moves for summary judgment on the basis that NAF lacks constitutional standing and/or fails to state a claim for breach of contract.  In doing so, Trading attempts to shift this Court's attention from its own misconduct by arguing that NAF caused its own injuries.

---

[10] Trading accurately recites the standard to be utilized by this Court in ruling on the instant motion for summary judgment.  For the reasons set forth herein, a jury can easily return a verdict in favor of NAF based on the evidence of record, all of which must be construed in favor of NAF as the non-moving party.

More specifically, Trading contends that the losses sustained by NAF were not "fairly traceable" to its breach of the BAA, but rather were caused solely by NAF's own unilateral business decision to terminate its acquisition of Hampshire.  Trading further asserts that it is not legally responsible for NAF's alleged damages because NAF demonstrated an "intention to proceed" with the acquisition of Hampshire "by taking affirmative steps to complete the transaction" after Trading reneged on the BAA.  Trading's argument is without merit.

Trading conveniently ignores the fact that NAF would never have been forced to take any "affirmative steps to complete the transaction" or be forced to terminate its acquisition of Hampshire if Trading had not reneged on the BAA.  Unlike the cases relied upon by Trading, the damages incurred by NAF, as well as the "affirmative steps" taken by NAF to complete the transaction, were a direct result and consequence of Trading's breach of the BAA.  None of the aforementioned conduct would have been necessary in the absence of Trading's breach; therefore, NAF has clear standing to remedy the conduct complained of in the complaint.  See, e.g., Soundview Associates v. Town of Riverhead, 2012 U.S. Dist. LEXIS 140963, ** 30-31 n.14 (E.D.N.Y. Sept. 28, 2012)(denying summary judgment motion for lack of standing where record established that defendant's conduct caused plaintiff's transaction with third party to fall through).  Here, NAF alleges, and the record demonstrates, that it was Trading's failure to honor its commitments under the BAA which resulted in NAF's inability to acquire Hampshire.

Although Trading correctly notes that NAF took "affirmative steps to complete the transaction" after Trading's breach, those actions were undertaken by NAF in an attempt to satisfy its legal obligation to mitigate the damages caused by Trading.  See, e.g., Bernstein v. Mount Ararat Cemetery, Inc., 2012 U.S. Dist. LEXIS 127633, * 9 (E.D.N.Y. Sept. 7, 2012)("The law imposes upon a party subjected to injury from breach of contract, the duty of making

17

reasonable exertions to minimize the injury"); U.S. Bank Nat'l Assoc. v. Ables & Hall Builders, 696 F. Supp.2d 428, 441 (S.D.N.Y. 2010)(duty to mitigate in breach of contract action "applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense"); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., 727 F. Supp.2d 256, 277-81 (S.D.N.Y. 2010)(reciting various precedent for duty to mitigate under New York law). Despite NAF's reasonable efforts to mitigate its damages, NAF was unable to resuscitate the deal within the necessary time without incurring substantial risk and expense. As set forth above, at the time NAF would have been obligated to purchase the tendered Hampshire shares, NAF did not have financing in place to acquire same. (GAR Dec., Ex H, 431:8-19). Therefore, NAF had no choice but to terminate the Hampshire acquisition.[11]

The primary standing case relied upon by Trading, Union Cosmetic Castle, Inc. v. Amorepacific, Cosmetics USA, Inc., 454 F. Supp.2d 62 (E.D.N.Y. 2006), is easily distinguishable from the instant dispute. In Union Cosmetic, the plaintiff was a retailer of Korean cosmetics distributed by defendant, which made up about 50% of plaintiff's gross annual sales. Id. at 65-66. The parties did not have an oral or written contract. When defendant announced that it intended to enter into exclusive distributorship agreements with retailers on a going forward basis, plaintiff made a voluntary business decision not to do so. Id. at 66-67. As a result, defendant discontinued sales to the plaintiff, who lost significant profits. Id. In concluding that plaintiff lacked Article III standing, the court reasoned that plaintiff's alleged injuries were the result of plaintiff's "free choice" and "poor business judgment in rejecting the . . . exclusive dealing arrangement" offered by defendant to protect its "business interests". Id. at

---

[11] If NAF had failed to take these "affirmative steps to complete the transaction", there is no doubt that Trading would be the first to argue that it cannot be liable for the financial losses alleged in this action because NAF failed to take action to mitigate its damages. Trading cannot have it both ways.

71.  The court further stated that plaintiffs do not have access to the federal courts "to second-guess their poor business judgment".  Id.

