UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NAF HOLDINGS LLC,

                Plaintiff,

-v-

LI & FUNG (TRADING) LIMITED,

                Defendant.

No. 10 Civ. 05762 (PAE)

---

### DEFENDANT'S REPLY MEMORANDUM OF LAW
### IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**SALANS LLP**
    John J. Hay
    Deric Gerlach
    Ulyana Bardyn

620 Fifth Avenue
New York, New York 10020
212-632-5500

*Attorneys for Defendant*
  *Li & Fung (Trading) Limited*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

ARGUMENT ........................................................................................................................1

I.     Trading Did Not Cause Plaintiff's Alleged Injury ...............................................1

II.    Plaintiff Lacks Standing to Assert Claims Predicated on Injuries Suffered by a Company it Owns .................................................................................................7

III.   Trading Properly Terminated The Buying Agency Agreement ........................10

        A.    Trading Properly Terminated the BAA Under Clause 8.3.4 ..........................11
        B.    Trading Properly Terminated the BAA Under Clause 8.3.5 ..........................14

CONCLUSION ....................................................................................................................15

# TABLE OF AUTHORITIES

## FEDERAL CASES

Astra Oil Trading NV v. PRSI Trading Co. LP, 794 F.Supp.2d 462 (S.D.N.Y. 2011)....................9

Deligiannis v. Pepsico Inc., 757 F. Supp. 241 (S.D.N.Y. 1991)........................................................4

Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005)..........................................................5, 6

Nat'l Commc'ns Ass'n v. AT&T Corp.,
 No. 93 Civ. 3707, 2001. LEXIS 951 (S.D.N.Y. Feb. 5, 2001)................................................4, 5

Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572 (2d Cir. 1969).........................................5

Point Products A.G. v. Sony Music Entm't Inc.,
 215 F.Supp.2d 336 (S.D.N.Y. 2002)...........................................................................................6

Primavera Familienstiftung v. Askin, 130 F.Supp.2d 450 (S.D.N.Y. 2001) ....................................7

Silveira Indus. Ltd. v. Actus Lend Lease LLC,
 No. 7:06-Civ-265, 2008. LEXIS 104127 (N.D.N.Y. Dec. 24, 2008).......................................15

Site Microsurgical System Inc. v. Cooper Cos., 797. 333 (D. Del. 1992).........................................9

Trans-Orient Marine Corp. v. Star Trading & Marine Inc., 925 F.2d 566 (2d Cir. 1991) ...............5

Tse v. UBS Financial Servs. Inc., 568 F.Supp.2d 274 (S.D.N.Y. 2008) ..........................................4

Weissman v. Weener, 12 F.3d 84 (7th Cir. 1993) ............................................................................9

## STATE CASES

Digital Broadcast Corp. v. Ladenburg, Thalmann & Co. Inc.,
 No. 117041/05, 2008 N.Y. Misc. LEXIS 10179 (N.Y. Sup. Ct. Dec. 11, 2008).....................10

Fin. Guar. Ins. Co. v. IKB Deutsche Industriebank AG,
 No. 600704/08, 2008. LEXIS 7520 (N.Y. Sup. Ct. Dec. 29, 2008) ........................................10

Lumbermens Mut. Cas. Co. v. Commonwealth of Pa.,
 No. 600175/2007, 2008. LEXIS 217 (N.Y. Sup. Ct. Jan. 24, 2008) ..................................9, 10

Suarez v. Ingalls, 282 A.D.2d 599 (N.Y. App. Div. 2001)..............................................................12

Yudell v. Gilbert,
 No. 6903, 2012 N.Y. App. Div. LEXIS 5821 (N.Y. App. Div. Aug. 7, 2012) ........................9

**STATUTES AND RULES**

Fed. R. Civ. P. 17(a) ...................................................................................................9

**MISCELLANEOUS**

4-17 Moore's Federal Practice - Civil § 17.10 ...............................................................9

NewYork 1560949.1

Defendant Li & Fung (Trading) Limited ("Trading"), by and through its counsel, Salans LLP, respectfully submits this reply memorandum of law in further support of its motion for summary judgment dismissing the claim asserted by Plaintiff NAF Holdings LLC ("NAF").[1]

In its opposition to Trading's motion for summary judgment, NAF was required to demonstrate the existence of genuine issues of material fact that would preclude granting judgment in Trading's favor. It failed to do so, and offers instead unsupported arguments contradicted by the undisputed record, in a transparent attempt to create issues of disputed material fact where none exist. In addition, NAF fails to address controlling law that mandates summary judgment for Trading. We address each of these failings below.[2]

