UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                        :

NAF HOLDINGS, LLC,                    :

                                        :               10 Civ. 5762 (PAE)

                     Plaintiff,        :

                                        :              OPINION & ORDER

                  -v-                     :

                                        :

LI & FUNG (TRADING) LIMITED,      :

                                        :

                   Defendant.     :

                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        In this diversity action, plaintiff NAF Holdings, LLC ("NAF") sues Li & Fung (Trading) Limited ("Trading") for breach of contract. NAF claims that Trading breached an agreement with it when, before a planned merger between NAF's two subsidiaries and Hampshire Group, Limited ("Hampshire") was to close, Trading backed away from a commitment to provide post-merger sourcing services to Hampshire. NAF claims that this caused, or contributed to, the failure of its subsidiaries' merger. NAF seeks compensatory damages of more than $30 million.

        Trading moves for summary judgment on multiple grounds. To resolve this motion, however, two facts are decisive. First, the injury for which NAF seeks remediation was one suffered by its wholly-owned subsidiaries and felt only indirectly, or derivatively, by NAF; and, second, before this lawsuit, those subsidiaries entered into a binding settlement agreement in which they waived the right to sue Trading in connection with the failed merger. NAF therefore has no right to sue on its own behalf for damages, and any derivative lawsuit on behalf of NAF's subsidiaries is precluded as a matter of law. Trading's motion for summary judgment is, therefore, granted.

I.      **Background**[1]

   **A.  The Failed Merger Between the NAF Subsidiaries and Hampshire**

NAF is a Delaware limited liability holding company wholly owned by Efrem Gerszberg.

Pl. 56.1 ¶¶ 1–2; Def. 56.1 ¶¶ 1–2.  NAF was created in 2008 for the sole purpose of facilitating

an acquisition of Hampshire.  Gerszberg Dep. 24–25; *id.* Ex 5, at 1.  Two subsidiaries of NAF

are relevant here:  NAF Holdings II LLC ("NAF II") and NAF Acquisition Corp. ("NAF

Acquisition," collectively with NAF II, the "NAF Subsidiaries").  NAF II, formed in January

2009, is a wholly-owned subsidiary of NAF; NAF Acquisition, in turn, is a wholly-owned

subsidiary of NAF II.  Pl. 56.1 ¶¶ 5, 7; Def. 56.1 ¶¶ 5, 7; Gerszberg Dep. Ex. 42, at 9.

Beginning in 2008, Gerszberg, on behalf of NAF, sought to acquire Hampshire from its

shareholders through a tender offer.  Pl. 56.1 ¶ 18; Def. 56.1 ¶ 18; Hay Decl. Ex. D.  Hampshire

is a Delaware corporation that produces and markets women's and men's clothing, such as

sweaters and knitwear, to retailers such as Macy's, JC Penney, Dillard's, and Bloomingdale's.

Hay Decl. Ex. D.

In August 2008, as part of its preparation for that tender offer, NAF approached Trading

to be Hampshire's sourcing agent post-acquisition.  Pl. 56.1 ¶ 19; Def. 56.1 ¶ 19.  Trading, a

Hong Kong company, serves as a sourcing agent for its customers, which consist primarily of

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' pleadings and
their submissions in support of and in opposition to the instant motions—specifically, the
Declaration of John J. Hay ("Hay Decl.") (Dkt. 34, 37) and attached exhibits; the Declaration of
George A. Reihner ("Reihner Decl.") (Dkt. 46) and attached exhibits; the Reply Declaration of
John J. Hay ("Hay Reply Decl.") (Dkt. 50) and attached exhibits; the deposition of Efrem
Gerszberg ("Gerszberg Dep.") (Dkt. 37 Ex. H) and attached exhibits; Defendant's Local Rule
56.1 Statement of Material Fact ("Def. 56.1") (Dkt. 35); and Plaintiff's Local Rule 56.1
Statement of Material Fact ("Pl. 56.1") (Dkt. 44).  Citations to a party's 56.1 statement
incorporate by reference the documents cited therein.

apparel companies.  Pl. 56.1 ¶ 10; Def. 56.1 ¶ 10.  Trading thereby assists customers in

identifying and placing orders with factories worldwide.  Pl. 56.1 ¶¶ 11–12; Def. 56.1 ¶¶ 11–12.

In December 2008, NAF and Trading negotiated a buying agent agreement ("BAA").

Hay Decl. Ex. A ("BAA"); Pl. 56.1 ¶ 27; Def. 56.1 ¶ 27.  The BAA provided that, after the

merger, Trading would serve as Hampshire's sourcing agent.  Trading disputes that the BAA was

binding in December 2008—it contends that the BAA was contingent upon NAF's acquiring

Hampshire, which, as explained below, never occurred.  However, acknowledging that questions

of fact bar resolution of that dispute on summary judgment, Trading has stipulated, for the

purpose of this motion, that the BAA was in effect as of December 2008.  Trading Br. 5 n.3.