That is not even close to the situation here.  For starters, unlike the parties in Union Cosmetic, NAF and Trading were parties to a written contractual agreement.  More importantly, this is not a case where NAF is seeking a legal remedy against Trading for making a business decision that ultimately back-fired, or because NAF is "second-guessing" a poor business decision.  Unlike the plaintiff in Union Cosmetic, NAF did not exercise poor business judgment by simply rejecting a business offer presented by Trading, nor did NAF voluntarily end its relationship with Trading to protect and/or serve its own business interests.

On this point, the Court's decision in Hospital Authority of Rockdale County v. GS Capital Partners V Fund, L.P., 2011 U.S. Dist. LEXIS 5184 (S.D.N.Y. Jan. 20, 2011), is instructive.  In that case, the plaintiff hospital authority entered into a series of agreements which contemplated the sale of a hospital to a third party.  Id. at ** 2-6.  The defendant agreed to finance the proposed sale up to $87 million.  However, shortly before closing, defendant informed the purchaser that it would only provide $35 million and, as a result, the deal collapsed. Id.  Although the hospital authority and the buyer looked for alternative financing in order to mitigate the damages, they were unsuccessful and the authority was forced to sell the hospital to another party in a less-beneficial transaction.  Id. at ** 5-6.  In denying defendant's motion, the court concluded that the question of whether the hospital authority "attempted to negotiate a new agreement in order to mitigate the breach presents questions of fact that cannot be determined at this juncture".  Id. at ** 10-11.   That same conclusion is warranted here because NAF was unable to acquire the tendered shares because it did not have the financing in place to do so. (GAR Dec., Ex H, 431:8-19; Ex L; Ex R).

The primary cases cited by Trading in the failure to state a claim portion of its brief are also easily distinguishable.  To begin with, and as acknowledged by Trading, the findings and conclusions by the court in <u>Diesel Props S.R.I. v. Greystone Bus. Credit II LLC</u>, 631 F.3d 42 (2d Cir. 2011) and <u>TD Waterhouse Investor Servs., Inc v. Integrated Fund Serv., Inc.</u>, 2005 U.S. Dist. LEXIS 5 (S.D.N.Y. Jan. 3, 2005), were made only after a bench trial, not on a motion for summary judgment.  As with any trial, the findings and conclusions came only after the court, as fact-finder, weighed the evidence and made credibility determinations with respect to the witnesses who testified in the respective trials.   <u>Diesel</u>, 631 F.3d at 47, 49-50, 53; <u>TD Waterhouse</u>, 2005 U.S. Dist. LEXIS 5 at * 14.

While this procedural distinction alone undermines Trading's reliance on these cases, they are also factually inapposite. In <u>Diesel</u>, the plaintiff shoe manufacturer sued a credit company alleging that it suffered damages because the company failed to provide it with a contractually required notice of default by defendant shoe distributor.  Diesel, 631 F.3d at 47. Had notice of default been provided, plaintiff alleged that it would have ceased shipping shoes to the distributor.  <u>Id</u>. at 53.  Although the Court found that there were times when the credit company failed to provide notice of the default, the court held that the losses suffered by plaintiff for nonpayment of shoes were not caused by the lack of notice.  <u>Id</u>. at 49.  Significantly, the court's conclusion was based on the fact that plaintiff was fully aware of the distributor's "dire financial situation" and, despite that knowledge, the plaintiff nevertheless "chose to take the business risk associated with continuing to ship shoes" to the distributor "to ensure a market for its footwear in the United States".  <u>Id</u>. at 49-50. The facts of <u>Diesel</u> bear no resemblance to those at issue in this case, especially keeping in mind the fact that the court's decision was made after a bench trial on the merits, not summary judgment.

The same holds true with respect to the <u>TD Waterhouse</u> case.  In that case, the plaintiff mutual fund administrator filed a breach of contract claim against its accountant for failure to accurately record the fund's purchase of two bonds and resulting revenue stream.  <u>Id</u>. at ** 3-4.  As a result of this unreported income, the administrator waived approximately $1.5 million of administrative fees to which it was entitled because it believed that the fund was under-performing when, in fact, its performance was not accurately reported by the accountant.  <u>Id</u>. at * 3.  After a trial on the merits, the court concluded that the administrator failed to demonstrate with certainty that the damages allegedly incurred were caused by the accountant, and "were not the result of its independent business decision to forego any attempt to recapture the waived fees from the unaccrued income".  <u>Id</u>. at * 20.   The court's decision was based on the facts that after learning of the accounting error, and before filing suit, the administrator -- together with its counsel and auditors -- eventually made a collective business decision not to recoup the waived fees from the fund because of the need to avoid "severe reputational damage" and regulatory problems with the SEC due to their failure to properly oversee the accounts.  <u>Id</u>. at ** 3-4, 10, 13-14, 18-19. Like <u>Diesel</u>, these facts bear no resemblance to those at issue in this case, again keeping in mind that the court's decision was made after a bench trial on the merits, not summary judgment.