## ARGUMENT

### I. TRADING DID NOT CAUSE PLAINTIFF'S ALLEGED INJURY.

Trading's argument on lack of causation is straight-forward: causation is both a prerequisite for the Article III standing and an element of the cause of action for breach of contract, and because it has not been shown here, NAF has neither a valid claim nor standing to

---

[1] Submitted along with this reply brief is the November 12, 2012, Declaration of John J. Hay in further support of Trading's motion ("Hay Nov. 12 Decl."). Citations in this brief to the "Hay Aug. 15 Decl." refer to the August 15, 2012, declaration of John J. Hay, which was submitted in connection with Trading's opening brief. Citations to "Def. Br." refer to Trading's memorandum of law in support of its motion for summary judgment. Citations to "Pl. Br." refer to NAF's memorandum of law in opposition.

[2] In addition to attempting to manufacture issues of disputed material fact, NAF theorizes that Trading had an improper motive for terminating the alleged buying agency agreement between NAF and Trading ("BAA") -- namely that Trading terminated in order to prevent NAF from acquiring Hampshire Group Limited ("Hampshire") so that Trading's affiliate, LF USA Inc., could buy Hampshire instead. (Pl. Br. 1, 7, 14-16.) Trading, of course, disputes that any such improper motive existed, and the record firmly supports Trading's position. We will not further address NAF's contention, however, as it is not relevant to this motion and was obviously conjured up in a bid to generate sympathy for NAF. We note, though, that the theory is directly contradictory to NAF's earlier theory that Trading terminated the BAA not because it wanted Hampshire for itself, but because it came to view Hampshire as a credit risk. (See Hay Aug. 15 Decl. Ex. H, Def. Ex. 3 ¶¶19-20.)

1

assert it. In its opening brief, Trading set forth the law concerning the requirements NAF must meet to establish causation. (Def. Br. 15-20.) In sum, NAF must prove (1) there is a traceable nexus between NAF's alleged injury and an act or omission by Trading, and (2) NAF's alleged injury is not the result of some intervening cause. The causation requirement is not satisfied here because -- regardless of whether the BAA was breached or not -- NAF had a full opportunity to close the merger deal, having secured all of the necessary conditions for the merger to go forward (Def. Br. 9-11); instead, at the last minute, and for reasons wholly unrelated to the BAA or Trading, NAF walked away from the deal.

In opposition, NAF argues that it failed in its efforts to close the transaction because it could not obtain necessary financing and that a jury could conclude that Trading caused NAF's injuries. (Pl. Br. 22.) Both arguments fail as a matter of law.

All evidence in the record shows that NAF could have closed the merger transaction. In its opening brief, Trading demonstrated that all of the prerequisites for the merger transaction to proceed without Trading's participation were put in place. The record indisputably demonstrates that NAF was able to successfully arrange for various entities and individuals to replace Trading in the transaction; that Hampshire and Wells Fargo Trade Capital LLC ("Wells"), the financing bank, accepted the substitution and were ready to proceed with the transaction; and that Wells had told NAF via email that it was willing to proceed with the financing. (Def. Br. 17-18.)

NAF does not dispute these facts. Rather, it completely ignores the record and argues for the first time in its opposition papers, that it "was unable" to acquire the tendered shares because it "did not have financing in place," and that "NAF terminated the modified transaction with Hampshire because NAF could not finance the acquisition." (Pl. Br. 14, 18-19.)

NAF's bare assertion that it did not have the financing to close the acquisition is belied

NewYork 1560949.1

not only by the undisputed facts set forth above, but also by numerous sworn statements made by NAF:

- At NAF's 30(b)(6) deposition, Efrem Gerszberg testified that Hampshire's press release, which stated that "We believe that your attempt to terminate the Merger Agreement has occurred because [NAF does] not have the financing in place necessary to consummate the tender offer and the merger on the terms agreed", was "false and defamatory" because, "If I chose to do so I could have gotten the financing," and that while he technically did not have the financing in place because you only have it "in place" when the transaction closes, "I could have gotten the financing." (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 422:3-423:9, Def. Ex. 63 ¶108.) Incredibly, the position that Hampshire took in its press release which NAF swore was "false" and "defamatory," is the exact position NAF now takes in its opposition brief.

- NAF, in the context of explaining the facts surrounding its defamation claim against Hampshire, testified that just before terminating the agreement, it told Hampshire's management that it had the financing and side collateral necessary to close, and NAF testified further that those statements were "true." (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 416:11-417:22.)