Also in preparation for the tender offer, Gerszberg arranged to obtain funding from Wells

Fargo Trade Capital LLC ("Wells Fargo").  In December 2008, Wells Fargo sent Gerszberg a

loan commitment letter.  Wells Fargo therein agreed to help create a $75 million credit facility to

fund Hampshire's operations post-closing.  Gerszberg Dep. Ex. 13; Pl. 56.1 ¶ 30; Def. 56.1 ¶ 30.

The funding was to go to Hampshire, as the sole surviving entity of the forthcoming merger.

Gerszberg Dep. Ex. 13, at 2.  Wells Fargo's letter contemplated a $37.5 million loan by Wells

Fargo itself and an additional $37.5 million of third-party financing.  *Id.* Ex. 13.  Ultimately,

however, when Gerszberg proved unable to obtain the additional financing, the agreement with

Wells Fargo was amended to provide for a $40 million credit facility, with $30 million funded by

Wells Fargo.  *Id.* Ex. 25.  Both of these agreements were expressly conditioned upon the

existence of a buying agency agreement with Trading.  Pl. 56.1 ¶ 35; Def. 56.1 ¶ 35; Gerszberg

Dep. Ex. 13, at 6 (¶ 14); *id.* Ex. 25, at 6 (¶ 14).

During early 2009, the per-share purchase price that Gerszberg offered for Hampshire's

shares dropped by some 30%, from $8 to $5.55 per share.  In the February 13, 2009 letter to

3

Hampshire's board in which he offered the lower price, Gerszberg attributed the reduced offer to, among other things, an "alarming" and "significant" erosion of Hampshire's sales, from more than $280 million in 2008 to between $225 million and $235 million projected in 2009. Gerszberg Dep. Ex. 26, at 2.

On February 23, 2009, the two NAF Subsidiaries entered into a merger agreement with Hampshire, at the $5.55/share price, which equated to $30,353,865 for all shares of Hampshire. Gerszberg Dep. Ex 27 ("Merger Agreement" or "MA") at 1; Pl. 56.1 ¶¶ 46, 48; Def. 56.1 ¶¶ 46, 48. That amount was to be paid by NAF Acquisition. MA 1, § 1.1(a). Important here, NAF was not a party to the Merger Agreement. Pl. 56.1 ¶ 4; Def. 56.1 ¶ 4. NAF II and NAF Acquisition, the only NAF entities that were parties to the Merger Agreement, are not parties to this litigation. *See* Second Am. Compl. ("SAC"); Pl. 56.1 ¶¶ 6, 8–9; Def. 56.1 ¶¶ 6, 8–9. The Merger Agreement included a number of representations, including that there was a $40 million loan commitment from Wells Fargo and a sourcing agreement between NAF and Trading. MA § 5.6(e); Pl. 56.1 ¶ 47; Def. 56.1 ¶ 47.

Under the Merger Agreement, the expiration date for the NAF Subsidiaries to acquire Hampshire's shares was March 27, 2009. After NAF advised Trading that the agreement had been executed, Trading began due diligence as to how it would transition into being Hampshire's sourcing agent, assuming the acquisition closed. Hay Decl. Ex. I, Ex. 20; Pl. 56.1 ¶ 49; Def. 56.1 ¶ 49. On March 23, 2009, a Trading employee sent Gerszberg an email requesting certain additional security for the BAA. Pl. 56.1 ¶ 53; Def. 56.1 ¶ 53; Hay Decl. Ex. J, Ex. 11. Trading requested $5 million in cash collateral, revised letters of credit, and an $11.5 million standby letter of credit opened in Trading's favor. Hay Decl. Ex. J, Ex. 11. On March 25, 2009,

Gerszberg responded by email, asking Trading to "reconsider your position and honor [the prior BAA]" without additional security.  Gerszberg Dep. Ex. 51; Pl. 56.1 ¶ 56; Def. 56.1 ¶ 56.