Notwithstanding the foregoing, even if NAF took some actions and/or made decisions which can somehow be construed as contributing to the failed acquisition of Hampshire, it is well-established that "standing is not defeated merely because the plaintiff has in some sense contributed to his own injury.  Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain".  <u>Mary Jo. C. v. New York State and Local Retirement System</u>, 2011 U.S. Dist. LEXIS 49567, * 15 (E.D.N.Y. May 5,

2011).   While NAF contends that the record is devoid of any competent evidence which demonstrates that NAF played any role in NAF's breach of the BAA or the failed acquisition of Hampshire, it certainly cannot be concluded on this record as a matter of law that the failed Hampshire acquisition was due solely and completely to the fault of NAF.

Based on the evidence of record as set forth in more detail above -- which must be construed in NAF's favor -- a jury can easily conclude that NAF's failed acquisition of Hampshire, including the actions taken by NAF to mitigate its damages, albeit unsuccessfully, were a direct result of Trading's untimely breach of the BAA.   To that end, the record sufficiently establishes -- for purposes of the standing requirement -- that NAF's alleged damages were "fairly traceable" to Trading's breach of the BAA, not NAF's own actions. As emphasized by the Supreme Court, an injury is "fairly traceable" to the challenged action if there is "a causal connection between the injury and the conduct complained of".   See Lujan, 504 U.S. 555, 560 (1992).   More importantly, "the causal connection between the injury and the complained of conduct, need to be proven with scientific certainty,  . . . and is distinct from the question of whether plaintiffs have a meritorious claim".   DMJ Associates, LLC v. Capasso, 288 F. Supp.2d 262, 271-72 (E.D.N.Y. 2003)(alteration added).   To this end, "the Supreme Court has established a low causation threshold for standing purposes, stating that a 'substantial likelihood' that defendant's actions caused plaintiff's harm confers standing".   Id. at 272 (quoting Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 75 n.20 (1978).   See also Caudle v. Towers, Perrin, Forster & Crosby, Inc., 580 F. Supp.2d 273, 280 (2008)(quoting Wooden v. Bd. of Regents of the Univ. Sys of Ga., 247 F.3d 1262, 1280 (11th Cir. 2001))("'[S]tanding simply means that the plaintiff is entitled to 'walk through the courthouse door' and raise his grievance before a federal court'").

Here, a jury can easily conclude based on the evidence of record that there was a causal connection between Trading's alleged breach of the BAA and NAF's failed acquisition of Hampshire to satisfy the "low causation threshold for standing" established by the Supreme Court. Indeed, the evidence is more than sufficient for a jury to conclude that there was a "substantial likelihood" that NAF would have consummated the Hampshire acquisition if Trading had not committed an untimely breach of the BAA. Trading is certainly free to argue to the contrary at the time of trial. Until then, however, the issue of whether the damages were caused by Trading's breach of the BAA, or whether said damages were caused by NAF's own actions, remains a disputed issue of material fact which cannot be decided by way of the instant motion for summary judgment.[12]

## B.   NAF Has Standing To Assert Its Breach of Contract Claim Against Trading.

Trading argues that NAF lacks standing to assert a breach of contract action because it did not suffer any damages as a result of Trading's breach of the BAA. Trading argues that NAF's attempt to impute the damages suffered by NAF II and NAF Acquisition to NAF itself. In support of its argument, Trading gives a dissertation regarding the ability of a shareholder or parent corporation to assert a claim belonging to a subsidiary and the difference between a direct and derivative claim. All of the discussion on pages 20 through 23 of Trading's brief involves the situation where the claim to be asserted belongs to or could be brought by the subsidiary. In a derivative claim, a shareholder brings an action on behalf of a corporation because the corporation itself has a claim and fails or refuses to bring the claim. Hence, the shareholder must act to assert the corporation's claim on its behalf. In the instant action, NAF II and NAF

---

[12]   Although Trading also moves for a dismissal of the Complaint for failure to state claim, Trading's argument essentially mimics the causation argument advanced by Trading with respect to standing. Thus, this parallel argument should be rejected for the same reasons articulated above.