- In its sworn SEC filing NAF stated its reasons for terminating the Merger Agreement, never mentioning its inability to obtain financing. Rather, it unambiguously stated that: "Principally for the reasons enumerated above [which included Hampshire's alleged misrepresentations and the material changes in Hampshire's financial condition], **and because the financing of the transaction became unattractive to purchaser as a result of the material deterioration of the financial condition of Hampshire**," NAF terminated the agreement. (Hay Aug. 15 Decl. Ex. H, Def. Ex. 60 at 11265 (emphasis added).)

- At its 30(b)(6) deposition, NAF testified that the reasons stated in its SEC filing were "exactly true," "it's a true statement," and that the statement reflected "the legal reason why I terminated." (Hay Nov. 12 Decl. Ex. C (Gerszberg Dep.) 407:4-18, 408:13-25.)

NAF argues that it could not obtain the financing because it was too risky and expensive and, also, "untimely," and therefore "NAF had no choice but to terminate the Hampshire acquisition." (Pl. Br. 18.) NAF's assertions in this regard do not survive scrutiny, and, in any event, cannot overcome NAF's sworn statements to the contrary.

First, NAF's position is that because Wells required side collateral in the amount of $5 million as a condition for providing financing, and NAF regarded that condition as too risky and expensive. That argument is unavailing, as the side collateral was required due to

3

Hampshire's worsening financial position, not because of the termination of the BAA. (Hay Aug. 15 Decl. Ex. G ¶¶6-8.) Accordingly, NAF's argument that the deal became too risky and expensive as a result of the termination of the BAA is unsupported by any evidence, and is contradicted by evidence submitted by Trading. (Def. Br. 10-11.)

Second, NAF's claim that it did not have a "commitment letter" in time and that it did not have financing in place by the time the tender offer was scheduled to close is refuted by (1) NAF's sworn testimony to the contrary (see p. 3 above), and (2) the fact that NAF made no effort to try to resolve the purported issue, no doubt because it had already decided not to proceed with the acquisition because it was risky and expensive. NAF did not make an attempt to extend the tender offer, although it is likely that it could have been easily extended given that it had been successfully extended three times before (Def. Br. 9-10) and there is no evidence -- or even a suggestion -- that another extension would have been opposed by Hampshire. On this issue, Nat'l Commc'ns Ass'n v. AT&T Corp., No. 93 Civ. 3707, 2001 U.S. Dist. LEXIS 951 (S.D.N.Y. Feb. 5, 2001), is instructive. There, on a summary judgment motion, this Court rejected plaintiff's argument that it was not required to obtain (or at least attempt to obtain) a loan that would have prevented plaintiff's alleged loss, and found that plaintiff's failure to act broke the chain of causation between defendant's alleged breach and the injury claimed by plaintiff -- despite plaintiff's arguments that the company could not afford to make a necessary deposit, and its owner "had no legal obligation to risk his family's net worth" to make the deposit. Id. at *19-24; see also Tse v. UBS Financial Servs. Inc., 568 F. Supp. 2d 274, 302 (S.D.N.Y. 2008) (where plaintiff could have mitigated damages by remaining on his job he acted inconsistently with the obligation when he voluntarily abandoned the job); Deligiannis v. Pepsico Inc., 757 F. Supp. 241, 259 (S.D.N.Y. 1991) (it was unreasonable as a matter of law for plaintiff to refuse to sell a

NewYork 1560949.1

business at less than asking price when doing so would have mitigated all plaintiff's damages). Even if the timing of the financing was an issue (and there is no evidence that suggests it was), by not even trying to complete the acquisition by obtaining another brief extension, NAF failed to mitigate, which broke any chain of causation between the alleged breach of the BAA and NAF's alleged injury.[3]

Where, as here, the non-moving party's opposition to a summary judgment motion is based largely on its own contradictory and incomplete testimony, an inquiry into the existence of a genuine issue of material fact inevitably involves "some assessment of the plaintiff's account" of events. Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005) (affirming summary judgment for defendant, where plaintiff's claim that he was thrown out of third-floor window was contradicted by multiple prior statements that he had jumped); see also Trans-Orient Marine Corp. v. Star Trading & Marine Inc., 925 F.2d 566, 572 (2d Cir. 1991) (affirming summary judgment in breach of contract action because issue of material fact was not created simply because plaintiff's post-trial sworn statement conflicted with trial testimony); Perma

---

[3] Nor is there any evidence attributing the timing of Wells's decision to provide the commitment letter to any conduct of Trading. Rather, the evidence indicates that the timing of the bank's decision was attributable to the issue of Hampshire's declining financial condition and what security Wells would require to address that problem, since that was the subject matter of the discussions between NAF and Wells at the time. (Hay Aug. 15 Decl. Ex. G ¶¶6-7; see generally Ex. H, Def. Ex. 76.)