      The expiration date of the merger was extended twice, first until March 31, 2009, and then until April 17, 2009, at least in part because an insufficient number of Hampshire's outstanding shares had, by then, been tendered.  The parties vigorously dispute two aspects of the events of late March and early April.  Trading contends that, on March 30, 2009, it terminated the BAA, on the basis of NAF's refusal to provide additional security.  Def. 56.1 ¶ 58.  NAF disputes that it was told of the termination at that point; it claims that it learned of it only later.  Pl. 56.1 ¶ 58.[2]  The parties also dispute whether Trading's termination was justified under the BAA.  The BAA allowed Trading to terminate the agreement "with immediate effect" if NAF was at any time in breach of its obligations under Clause 8 of the agreement, Hay Decl. Ex. A ("BAA"), § 14.4; Pl. 56.1 ¶ 28; Def. 56.1 ¶ 28, but the parties dispute whether NAF was then in breach.[3]

---

[2] NAF has conceded that "[o]n March 30, 2010 Defendant notified NAF via email of its intent not to do business with NAF."  SAC ¶ 22.  NAF's argument is that, under the BAA, an email does not constitute adequate notice of termination.  NAF Br. 26 n.13 (citing BAA cl. 20).  NAF also points out that Trading decided internally to terminate the BAA five days earlier, on March 25, 2009.  *Id.* at 26.  Regardless whether Trading properly conveyed notice of termination when it sent its March 20, 2009 email, it is clear that Trading notified Gerszberg by email that day that "Li and Fung will not go forward in any way with your Hampshire venture."  Hay Decl. Ex. I, Pl. Ex. 26, at 45.  Trading further contends that NAF was not prejudiced by any deficiency in the form of its notice.  Trading Reply Br. 12.

[3] Trading contends that NAF breached the BAA by refusing to provide Trading with additional security and by refusing to provide an irrevocable standby letter of credit in response to a Material Adverse Change in Hampshire's business.  Def. Br. 24.  Trading also argues that NAF breached by failing to notify Trading of the decline in Hampshire's financial position.  *Id.* at 25.  NAF, in response, argues that the BAA's provision regarding Material Adverse Changes does not apply to Hampshire, and that there was no Material Adverse Change in *NAF's* position to justify additional security.  NAF Br. 27–28.

As for the merger between the NAF Subsidiaries and Hampshire, it never closed.  As of April 17, 2009, sufficient shares of Hampshire had been tendered, but Hampshire had insufficient cash on hand to complete the transaction pursuant to the terms of the Merger Agreement.  Pl. 56.1 ¶¶ 59–62; Def. 56.1 ¶¶ 59–62.  The NAF Subsidiaries thereupon agreed to extend the tender offer again.  On April 20, 2009, the Merger Agreement was amended; the NAF Subsidiaries reaffirmed the representations in the original Merger Agreement, save that a sourcing agreement was in full force and effect.  Pl. 56.1 ¶¶ 63–65; Def. 56.1 ¶¶ 63–65.  On April 24, 2009, Wells informed Gerszberg that financing for the merger had been approved, and that it was ready to close the deal, but it advised that, as a result of Hampshire's deteriorating financial condition, it would require side collateral and a higher rate on the credit facility than originally contemplated.  Pl. 56.1 ¶ 73; Def. 56.1 ¶ 73; Gerszberg Dep. Ex. H, Ex. 76.  On April 26, 2009, however, the NAF Subsidiaries terminated the Merger Agreement.  Pl. 56.1 ¶ 74; Def. 56.1 ¶ 74.  At the time, Gerszberg attributed the termination to Hampshire's breach of various covenants in the Merger Agreement and Hampshire's eroding financial condition.  Gerszberg Dep. Exs. 57, 60; Pl. 56.1 ¶ 77; Def. 56.1 ¶ 77.  Gerszberg did not claim, at the time, a breach by Trading, or that Trading's conduct, including its termination of the BAA, had caused NAF to terminate the merger.[4]

---

[4] In a letter to Hampshire dated April 26, 2009, Gerszberg gave notice that NAF II and NAF Acquisition were terminating the Merger Agreement, "as a result of, among other things, one or more material breaches of covenants and agreement on the part of [Hampshire]."  Gerszberg Dep. Ex. 57.  In an SEC filing dated May 20, 2009, Gerszberg listed breaches of the Merger Agreement covenants by Hampshire and contended that they constituted a Material Adverse Effect.  He further stated that "the financing of the transaction became unattractive to Purchaser as a result of the material deterioration of the financial condition of Hampshire."  *Id.* Ex. 60, at 11264–65.  Gerszberg's SEC filing did not attribute the termination, even in part, to any conduct on Trading's part.

**B.  The Settlement Agreement**

On September 28, 2009, the parties to the merger—the NAF Subsidiaries and Hampshire—entered into a settlement agreement.  Gerszberg was also a party to that agreement.  Gerszberg Dep. Ex. 64 (the "Settlement Agreement"); Pl. 56.1 ¶ 81; Def. 56.1 ¶ 81.  Under the Settlement Agreement, Hampshire paid the NAF Subsidiaries $833,000 in exchange for a full release by Gerszberg, NAF, and the NAF Subsidiaries of all claims against Hampshire.  Pl. 56.1 ¶ 82; Def. 56.1 ¶ 82; Settlement Agreement 13810 (§1), 13811 (§2).