Acquisition have no claim with respect to Trading's breach of the BAA because they were not parties to the BAA.  The cases cited by Trading in its brief are not applicable to the breach of contract claim asserted by NAF.  Rather, they involve statutory shareholder claims that must be made derivatively, rather than independently.  These claims have not been asserted by Plaintiff in this action.  Consequently, there is no requirement that the claims asserted in this matter must be made derivatively.

There is no question that NAF was the party to the BAA with Trading, not NAF II or NAF Acquisition.  (GAR Dec., Ex A).  The real question is whether NAF suffered damages as a result of Trading's breach because the breach prevented the merger between Hampshire and NAF II and NAF Acquisition from taking place, thereby causing financial loss to NAF II and NAF Acquisition, which are wholly owned subsidiaries of NAF.   When Trading reneged on the BAA on the eve of closing, Trading knew that a consequence of its actions could result in the loss of the Hampshire acquisition.  Moreover, LF USA's decision to surreptitiously advise Wells of Trading's decision was intended to further undermine NAF's lending relationship with Wells.  NAF contends that both actions were taken to preserve Hampshire as a LF USA acquisition target.

There are three requirements that must be met in order for a plaintiff to have standing to bring a particular claim.  First, the plaintiff must have suffered an "injury in fact" which is an invasion of a legally protected interest that is concrete and particularized as well as "actual or imminent, not 'conjectural' or 'hypothetical'".    Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992) (citations omitted).    Second, there must be a causal connection between the injury and the alleged conduct of the defendant.  The injury cannot be the result of any action on the part of some other person or entity not before the court.    Lujan, 504 U.S. at 560-561

(citations omitted).  Third, the injury must be likely to occur as opposed to merely speculative and the injury will be "redressed by a favorable decision."  Id.  The facts of this case and the actions of Trading make it clear that all of the requirements are met.  Additionally, in federal court, all actions must be brought by the "real party in interest".  Fed. R. Civ. P. 17(a).  This rule requires that the party who brings the action is "the party who, by the substantive law, has the right sought to be enforced."  Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 257 (5th Cir. 1980). The purpose of the rule is to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure that any judgment will have its proper *res judicata* effect.  Steger v. General Electric Co., 318 F.3d 1066, 1080 (11th Cir. 2003). A court does not exceed its power when it takes jurisdiction over a controversy brought by a party that is not the real party in interest, so long as a substantial identity of interest between the plaintiff and the true party in interest exists.  Elandia Int'l v. Ah Koy, 2010 U.S. Dist. LEXIS 53193, 12-14 (S.D. Fla. Feb. 22, 2010).

New York law clearly allows a parent corporation to assert a claim for damages sustained by its wholly-owned subsidiary.  See, e.g., Astra Oil Trading NV v. PRSI Trading Co. LP, 794 F. Supp. 2d 462, 472 (S.D. N.Y. 2011) (where parent corporation executed a guaranty and payment on the guaranty was made by a wholly owned subsidiary, parent corporation has standing to assert a claim for indemnification in the amount of the economic loss which flowed from the payment made by its wholly owned subsidiary);  Lumbermens Mut. Cas. Co. v. Commonwealth of Pa., 856 N.Y.S.2d 499, 2008 NY Slip Op 50161U , *1  (N.Y. Sup. Ct. 2008), *reversed on other grounds*, 859 N.Y.S.2d 146, 2008 NY Slip Op 4919 (N.Y. App. Div. 1st Dep't 2008) ("It is well settled in New York that a parent company of a wholly owned subsidiary,

whose pecuniary interest is directly affected, has standing to prosecute and defend its subsidiary's claims.")

Therefore, because New York law permits a parent corporation to assert a claim for damages which flows from its wholly owned subsidiary, NAF has standing to assert the damages that flow to it from NAF II and NAF Acquisition. As such, Trading is not entitled to summary judgment on the grounds that NAF lacks standing to bring the breach of contract claim alleged in the Complaint. Indeed, NAF also has standing for recovery because it suffered a direct injury.

## C.   NAF Did Not Breach, And Trading Did Not Properly Terminate, The BAA.

Trading argues at Section D of its brief that summary judgment should be granted because Trading had the absolute right and, in fact, did terminate the BAA with immediate effect because NAF breached its obligations under Clause 8 of the BAA. Trading's assertion is wrong for several reasons.