NAF also argues at p. 14 of its opposition brief that it could not get financing from Keba to buy the Hampshire shares in the absence of a commitment from Wells. This again is nothing but a timing issue, for which NAF is charged with a duty to mitigate. See Nat'l Commc'ns Ass'n, 2001 U.S. Dist. LEXIS 951. Moreover, the allegation is contradicted by NAF's sworn testimony that it could have got its financing in place if it wanted to (see p. 3 above) and by NAF's responses to Trading's second interrogatories, in which Trading asked NAF to describe in detail the facts supporting NAF's contention that Trading caused NAF to abandon its efforts to acquire Hampshire, and, in response, NAF pointed Trading to the deposition testimony of Efrem Gerszberg, where the name "Keba" appeared exactly once, without so much as an inkling that Keba's financing was ever at issue. (Hay Nov. 12 Decl. Ex. A ¶2, Ex. B ¶2; Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 376:13-16.)

Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). Under these circumstances, if no reasonable juror would "undertake the suspension of disbelief necessary to credit the allegations made in [the] complaint," the court may grant a defendant's motion for summary judgment. Jeffreys, 426 F.3d at 555 (internal quotation omitted). Here, no reasonable jury could find credible NAF's contention that it did not complete the merger transaction because it lacked financing in light of NAF's 30(b)(6) witness's testimony and NAF's contemporaneous sworn statement to the SEC that it terminated the transaction for reasons unrelated to Trading (Hay Aug. 15 Decl. Ex. H, Def. Ex. 60 at 11265) and contemporaneous statements that it had financing in place to complete the transaction (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 419:5-423:9, Def. Ex. 63; see p. 3 above.).

In view of the above, there is no reasonable basis for a jury to conclude that the alleged breach by Trading caused the acquisition not to close, since Trading had been replaced and still the deal did not close. On the other hand, it is apparent from NAF's own words that the reason the acquisition was terminated was because it became "unattractive," expensive and risky, which was a direct result of the dramatic deterioration in Hampshire's financial position, which again by NAF's own words constituted "a material adverse condition" and "breach" of the Merger Agreement, which was why, according to NAF, it terminated the acquisition. (See Hay Aug. 15 Decl. Ex. H, Def. Ex. 60 at 11264-65.) Put differently, "but for" Hampshire's financial decline, the acquisition would have occurred -- without Trading. Point Prods. A.G. v. Sony Music Entm't Inc., 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) ("In a breach of contract action, the

plaintiff must demonstrate more than simply that defendant breached its contract and that the plaintiff suffered damage. Plaintiff cannot recover if it would have suffered the harm regardless of defendant's actions."); Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 537-38 (S.D.N.Y. 2001) (granting summary judgment to defendants where plaintiff could not show that but for defendants' alleged breach plaintiff would not have been injured). Hampshire's financial decline, which caused NAF to make the business decision not to go forward with the acquisition, is the classic case of an intervening event breaking any arguable claim of a casual connection between Trading's alleged breach and NAF's failure to close the acquisition. Accordingly, as a matter of law, the claim against Trading must be dismissed.

## II. PLAINTIFF LACKS STANDING TO ASSERT CLAIMS PREDICATED ON INJURIES SUFFERED BY A COMPANY IT OWNS.

NAF argues that it has standing to bring a claim for the losses allegedly suffered by its direct and/or indirect subsidiary. NAF is wrong under the governing law.

Preliminarily, it is worth noting that there is no dispute concerning the facts relevant to this issue: the only evidence of any injury proffered in this case is evidence of the loss of value of Hampshire arising from the failed acquisition. NAF, however, was never going to own Hampshire; under the Merger Agreement it was NAF's indirect subsidy NAF Acquisition Corp. ("NAF Acquisition"), that would purchase Hampshire, and NAF has not claimed any damages, other than the loss to its indirect subsidiary, NAF Acquisition.[4]

The fundamental flaw in NAF's argument is that it attempts to stitch together a cause of action -- without legal basis, or even explanation or justification -- from a duty allegedly owed to

---

[4] "The real question is whether NAF suffered damages as a result of Trading's breach because the breach prevented the merger between Hampshire and NAF II and NAF Acquisition from taking place, **thereby causing financial loss to NAF II and NAF Acquisition, which are wholly owned subsidiaries of NAF**." (Pl. Br. 24 (emphasis added).)

7

one party (NAF) and damages allegedly sustained by a separate legal entity (NAF Acquisition). The issue here is not what claim NAF Acquisition may have against Trading,[5] but rather whether NAF can make a claim based on an injury allegedly incurred by its indirect subsidiary, NAF Acquisition. As established at pp. 20-23 of Trading's opening brief and discussed further below, it cannot.