> Important here, under the agreement, the NAF Subsidiaries and Gerszberg agreed not to:
>
> initiate, institute, reinstitute, maintain, prosecute or voluntarily aid in the initiation, institution, reinstitution, maintenance or prosecution of, any action, claim, suit, proceeding, arbitration or cause of action of any kind whatsoever, in any court, administrative agency or other forum, *against any person, whether or not a party to this Settlement Agreement*, to recover damages, attorneys fees, expenses of any type or *any other losses allegedly sustained as a result of the Transaction Agreements or the Transaction*.

Settlement Agreement 13813 (§7) (emphasis added).  It is undisputed that that provision bars the NAF Subsidiaries and Gerszberg from pursuing claims against Trading arising out of the merger and its failure.  NAF, however, was not a party to the Settlement Agreement.

**C.  Procedural History**

On July 29, 2010, NAF filed the complaint in this case.  Dkt. 1.  On December 16, 2010, and May 13, 2011, respectively, NAF filed its Amended Complaint and a Second Amended Complaint.  Dkt. 8, 18.  On May 31, 2011, Trading answered the Second Amended Complaint, and on January 12, 2012, with the Court's permission, filed an Amended Answer.  Dkt. 20, 29.

On August 15, 2012, Trading moved for summary judgment.  Dkt. 32–69.  On October 29, 2012, NAF submitted its opposition.  Dkt. 44–46, 48.  On November 12, 2012, Trading submitted its reply.  Dkt. 49–51.  On January 29, 2013, the Court heard oral argument.

## II.      Discussion

Trading moves for summary judgment on three grounds.  First, it argues, NAF has not suffered an injury in fact, and therefore lacks Article III standing and has failed to state a claim. Second, it argues, NAF may not properly bring claims for damages based on injuries suffered only by its subsidiaries.  Third, it argues, Trading properly terminated the BAA.  Trading Br. 15– 25.  NAF counters that whether NAF suffered an injury in fact, and whether Trading breached the BAA, are questions of fact that preclude summary judgment.  And it argues that as a parent corporation, it may assert a claim for damages sustained by its subsidiaries.  NAF Br. 16–30.

For the reasons that follow, the Court holds that the injury upon which NAF seeks to recover fell, if at all, only upon NAF's subsidiaries, not NAF; that any right NAF has to bring suit would therefore be in a derivative, not direct, capacity; and that because NAF's subsidiaries have both expressly relinquished their rights to pursue claims against Trading, NAF may not pursue such a lawsuit.  Summary judgment is thus merited in favor of Trading.

### A.  Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to

the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

### B. Choice of Law

The parties cite to both Delaware and New York law but do not address choice of law. Because this Court's subject matter jurisdiction is based solely upon diversity, we apply the choice of law rules of the forum state—here, New York. *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980) (citing *Swanson v. Traer*, 354 U.S. 114, 116 (1957)).

Under those rules, New York law applies to substantive issues relating to the formation, interpretation, and alleged breach of the BAA. The BAA contains a forum selection clause providing that it "shall be governed by and construed in accordance with the laws of the State of New York."[5] BAA § 18. Such forum selection clauses are "prima facie valid and enforceable unless shown by the resisting party to be unreasonable." *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 612 (S.D.N.Y. 2008) (quoting *Brooke Grp. v. JCH Syndicate 488, et al.*, 87 N.Y.2d 530, 534 (1996)); *see also Sterling Nat'l Bank v. E. Shipping Worldwide, Inc.*, 35 A.D.3d 222, 222 (1st Dep't 2006) ("[I]t is the well-settled 'policy of the courts of this State to enforce contractual provisions for choice of law and selection of a forum for litigation.'" (quoting *Koob v. IDS Fin. Servs.*, 212 A.D.2d 26, 33 (1st Dep't 1995))).

---

[5] The Merger Agreement contains a forum-selection clause (at § 9.4) identifying Delaware law as governing law, but the NAF Subsidiaries and Trading are not parties to that agreement.