First, the BAA, at Clause 20, provides the means and manner through which parties to the BAA provide notice to each other. (GAR Dec., Ex A, Clause 20). No notice of termination with immediate effect was ever issued to NAF. (GAR Dec., Ex M, ¶ 14). Trading decided internally to renege on the BAA on or before March 25, 2009. (GAR Dec., Ex N, N14). It did not advise NAF of its decision. (GAR Dec., Ex M, ¶ 14). When NAF learned of Trading's decision from Wells, Gerszberg confronted Compagnon. (GAR Dec., Ex N, N15). During those telephonic and email communications, Compagnon told Gerszberg that Trading would not do business with NAF because of Gerszberg's alleged misrepresentations to Wells and Gerszberg's direct approach to Hampshire's factories in China.[13]   (GAR Dec., Ex N, N18).   At no time did

---

[13] To the extent Trading contends that Compagnon's March 31, 2009 email (GAR Dec., Ex N, N18) constitutes notice of termination with immediate effect, such email transmission does not constitute notice pursuant to the BAA. (GAR Dec., Ex A, Clause 20).

Compagnon represent to Gerszberg that Hampshire's losses or declining projections had any effect on Trading's decision to renege on the BAA. (GAR Dec., Ex M, ¶ 15).

Secondly, Trading materially misrepresents the scope and content of Clause 8.3.4. of the BAA. Specifically, Clause 8.3.4 obligates NAF:

> "to discuss potential adjustment to the payment terms, including terms that the Principal provide the Agent with an irrevocable standby letter of credit of sufficient amount to cover, or advance payments in full, for any goods ordered or to be ordered, or any other terms if, in the sole discretion of the Agent, the Principal's financial statements indicate a Material Adverse Change. Failing such adjustment, and without limiting any of the Agent's other rights and remedies, Agent has the right to suspend all services in connection with new orders until Agent is comfortable that such financial condition has been remediated;

(GAR Dec., Ex A). Trading's argument is based on Trading's unilateral decision that Hampshire had suffered a Material Adverse Change. The BAA, however, defines the term "Principal" to be NAF, not Hampshire. (GAR Dec., Ex A). As set forth more fully above, a material component of Hampshire's decline between November, 2008 and March, 2009 related to the write down of Hampshire's intangible assets. (GAR Dec., Ex H, 289:12-25; 290; 291; 292:1-24). Because NAF did not include those assets in its projected opening balance sheet for post-merger Hampshire, the subsequent write down of Hampshire's intangible assets did not impact NAF or Trading. (Id.). Trading has not and cannot establish that NAF, as a matter of law, suffered a Material Adverse Change under the BAA.

In the event Trading asserts that the BAA can be construed to permit the term "Principal" to include Hampshire, NAF contends that the BAA is ambiguous. Under New York law, if the terms of a contract are ambiguous, then a Court cannot determine as a matter of law that the contract was breached. The construction of said terms must be submitted to the factfinder. See Leon v. Lukash, 121 A.D.2d 693, 694; 504 N.Y.S.2d 455, 455 (N.Y. App. Div. 1986) ("When

the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment."); 1000 Northern of New York Co. v. Great Neck Medical Assoc., 7 A.D.3d 592, 593; 775 N.Y.S.2d 884, 884 (N.Y. App. Div. 2004); Federated Assoc. v. Pergament Distrib., Inc., 240 A.D.2d 622, 622; 659 N.Y.S.2d 1002, 1003 (N.Y. App. Div. 1997).  Moreover, Trading was aware of the write down of the intangibles through the financials provided by NAF.  (GAR Dec., Ex H 289:12-25; 290; 291; 292:1-24; Ex P).  Additionally, NAF on multiple occasions informed Trading of the sales numbers and Trading never voiced any concerns.  (GAR Dec., Ex N, N8; N9; N31).

Trading also argues that NAF breached Clause 8.3.5 of the BAA by failing to promptly notify it of "any situation which would provide reasonable grounds that a Material Adverse Change had occurred".   Trading argues that Hampshire's declining financial condition constituted such a situation and that NAF should have reported this to Trading.  Again, to prevail on this argument, this Court must determine that the defined term "Principal" in the BAA means Hampshire, not NAF.  Given Trading's focus on Hampshire's alleged Material Adverse Change, the record does not establish, as a matter of law, that NAF suffered a material adverse change or material adverse effect.  While Trading cites several fact specific and detailed financial events that it contends constitute a Material Adverse Change, the question of whether the events described by Trading either occurred or constitute a Material Adverse Change for NAF pursuant to the BAA is a question of fact for the factfinder.  In that regard, as set forth more fully above, Hampshire's financial information was available to Trading at all times through Hampshire's public securities filings.  Moreover, NAF did, in fact, provide financial information to Trading which showed declining assets and net sales at Hampshire.  (GAR Dec., Ex N, N9; N31; Ex P).