In its opening brief, Trading set out the test that the Court should apply when determining which state's law should be applied to decide whether NAF has standing to seek the damages suffered by its direct and/or indirect subsidiaries. (Def. Br. 20 n.10.) Applying that test to the facts of this case, Delaware law governs, since all of the NAF entities are Delaware corporations. NAF did not present contrary authority; it simply ignored the question and assumed that New York law controlled. Because NAF has offered no reason why New York law, as opposed to Delaware law, is the applicable law, and because the legal authorities cited by Trading on this point are determinative, the Court should look to Delaware law in determining whether NAF has standing to bring a claim against Trading.

As set forth in greater detail in Trading's opening brief, under Delaware law the questions to be answered when determining whether a claim is direct, and may therefore be brought by a shareholder in its own name, or derivative, and must therefore be brought in the name of the company, are (1) whether the defendant breached a duty to the stockholder (i.e., NAF) and (2) whether the stockholder can prevail **without showing an injury to the corporation** (i.e., NAF Holdings II LLC ("NAF II") and/or NAF Acquisition). (Def. Br. 20-22.) NAF alleges that Trading breached a duty to NAF under the BAA, which Trading disputes.

---

[5] Any claim NAF's subsidiaries might have asserted against Trading was released by the NAF subsidiaries' settlement agreement with Hampshire in which they agreed not to sue any third party relating to the merger. (Def. Br. 13.)

8

Nonetheless, it is beyond dispute that NAF cannot show an injury to itself without showing an injury to NAF II and/or NAF Acquisition, since it was those entities, not NAF, that would have acquired Hampshire pursuant to the Merger Agreement, and NAF has not identified any other injury allegedly suffered, other than the loss of the value of Hampshire.[6]

In addition, even if the Court were to apply New York law in determining whether NAF's claim was direct or derivative (which it should not do), a recent decision by New York's Appellate Division establishes that the Delaware standard set out above is the one to be applied in New York as well. Yudell v. Gilbert, No. 6903, 2012 N.Y. App. Div. LEXIS 5821, at *10 (N.Y. App. Div. Aug. 7, 2012) (adopting Delaware standard). In Yudell, the court noted that "[i]t is only through loss to [the corporation] that [the owners] suffered a loss at all" and dismissed plaintiff's claims. Id. at *11. NAF's cases are not to the contrary.[7]

---

[6] NAF correctly notes that all federal actions must be brought by the "real party in interest." However, NAF incorrectly concludes that it is the real party in interest. Under Federal Rule 17(a), the right to enforce an action is conferred by substantive law. 4-17 Moore's Federal Practice - Civil § 17.10. Here, the applicable substantive law is Delaware law. (Def. Br. 20 n.10.) Applying Delaware law, NAF is not the real party in interest, and therefore lacks standing, because, as discussed at p. 23 of Trading's opening brief, NAF has suffered no separate, independent injury. See Site Microsurgical Sys., Inc. v. Cooper Cos., 797 F. Supp. 333, 337-39 (D. Del. 1992); see also Weissman v. Weener, 12 F.3d 84, 86 (7th Cir. 1993) (simply losing money as a shareholder when the company itself is injured is not enough to comply with Rule 17).

[7] NAF's New York cases, in addition to being inapposite because Delaware law controls, do not support the proposition that NAF has standing to bring a claim against Trading. In Astra Oil Trading NV v. PRSI Trading Co. LP, 794 F. Supp. 2d 462 (S.D.N.Y. 2011) there was no question that the loss was suffered by the parent company, not the subsidiary, since it was the parent company that was obligated to pay $156 million on a loan guarantee, and the fact that the parent company effectuated the payment through a subsidiary's account was of no significance. Id. at 472. Here, the very question to be answered is **what company suffered the loss of Hampshire**, and the answer is not in dispute: NAF II and/or NAF Acquisition. Concerning Lumbermens Mut. Cas. Co. v. Commonwealth of Pa., No. 600175/2007, 2008 N.Y. Misc. LEXIS 217 (N.Y. Sup. Ct. Jan. 24, 2008), NAF correctly notes that the decision was reversed on appeal. See 52 A.D.3d 212 (N.Y. App. Div. 2008). NAF fails to apprise the Court, however, that the language in Lumbermens concerning a parent corporation's standing to enforce a claim that belongs to its subsidiary has been explicitly rejected in every reported case in which it has been

9

Because NAF does not have standing to sue for an injury allegedly sustained by its indirect subsidiary, its claim must be dismissed.