However, whether NAF can bring a shareholder suit to vindicate claims of injuries directly felt by its subsidiaries is a question of corporate law.  On such questions of corporate law, New York law defers to the state of incorporation:  New York courts "look to the law of the state of incorporation in adjudicating a corporation's 'internal affairs,' including questions as to the relationship between the corporation's shareholders and its directors."  *Galef*, 615 F.2d at 58; *see also* N.Y. Ltd. Liab. Co. Law § 801(a) ("[T]he laws of the jurisdiction under which a foreign limited liability company is formed govern its organization and internal affairs.").  The law of the state of incorporation also governs the question whether a particular shareholder suit is direct or derivative.  *Seidl v. Am. Century Companies, Inc.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y. 2010) *aff'd*, 427 F. App'x 35 (2d Cir. 2011); *Finkelstein v. Warner Music Grp. Inc.*, 32 A.D.3d 344, 345 (1st Dep't 2006).  The same is true if the inquiry is presented as whether NAF may pierce the corporate veil separating it from its subsidiaries.  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 85 n.10 (S.D.N.Y. 2010) ("Under New York choice-of-law principles, the issue of whether the corporate veil may be pierced is determined under the law of the state of incorporation." (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))).  Here, NAF and the NAF Subsidiaries are organized under the laws of Delaware, *see* Pl. 56.1 ¶¶ 1, 5, 7; Def. 56.1 ¶¶ 1, 5, 6.  Delaware law therefore applies to such questions relating to NAF's internal affairs.

### C.  Because NAF Has Not Suffered a Direct Injury, Its Claims Are Exclusively Derivative in Nature

NAF asserts that it suffered a direct injury when the merger with Hampshire fell through. However, pressed at argument to be concrete as to the nature of that injury, NAF stated only that its subsidiaries had lost value as a result of the failed merger, and that NAF was thus injured in its capacity as the 100% shareholder/owner of the subsidiaries.  The Court then asked counsel for NAF whether NAF suffered any injury *other* than through the diminished value of the

subsidiaries that it wholly owned. NAF's counsel identified none. Consistent with this, NAF's Second Amended Complaint also lacks any concrete allegation of an injury to NAF from Trading's alleged breach and the collapse of the merger allegedly caused by that breach, other than that NAF's ownership stake in the NAF Subsidiaries lost value.

Under these circumstances, any viable lawsuit brought by NAF against Trading for breach of contract resulting in the collapse of the merger would necessarily be a derivative one, on behalf of the NAF Subsidiaries, and any recovery would go to the NAF Subsidiaries, not NAF. Under Delaware law, to determine whether a shareholder suit is direct or derivative,

> "[a] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004). The inquiry thus turns on "(1) who suffered the alleged harm (the corporation or the stockholders); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders individually)." *Id.* at 1035. [6]

Measured against this standard, NAF's claim is necessarily derivative. It is only through a loss to the NAF Subsidiaries that NAF claims to have suffered a loss at all. And the Delaware Supreme Court has repeatedly emphasized that a decrease in a shareholder's stock's value can be asserted only as a derivative claim. *See Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006) ("Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In

---

[6] This same analysis would apply under New York law. *See Yudell v. Gilbert*, 99 A.D.3d 108, 114–15 (1st Dep't 2012) (expressly adopting *Tooley* standard).

the eyes of the law, such equal 'injury' to the shares . . . is not viewed as, or equated with, harm to specific shareholders individually."); *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("Thus, where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature."); *see also Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550 (SHS), 2006 WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) ("Because injury alleged by a diminution of investment value is indirect and contingent upon injury to the corporation, the claim is derivative." (citing *Kramer*, 546 A.2d at 353)), *aff'd*, 242 F. App'x 735 (2d Cir. 2007). Tellingly, NAF states in its brief that, as a parent, there are "damages that flow to it from NAF II and NAF Acquisition." NAF Br. 26. A suit to recover for such injuries is the paradigm of a derivative, as opposed to a direct, lawsuit.

### D.  NAF May Not Directly Assert Its Subsidiaries' Claims

NAF claims that these familiar rules do not apply, because it is a corporate parent. It asserts that, in that capacity, it is entitled *itself* to recover for injuries suffered by its subsidiaries. But the case law in Delaware—and New York—refutes that claim. Delaware law firmly holds that a parent does not have the right to recover for claims that belong to a subsidiary corporation. Rather, a parent's interest in such a claim is only indirect and, as such, the claim must be asserted derivatively on behalf of the subsidiary or by the subsidiary itself. *See Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081 n.13 (Del. 2011) (parent corporation has only *indirect* property interest in a claim of its subsidiary, subject to the subsidiary's board's discretionary power to decide whether to enforce that claim); *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1205 (Del. Ch. 2010) ("The parent corporation does not receive the right to sue as a result of the merger and cannot assert directly the right of the

subsidiary."); *see also Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684,

686–87 (Del. 1959) (describing parent corporation's property interest in subsidiary's corporate

assets, including claims, as an "indirect interest" which creditors of parent cannot reach directly,

absent fraud); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008)

("[A] plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces 'a

difficult task.'" (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV. A. 1331, 1989 WL