In support of its argument, Trading cites <u>Silveira Industries, Ltd. v. Actus Lend Lease, LLC</u>, 2008 U.S. Dist. LEXIS 104127 (N.D. N.Y. 2008), wherein the court granted summary judgment in favor of a defendant that argued it properly terminated an agreement due to the plaintiff's material breaches of the Agreement.   However, the <u>Siveira</u> case concerned a construction contract with clear terms which the plaintiff <u>admitted</u> it had breached.  This is in stark contrast to the instant matter wherein NAF denies that it materially breached any provision of the BAA.   In such cases, courts routinely deny summary judgment.  <u>See</u>, <u>e.g.</u>, <u>24/7 Records, Inc. v. Sony Music Entertainment, Inc.</u>, 429 F.3d 39, 43-45 (2d Cir. 2005) (summary judgment inappropriate for defendant on plaintiff's claim that defendant   breached agreement by terminating it altogether, where evidence was conflicting about whether agreement had been terminated); <u>Corallo v. Merrick Cent. Carburetor, Inc.</u>, 733 F.2d 248, 252 (2d Cir. 1984) (summary judgment inappropriate where disputes exist in parties' factual representations regarding contract termination); <u>Abiele Contr. v. New York City Sch. Constr. Auth.</u>, 256 A.D.2d 494, 495, 682 N.Y.S.2d 419 (2d Dep't 1998) (summary judgment denied where issues of fact existed as to defendant's purported termination of the parties' contract); <u>Boston Concessions Group, Inc. v. Criterion Center Corp.</u>, 250 A.D.2d 435, 436, 673 N.Y.S.2d 111 (1st Dep't 1998) (summary judgment denied where factual question existed as to whether defendant terminated the agreement and the validity thereof).[14]

Third and finally, Trading's Material Adverse Change assertion is knowingly false and materially misleading.  For much of the time that Trading has defended this action, Trading has

---

[14] Trading's assertion that it declared a Material Adverse Change and, as a result, demanded additional security is belied for several other reasons.  As set forth more fully above, Trading's Yim was the individual who demanded the additional security for Trading and he wasn't aware of the pre-March 2009 financial information relating to Hampshire.  GAR Dec., Ex J, 18:17-20).  Moreover, Yim wasn't aware that the BAA had been executed.  (GAR Dec., Ex J, 72:25; 73:1-14).  In fact, he had been told to the contrary.  (GAR Dec., Ex J, 72:25; 73:1-14).  Thus, it defies logic and reason to contend that Yim's demand for additional security was based on a Hampshire financial decline of which he was unaware or to assert a contractual right on a contract he was told did not exist.

done so on the basis that the parties had not never entered into the BAA.  Now, Trading wants this Court to determine as a matter of law that Trading's actions constitute the exercise of a legal right that Trading had in a contract which Trading has contended does not exist.  More significantly, the very information upon which Trading now relies to support its Material Adverse claim (the decline in Hampshire's financial projections) was  known by Compagnon on or before February 24, 2009 and Compagnon had no problem with respect to Hampshire's revised projections!  (GAR Dec., Ex I, 118-119).  Trading's factual flip-flopping is improper and, at a minimum, creates dispute issue of material fact which precludes summary judgment.

## IV.  CONCLUSION

For reasons stated above, summary judgment should not be granted to Trading, and NAF's claim against Trading should not be dismissed.


Respectfully submitted,

/s/  George A. Reihner
George A. Reihner
WRIGHT & REIHNER, P.C.
148 Adams Avenue
Scranton, PA 18503
(570) 961-1166
         and
Steven T. Halperin
HALPERIN & HALPERIN, P.C.
18 East 48th Street - Suite 2200
New York, NY  10017
(212) 935-2600

Dated:  October 29, 2012

## <u>CERTIFICATE OF SERVICE</u>

I, George A. Reihner, hereby certify that I have caused to be served on this day a true and correct coy of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgement upon counsel of record, via the electronic filing system of this court.


<u>/s/ George A. Reihner</u>
George A. Reihner

DATED:  October 29, 2012