## III. TRADING PROPERLY TERMINATED THE BUYING AGENCY AGREEMENT.

In its moving papers, Trading showed that it was also entitled to summary judgment because it had properly terminated the BAA based on NAF's breach. Two independent grounds for termination existed, <u>either one</u> of which entitled Trading to terminate with immediate effect. These were: (1) NAF's failure to adjust payment terms upon the occurrence of a material adverse change, as required by Clause 8.3.4 of the BAA,[8] and (2) NAF's failure to promptly notify Trading of any situation which would provide reasonable grounds to believe that a material adverse change had occurred, as required by Clause 8.3.5 of the BAA.[9] (Def. Br. 23-25.) Here,

---

considered, specifically on the ground that <u>Lumbermens</u> had been reversed. See <u>Digital Broadcast Corp. v. Ladenburg, Thalmann & Co. Inc.</u>, No. 117041/05, 2008 N.Y. Misc. LEXIS 10179, at *18 (N.Y. Sup. Ct. Dec. 11, 2008) (rejecting the language relied upon by NAF as "dictum"); <u>Fin. Guar. Ins. Co. v. IKB Deutsche Industriebank AG</u>, No. 600704/08, 2008 N.Y. Misc. LEXIS 7520, at *19 (N.Y. Sup. Ct. Dec. 29, 2008). <u>Lumbermens</u> is in any event distinguishable on the grounds that the plaintiff in <u>Lumbermens</u> litigated all insurance claims on behalf of its subsidiaries and was ultimately liable to pay all such insurance claims; further, as the court in <u>Lumbermens</u> noted, the addition of the subsidiary as a party **mooted the question of standing**. 2008 N.Y. Misc. LEXIS 217.

[8] Information reflecting the changes in Hampshire's financial condition that entitled Trading to request additional security pursuant to Clause 8.3.4 was contained in a March 18, 2009, email that NAF sent to Trading. (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 293:25-294:7, Def. Ex. 43). The changes were: (1) a net loss for 2008 of $29,897,000 (Hay Aug. 15 Decl. Ex. H, Def. Ex. 43 at 0464, 0475); and (2) projected gross sales information for a twelve month period, which showed a projected decline of over $15 million in sales compared with the projections NAF had provided Trading in November 2008 (<u>compare</u> Hay Aug. 15 Decl. Ex. H, Def. Ex. 8 at 1507 (projected total gross sales of approximately $245,840,000) <u>with</u> Hay Aug. 15 Decl. Ex. H, Def. Ex. 43 at 0471 (projected total gross sales of approximately $230,385,000).)

[9] The material adverse changes of which NAF failed to provide prompt notice to Trading were: (1) that Hampshire had missed its projections by $3 million (Hay Aug. 15 Decl. Ex. H. (Gerszberg Dep.) 265:4-19, Def. Ex. 26); (2) that Hampshire's operational loss for the year ending December 31, 2008, would increase to $6.1 million (Hay Aug. 15 Decl. Ex H (Gerszberg Dep.) 285:19-24, Def. Ex. 42 at 10); (3) that Hampshire was potentially in breach of certain covenants under its credit facility (Hay Aug. 15 Decl. Ex. H, Def. Ex. 42 at 10; Hay Aug. 15

10

there is no genuine dispute that Trading properly terminated the BAA under both clauses; all of NAF's arguments to the contrary are specious.[10]

### A. Trading Properly Terminated the BAA Under Clause 8.3.4

Clause 8.3.4 of the BAA entitled Trading to request additional security from NAF if a material adverse change occurred. (Def. Br. 5-6.) As discussed at n.11 below and at pp. 8-9 of Trading's opening brief, there is no genuine dispute that a material adverse change occurred. Nor is there a dispute that Trading requested additional security, and NAF refused to provide it. (Id.) That refusal entitled Trading to terminate the BAA with immediate effect pursuant to Clause 14.4 of the BAA. (Hay Aug. 15 Decl. Ex. A cl. 14.4.) NAF's other arguments on this point lack merit:

First, NAF argues that Trading did not properly terminate because Trading did not provide notice of termination to NAF. That argument fails because the termination provision relied upon by Trading, Clause 14.4, unlike certain other termination provisions in the BAA, **does not contain a notice requirement**. (Compare Hay Aug. 15 Decl. Ex. A cl. 14.4 with id. cls. 14.2 and 14.3). The reason that Clauses 14.2 and 14.3 of the BAA require notice is that termination under those provisions is not effective immediately; termination is effective after a period of months or days following the provision of notice. Clause 14.4, however, allows for termination with immediate effect, hence no notice is required. Therefore, whether Trading provided notice of termination pursuant to Clause 20 or not has no impact on whether Trading

---

Decl. Ex. H (Gerszberg Dep.) 292:22-293:19); (4) that Hampshire's total assets for 2008 were substantially reduced (Hay Aug. 15 Decl. Ex. H, Def. Ex. 60 at 11265; Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 192:9-14, Def. Ex. 36 at 1106).