110537, at *4 (Del. Ch. Sept. 19, 1989))).  *Cf. Japan Petroleum Co. (Nigeria) Ltd. v. Ashland*

*Oil, Inc.*, 456 F. Supp. 831, 838 (D. Del. 1978) ("Thus, under ordinary circumstances, a parent

corporation will not be held liable for the obligations of its subsidiary.").  Moreover, Delaware

law recognizes that, where a subsidiary is wholly owned by a parent, there is no need for the

parent to bring a lawsuit.  Rather, "the parent, as a practical matter and by virtue of its 100%

control, can cause its wholly owned subsidiary to enforce its claim directly."  *Sagarra*

*Inversiones*, 34 A.3d at 1081 n.13.  Notably, NAF has not argued that it lacks the authority or

ability to direct NAF II or NAF Acquisition to bring suit directly against Trading.

New York law similarly bars parent corporations from bringing direct suits aimed at

vindicating injuries suffered by their subsidiaries.  The Second Circuit has noted that a corporate

subsidiary is a "separate corporation," and the parent company thus does not have any inherent

"standing to assert [the subsidiary's] legal rights."  *Hudson Optical Corp. v. Cabot Safety Corp.*,

No. 97-9046, 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998) (summary order); *see also In re*

*Beck Indus., Inc.*, 479 F.2d 410, 418 (2d Cir. 1973) ("Where a parent corporation desires the

legal benefits to be derived from organization of a subsidiary that will function separately and

autonomously in the conduct of its own distinct business, the parent must accept the legal

consequences, including its inability later to treat the subsidiary as its alter ego because of certain

advantages that might thereby be gained.  In short the parent cannot 'have it both ways.'");

*Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *6

(S.D.N.Y. Oct. 12, 2012) ("It is black-letter law that one corporation cannot assert an affiliate's

legal rights."); *Pac. Elec. Wire & Cable Co., Ltd. v. Set Top Int'l, Inc.*, No. 03 Civ. 9623 (JFK),

2005 WL 578916, at *8 (S.D.N.Y. Mar. 11, 2005) ("A parent corporation may not pierce the

corporate veil in order to assert the claims of its subsidiary." (citation omitted)); *Bross Util. Serv.*

*Corp. v. Aboubshait*, 618 F. Supp. 1442, 1444–45 (S.D.N.Y. 1985) ("A parent corporation

cannot create a subsidiary corporation and then ignore the separate corporate existence of that

subsidiary whenever it would be advantageous to the parent. . . . Thus, the courts will not allow a

*parent* to pierce the corporate veil it created for its own benefit, so as to assert the claims of its

subsidiary." (emphasis in original)).  Under New York law, the fact of corporate affiliation does

not give an entity the right to bring a suit in its own name for an injury to an affiliate.  *See, e.g.*,

*Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 495 (S.D.N.Y. 2003) *aff'd in part, vacated*

*in part, remanded, on other grounds*, 388 F.3d 39 (2d Cir. 2004) ("While, given their affiliated

status, it may be that Motorola, Inc. and MCC can be conflated or viewed as agents of one

another for certain evidentiary and other purposes, when it comes to bringing a claim the

corporate forms must be respected and, absent an assignment or the like (not present here), only

a company that itself suffered an injury can sue on that claim."); *Wilhelmina Models, Inc. v.*

*Fleisher*, 19 A.D.3d 267, 269 (1st Dep't 2005) ("As separate entities from the potential

borrower, plaintiffs could not directly profit from the loan proceeds and therefore damages were

insufficiently pleaded.").  *Cf. Green Island Power Auth. v. F.E.R.C.*, 577 F.3d 148, 161 (2d Cir.

2009) (holding that subsidiary had "fail[ed] to explain the mechanism by which injury would

flow to it" from injury to its parent, and thus subsidiary had no standing).

NAF relies on two cases to support its claim of entitlement as a corporate parent to sue in its own name to vindicate injuries directly felt by its subsidiaries, but both are inapposite. The plaintiff in *Astra Oil Trading NV v. PRSI Trading Co.*, 794 F. Supp. 2d 462, 471–72 (S.D.N.Y. 2011) was a parent company that was pursuing *its own* indemnification claim against a partnership. The partnership asserted that the parent lacked standing to sue the partnership, because the parent, in making its payment as guarantor, had directed "that funds be transferred from its subsidiary's account." *Id.* at 472. The district court recognized, however, that the legal duty to pay, and therefore the legal right to recover, belonged to the parent, regardless of where the parent had obtained the money that it had used to pay its guarantee. *Id.* Here, by contrast, NAF has failed to identify any injury to it, as opposed to its subsidiaries, when the merger with Hampshire collapsed.