[10] As noted at nn.8 and 9 above, the facts constituting a material adverse change cited by Trading that entitled Trading to request additional security from NAF pursuant to Clause 8.3.4 are different from those of which NAF failed to promptly notify Trading, and which allowed Trading to terminate the BAA pursuant to Clause 8.3.5. In NAF's opposition, it does not distinguish clearly between the two.

11

validly terminated the BAA pursuant to Clause 14.4.

In any event, NAF does not dispute that it actually received notice of termination, and in fact alleged in its complaint that Trading provided notice of termination by email on March 30, 2009. (Hay Aug. 15 Decl. Ex. H, Def. Ex. 3 ¶23; Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 25:22-27:14.) Since NAF undisputedly received notice of termination of the BAA on or about March 30, 2009, and there is no contention that NAF was prejudiced by receiving notice by an alternative means, the fact that it received notice by a means other than those listed in Clause 20 lacks legal significance. E.g., Suarez v. Ingalls, 282 A.D.2d 599, 599-600 (N.Y. App. Div. 2001).

Second, NAF argues that Trading "materially misrepresents the scope and content of Clause 8.3.4 of the BAA" (Pl. Br. 27) by treating Hampshire, rather than NAF, as the Principal for purposes of the BAA, and failing to establish that NAF, rather than Hampshire, suffered a material adverse change. That is not true, and in fact it is NAF that has misrepresented Trading's position rather than Trading that misrepresented the BAA. At p. 5 of its opening brief, where Trading quotes from Clause 8 of the BAA, it notes that "Principal" refers to NAF. Further, in its discussion of material adverse change, Trading stated that "a Material Adverse Change in Hampshire's business did occur which would have a concomitant impact on **NAF's prospects for acquiring and successfully operating Hampshire**." (Def. Br. 24 (emphasis added).)

A material adverse change to Hampshire constitutes a material adverse change with respect to NAF for purposes of the BAA. The BAA provides that a material adverse change includes a material adverse effect on "the business, operations, property, condition (financial or otherwise) or prospects of the Principal taken as a whole," "the ability of Principal to perform its obligations under the sale and purchase agreement (the 'S&P') with Hampshire," or "the ability of the Principal to perform or comply with its obligations under this Agreement." (Hay Aug. 15

12

Decl. Ex. A cl. 8.1.)[11] Since NAF was a holding company with no business or operations of its own, it was unquestionably Hampshire's financial condition that mattered for purposes of determining whether a material adverse change occurred, a fact that was acknowledged by NAF's 30(b)(6) witness at deposition (Hay Nov. 12 Decl. Ex. C (Gerszberg Dep.) 58:11-23) and stipulated by NAF'S counsel (Hay Nov. 12 Decl. Ex. C (Gerszberg Dep.) 334:10-335:4).

Third, NAF accuses Trading of making an assertion concerning a material adverse change to Hampshire that "is knowingly false and materially misleading" (1) because Trading denies that a binding BAA existed between the parties, while at the same time arguing that, if such a binding agreement did come into effect, Trading validly terminated it (Pl. Br. 29-30), and (2) because Marc Compagnon, one of Trading's group presidents, testified that NAF advised him of Hampshire's declining gross sales in an email dated February 24, 2009, and that "Compagnon had no problem with respect to Hampshire's revised projections" (Pl. Br. 30), which, in NAF's view, is at odds with Trading's position that the decline in Hampshire's projected 2009 revenue constituted a material adverse change. (Pl. Br. 29-30.) The first point is silly, since Rule 8(d)(3) clearly allows a party to "state as many separate claims or defenses as it has, regardless of consistency." As to the second point, Trading asked for additional security based not only on the $15 million decline in gross sales but also on other information concerning Hampshire's

---

[11] There can be no genuine dispute that the Hampshire net loss of $29,897,000 and the $15 million decline in Hampshire's projected 2009 revenue (see n.8 above) represented a material adverse change to Hampshire, since NAF relied on the first of these in its SEC filing as constituting a Company Material Adverse Effect that justified NAF in terminating the Merger Agreement (Hay Aug. 15 Decl. Ex. H, Def. Ex. 60 at 11265), and relied on the second of these in the February 13, 2009, letter to Hampshire's board in which NAF explained why it was reducing its offer price for Hampshire from $8 to $5.55 per share (Hay Aug. 15 Decl. Ex. H, Def. Ex. 26). NAF also admitted in its deposition that the facts cited in its SEC filing constituted material adverse changes to Hampshire, justifying NAF's termination of the merger. (Hay Nov. 1 Decl. Ex. D (Gerszberg Dep.) 403:4-404:4, 406:22-407:3.) It would be disingenuous for NAF to claim these facts concerning Hampshire's declining financial condition established a material change for purposes of the Merger Agreement, but not for the BAA.