*Lumbermens Mutual Casualty Co. v. Pennsylvania*, 856 N.Y.S.2d 499 (table), 2008 WL 223274 (Sup. Ct. 2008) *rev'd and remanded*, 52 A.D.3d 212 (1st Dep't 2008), is also unhelpful to NAF. NAF contends that that trial court decision shows that "New York law clearly allows a parent corporation to assert a claim for damages sustained by its wholly-owned subsidiary." NAF Br. 25. NAF relies on a single sentence in which the *Lumbermens* court stated: "It is well settled in New York that a parent company of a wholly owned subsidiary, whose pecuniary interest is directly affected, has standing to prosecute and defend its subsidiary's claims." *Id.* at *2–3. But this statement does not avail NAF, for a host of reasons. First, it is dictum, because the subsidiary was a party to that case. Second, it is unsupported by the cases which *Lumbermens* cited in support of this proposition, which primarily deal with the assessment of a subsidiary's property for tax purposes. Third, the only two cases to cite *Lumbermens* for this proposition declined to follow *Lumbermens*, on the grounds that the decision had been reversed.

*See Digital Broadcast Corp. v. Ladenburg, Thalmann & Co., Inc.*, 2008 NY Slip Op. 33451U, 18 (Sup. Ct. Dec. 11, 2008); *Fin. Guar. Ins. Co. v. IKB Deutsche Industriebank AG*, 2008 NY Slip Op. 33495U (Sup. Ct. 2008).  Fourth, the law in both Delaware and New York, canvassed above, is squarely to the contrary.  Fifth and finally, even if the *Lumbermens* formulation were the law, NAF would still not have the right to sue here, because there is no evidence in the summary judgment record that NAF's "pecuniary interest" was "directly affected" by the failed merger. Its pecuniary interest was at most indirectly affected, by virtue of the diminished value of its subsidiaries.

### E.  The NAF Subsidiaries Are Third-Party Beneficiaries of the BAA

In a final argument why it may pursue a direct claim, NAF noted at argument that, in December 2008, when it entered into the BAA with Trading, the NAF Subsidiaries did not exist. They were instead created shortly afterwards, by NAF, in contemplation of the merger.  But that fact does not alter the analysis.  NAF's subsidiaries, and not NAF, were the parties to the merger whose collapse NAF claims caused injury.  NAF does not explain why the fact that it (and not its later-created subsidiaries) was the signatory to the BAA means that it was injured by Trading's alleged breach of that agreement.

Furthermore, the NAF Subsidiaries were clearly third-party intended beneficiaries of the BAA, such that they could lawfully pursue a claim that Trading breached that agreement.  Under New York law, to show a right to sue as a third-party beneficiary, a plaintiff must establish:

> "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [its] benefit, and (3) that the benefit to [it] is sufficiently immediate . . . to indicate the assumption by the contracting parties of a duty to compensate [it] if the benefit is lost."

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citation omitted).

Those elements are comfortably met here.  First, for purposes of this motion, it is undisputed that the BAA was a valid and binding contract.

Second, the BAA was intended for the subsidiaries' benefit.  As the Second Circuit has explained:

> "[a]n intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance. . . . In determining third party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement. Moreover, it is well-settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract."

*Trans-Orient Mar. Corp. v. Star Trading & Mar., Inc.*, 925 F.2d 566, 573 (2d Cir. 1991) (citing Restatement (Second) of Contracts § 302 (1981)) (other citations omitted); *see also Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) ("To create a third party right to enforce a contract, 'the language of the contract' must 'clearly evidence[] an intent to permit enforcement by the third party.'" (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)) (alterations in original) (emphasis omitted)); *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1234 (S.D.N.Y. 1994) (intent of the promisee governs).  On its face, the BAA was explicitly intended to effectuate the merger with Hampshire, whether by NAF, or, as later emerged, by the subsidiaries it created for the purposes of effectuating that merger.  And under New York law, "the identity of a third-party beneficiary to a contract need not be known at the time the contract is executed."  *Saratoga Schenectady Gastroenterology Assocs., P.C. v. Bette & Cring, LLC*, 83 A.D.3d 1256, 1257 (3d Dep't 2011).  Moreover, the text of the BAA and the surrounding circumstances of the merger fairly anticipate an intention that a wholly-owned subsidiary of NAF, rather than NAF itself, might be used as the vehicle to acquire Hampshire.  The BAA's recitations state that the purpose of the BAA was to enable NAF to

"acquir[e] a target company," Hampshire.  BAA 1(A).  There is no limiting language in the BAA to the effect that such an acquisition would be accomplished directly by NAF, as opposed to indirectly, by a subsidiary.  On the contrary, the BAA contains an exclusivity provision that implies that such an affiliate might be utilized:  It bars Trading from providing sourcing services to Hampshire or any entity considering the purchase of Hampshire, "unless such entity *is related to [NAF]*."  BAA § 23 (emphasis added).  And in December 2008, the same month that the BAA was executed, Gerszberg, NAF's owner, had stated to Wells Fargo that he planned to create a subsidiary to carry out the merger.  *See* Gerszberg Dep. Ex. 13, at 2 ("We understand that you and a group of investors intend to form a new entity that will merge with Hampshire Group, Ltd. . . .").