13

financial condition, including the fact that Hampshire suffered a net loss of $29,897,000 for 2008. (See n.8 above and Def. Br. 8-9.) In any event, as noted at n.11 above, NAF cannot dispute that the $15 million decline was a material adverse change, since it formed part of NAF's justification for lowering its share offer price from $8.00 to $5.55 in February 2009.

### B. Trading Properly Terminated the BAA Under Clause 8.3.5

NAF argues that NAF did not breach its obligations under Clause 8.3.5 of the BAA, to provide prompt notification to Trading of any situation occurring that would give reasonable ground to believe that a material adverse change had occurred, because Hampshire's financial information was available to Trading through Hampshire's public securities filings and that NAF did in fact provide financial information to Trading that showed declining assets and net sales at Hampshire. (Pl. Br. 28.) That is not correct. The only items in the record NAF cites in support of its position either bolster Trading's case or are completely irrelevant:[12]

-- Exhibit N to the October 29, 2012, declaration of George A. Reihner ("Reihner Decl.") is not its own exhibit; it is a container for Exhibits N1-N33.

-- Exhibit N9 to the Reihner Decl. is a February 24, 2009, email from Efrem Gerszberg at NAF to Marc Compagnon and Sean Coxall at Trading, in which NAF advised Trading that NAF's projected gross sales for 2009 was $225-$230 million. This, however, is not one of the items identified by Trading that NAF failed to bring promptly to Trading's attention. (See n.9 above.) Instead, it is one of the items that entitled Trading to request additional security under Clause 8.3.4. (See n.8 above.)

---

[12] In addition, NAF's 30(b)(6) witness **admitted** that NAF did not provide notice to Trading of at least three of the material adverse changes relied on by Trading to terminate under Clause 8.3.5: the fact that Hampshire had missed its projections by $3 million (Hay Aug. 15 Decl. Ex. H. (Gerszberg Dep.) 265:4-19, Def. Ex. 26), that Hampshire's operational loss for the year ending December 31, 2008 would increase to $6.1 million (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 285:19-24, Def. Ex. 42 at 10), and that Hampshire was potentially in breach of certain covenants under its credit facility (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 292:22-293:19, Def. Ex. 42 at 10). As to the fourth change, NAF does not contend that it gave prompt notice to Trading upon learning that Hampshire's total assets for 2008 were substantially reduced (Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 192:9-14, Def. Ex. 36 at 1106, Def. Ex. 60 at 11265).

-- Exhibit N31 to the Reihner Decl. is an unsigned, undated outsourcing agreement that contains no information concerning the items identified by Trading at pp. 7-8 of its opening brief and at n.9 above.

-- Exhibit P to the Reihner Decl. is a copy of Hampshire's 2008 annual report (Form 10-K), which, even if it contained information concerning all of the adverse changes identified by Trading at pp. 7-8 of its opening brief and at n.9 above, was not filed until April 9, 2009 -- after Trading had terminated the BAA.[13]

As Trading showed in its opening papers, summary judgment in favor of a defendant is appropriate where defendant validly terminated the parties' agreement under its express terms. Silveira Indus. Ltd. v. Actus Lend Lease LLC, No. 7:06-Civ-265, 2008 U.S. Dist. LEXIS 104127, at *15 (N.D.N.Y. Dec. 24, 2008). The cases cited by NAF at p. 29 of its brief are not to the contrary: in each one of those cases, the question was whether a termination had occurred. Here, there is no question a termination occurred, since NAF alleged in its complaint that Trading provided notice of termination by email on March 30, 2009. (Hay Aug. 15 Decl. Ex. H Def. Ex. 3 ¶23; Hay Aug. 15 Decl. Ex. H (Gerszberg Dep.) 25:22-27:14.)

## CONCLUSION

For the reasons stated above and in Trading's opening brief, summary judgment should be granted Trading, and NAF's claim against Trading dismissed with prejudice.

Dated: November 12, 2012

>Respectfully submitted,
>SALANS LLP
>
>By: _____
>John J. Hay
>620 Fifth Avenue
>New York, NY 10020-2457
>(212) 632-5500
>*Attorneys for Defendant Li & Fung (Trading) Limited*

---

[13] In any event, the BAA required NAF to notify Trading of any situation occurring that would give reasonable ground to believe that a material adverse change had occurred; Trading was not obligated to monitor SEC filings to detect such changes on its own.