Third and finally, the benefit to the NAF subsidiaries under the BAA is "sufficiently immediate" to indicate that NAF and Trading intended to compensate the subsidiaries in the event of a breach by Trading.  Had the acquisition of Hampshire gone through, Hampshire would have merged into NAF Acquisition and would have survived as the indirect subsidiary of NAF (via NAF II).  It is thus apparent that NAF's intent (as promisee) was that its subsidiary would have had the right to Trading's performance under the BAA.  *See Consol. Edison, Inc.*, 426 F.3d at 527 ("A non-party is an intended third-party beneficiary if (*inter alia*) 'recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties.'" (quoting Restatement (Second) of Contracts § 302 (1981))).  And because the NAF Subsidiaries were acquiring Hampshire, it was to their benefit, not NAF's, that Trading was to perform, by providing Hampshire, post-merger, with sourcing services.  *See Trepel v. City of New York*, No. 98-CV-6327 (JG), 2000 WL 1364362, at *6 (E.D.N.Y. Sept. 11, 2000) ("[W]here the performance is rendered directly to a third party, that party is generally considered an intended

beneficiary of the contract." (quoting *Alicea v. City of New York*, 145 A.D.2d 315, 318 (1st Dep't 1988))); *see also Noveck v. PV Holdings Corp.*, 742 F. Supp. 2d 284, 296 (E.D.N.Y. 2010) ("An intent to benefit a third party can . . . be found when no one other than the third party can recover if the promisor breaches the contract . . . ." (quoting *Alicea*, 145 A.D.2d at 318)), *aff'd, appeal dismissed sub nom. Noveck v. Avis Rent A Car Sys., LLC*, 446 F. App'x 370 (2d Cir. 2011).

**F. NAF's Derivative Claims Are Barred**

The Court therefore holds that, to the extent that NAF had the ability to sue Trading for allegedly breaching the BAA and causing the merger with Hampshire to fall through, such a suit would be a derivative one, based on NAF's status as a shareholder of the assertedly injured subsidiaries.

NAF, however, has not attempted to meet the pleading requirements of a derivative lawsuit.[7]  Nor are the derivative lawsuit procedures designed for this situation:  Delaware law recognizes that a parent company can simply direct its wholly-owned subsidiary to enforce its own claim directly.  *See Sagarra Inversiones*, 34 A.3d at 1081 n.13; *Lambrecht v. O'Neal*, 3 A.3d 277, 288–89 (Del. 2010).

Moreover, even assuming that these pleading requirements had been met, the decisive fact, fatal to NAF's claim, is that the NAF Subsidiaries no longer have a viable claim against Trading.  Both subsidiaries relinquished any such claim in their settlement agreement with

---

[7] Federal Rule of Civil Procedure 23.1(b) requires a derivative plaintiff to "state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  NAF has pled neither a demand nor demand futility.  And the facts pled do not suggest that the directors of the NAF Subsidiaries' boards were compromised in their ability to independently assess a demand by shareholder NAF that they bring suit against Trading.  Quite the contrary, because NAF presumably controls the boards of its wholly-owned subsidiaries, there is every reason to expect that those boards would give, at a minimum, full and fair attention to a demand by NAF.

Hampshire.  That broadly-worded agreement included an express waiver of claims by the NAF

Subsidiaries and Gerszberg "*against any person, whether or not a party to this Settlement*

*Agreement* to recover damages, attorneys fees, expenses of any type or *any other losses allegedly*

*sustained as a result of the Transaction Agreements or the Transaction*."  Settlement Agreement

13813 (§7) (emphasis added).  At argument, counsel for NAF acknowledged that that language

bars the NAF Subsidiaries from suing Trading.  It thus equally bars their shareholder, NAF, from

suing Trading derivatively on their behalf.

## CONCLUSION

For the reasons articulated above, the Court grants summary judgment in favor of

Trading.  Because the Court enters summary judgment for Trading on this ground, the Court

does not reach Trading's additional arguments—which the Court views as substantial—as to

why summary judgment is merited in its favor.

The Clerk of Court is directed to terminate the motion pending at docket number 32 and

to close this case.


SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge


Dated: February 8, 2013
       New York, New York