UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

NAF HOLDINGS, LLC,

                         Plaintiff,

          -v-

LI & FUNG (TRADING) LIMITED,

                      Defendant.

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/1/16

10 Civ. 5762 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This breach of contract case is now before the Court on defendant's motion for summary judgment, following—on defendant's motion to dismiss—a trip to the Second Circuit and a detour to the Delaware Supreme Court. Plaintiff NAF Holdings, LLC ("NAF") sues Li & Fung (Trading) Limited ("Trading"). NAF, anticipating a merger between its subsidiary and an apparel company called Hampshire Group, Limited ("Hampshire"), contracted with Trading to provide "sourcing services" to the new company. NAF secured financing for the planned merger that was conditioned on Trading's providing such post-merger services. NAF's claim here is that when Trading backed away from its commitment at the eleventh hour, Trading caused the merger to fail and cost NAF some $49 million.

Trading moves for summary judgment on essentially two grounds: (1) lack of causation, *i.e.*, that the merger's failure was caused by other factors, and not by any breach on Trading's part; and (2) inadequate proof of the amount of NAF's damages. For the following reasons, the Court denies Trading's motion.

I.      **Background**[1]

   A.      **Parties**

NAF is a Delaware limited liability company wholly owned by Efrem Gerszberg.  NAF 56.1 ¶¶ 1–2.  NAF has two non-party subsidiaries: NAF Holdings II LLC ("NAF II"), a wholly owned subsidiary of NAF; and NAF Acquisition Corp. ("NAF Acquisition"), a wholly owned subsidiary of NAF II (collectively, "NAF Subsidiaries").  *Id.* ¶¶ 4–5.  (The Court henceforth uses "NAF" to encompass NAF and its subsidiaries, save that, where the identity of a particular entity is important, the Court so specifies.)

Trading is a Hong Kong company that provides "sourcing" services to apparel companies.  Such services include identifying factories that meet an apparel company's needs and assisting it in placing orders with such factories.  *Id.* ¶¶ 6–7.

   B.      **Undisputed Facts**

Many facts relevant to this motion are undisputed.  The Court summarizes these chronologically.

      1.      **Oct.–Nov. 2008:  The Planned Merger with Hampshire**

NAF was formed for the purpose of buying Hampshire, a public company in the apparel business.  *Id.* ¶ 3.  In 2008, Hampshire's business was in decline.  *Id.* ¶ 8.

---

[1] The Court's account of the underlying facts is drawn from the Declaration of John J. Hay in support of Trading's motion for summary judgment, Dkt. 89 ("Hay Decl."), and attached exhibits; the Declaration of George A. Reihner in opposition to the motion for summary judgment, Dkt. 97 ("Reihner Decl."), and attached exhibits; the Supplemental Declaration of John J. Hay, Dkt. 101 ("Hay Supp. Decl."); Trading's Local Rule 56.1 Statement of Material Facts, Dkt. 91 ("Trading 56.1"); and NAF's Local Rule 56.1 Counter-Statement of Material Facts, Dkt. 98 ("NAF 56.1").  Citations to a party's 56.1 statement incorporate by reference the documents cited therein.  When the parties agree on the facts, the Court cites only to the NAF 56.1, which restates and admits many facts stated in the Trading 56.1.  "Tr." refers to the transcript of the March 11, 2016 oral argument.  Dkt. 110.

On or about October 23, 2008, NAF sent Hampshire's Board of Directors a letter of intent offering to buy Hampshire through a public tender offer at $8 per share. *Id.* ¶ 16. About two weeks later, Hampshire and NAF entered into a letter agreement under which NAF could proceed with diligence in contemplation of acquiring Hampshire. *Id.* ¶ 17.

### 2. December 2008:  NAF's Agreement with Trading; NAF Secures Post-Merger Financing

In December 2008, following the NAF/Hampshire letter agreement, NAF and Trading entered into a "buying agency agreement" ("BAA") whereby Trading would provide sourcing services for Hampshire after its acquisition by NAF.[2]  *See id.* ¶ 18; Hay Decl., Ex. B ("BAA"). NAF believed that Trading could help negotiate better prices and terms of payment with Hampshire's factories.  NAF 56.1 ¶ 15.  Also in December, Wells Fargo Trade Capital, LLC ("Wells") provided NAF with a loan commitment letter for $75 million to finance Hampshire's post-merger operations, under which Wells would provide $37.5 million and would help secure third-party financing for the balance.  *See id.* ¶¶ 19–21.

### 3. Jan.–Feb. 2009:  NAF Secures Tender Offer Financing; NAF and Hampshire Enter into Merger Agreement

In January 2009, Keba, LLC ("Keba") agreed to provide NAF with up to $40 million of financing for the tender offer, contingent on NAF's financing for post-merger operations.  *Id.* ¶ 12;[3] *see also* Hay Decl., Ex. K ("Yagoda Decl."), ¶ 6 ("Prior to any obligation to fund the bridge loan, Keba also required that post-merger Hampshire have a working capital line of credit

---

[2] Trading appears to dispute that it finalized the BAA, but concedes that this is a question of fact unsuited for resolution on summary judgment.  *See* Tr. 7.  The Court therefore assumes for purposes of this decision that the parties had a valid agreement, and that Trading breached it.

[3] NAF denies that the exhibit cited by Trading establishes this factual proposition.  NAF 56.1 ¶ 12.  The Court finds the exhibit sufficient to do so.  *See* Hay Decl., Ex. K, ¶¶ 4, 6.  In any event, the parties do not appear to dispute any facts relating to Keba's financing.  Any dispute as to the exhibit is immaterial to this decision.

in place."). In February 2009, after NAF and Wells were unable to obtain third-party financing, they reached a new financing arrangement whereby Wells provided a revised loan commitment letter for a $40 million credit facility to finance Hampshire's post-merger operations.[4] *See id.* ¶¶ 22–25. These financing commitments—both Wells's and Keba's—were expressly conditioned on the existence of NAF's contract with Trading. *Id.* ¶ 26; *see* Yagoda Decl. ¶¶ 6–8.

On or about February 23, 2009, the NAF Subsidiaries entered into a merger agreement with Hampshire. *Id.* ¶ 31; *see also* Hay Decl., Ex. G, Def. Ex. 27 ("Merger Agreement"). (NAF itself was not a party to this agreement.) The Merger Agreement contemplated that NAF Acquisition would commence a tender offer to acquire all of Hampshire's outstanding shares of common stock and that NAF Acquisition would merge into Hampshire. NAF 56.1 ¶ 32. The agreed price set forth in the Merger Agreement was $5.55 per share, or $30,353,865 for all Hampshire shares. *Id.* ¶ 35.

The Merger Agreement provided that NAF's offer to purchase Hampshire stock would expire at midnight on the date 20 business days after the offer was commenced. *See* Merger Agreement § 1.1(d). The parties agree that this "Expiration Date," which was extended several times, was March 27. *See* NAF 56.1 ¶ 42. The Merger Agreement separately defines as the "Termination Date" the last date that either party could, pursuant to certain conditions, terminate the agreement. *See* Merger Agreement § 8.2(a). The Merger Agreement initially set the Termination Date for June 23, 2009. *See id.*

---

[4] Under the new agreement, Wells would provide up to $30 million and Glenhill Capital would provide $10 million. *Id.* ¶¶ 24–25.

### 4.    March 2009:  Trading Terminates Its Relationship with NAF

In an email on March 23, 2009, Trading sought additional security from NAF.  NAF 56.1

¶ 37.  Specifically, Trading sought a cash deposit of $5 million and a standby letter of credit,

opened in Trading's favor, in the amount of $11.5 million.  *Id.* ¶ 38.

On March 25, 2009, Gerszberg, on behalf of NAF, sent an email to Trading refusing to

provide the requested additional security.  *Id.* ¶ 39.

On or about March 30, 2009, Trading ended its relationship with NAF, including the

relationship under the BAA.[5]  *Id.* ¶ 40.  For the purposes of this motion, the Court assumes that

Trading thereby breached the BAA on March 30, 2009.  *See* Tr. 7.

### 5.    April 2009:  NAF Attempts to Proceed with the Merger

As of March 27, 2009, the Expiration Date set in the Merger Agreement, an insufficient

number of Hampshire's shares had been tendered.  NAF 56.1 ¶ 43.  Therefore, even if Trading

had not breached, it was impossible for NAF to complete the merger on that date.  (Trading's

obligations under the BAA were not evidently conditioned on the merger being ready to close, or

having closed, on March 27 or by any specific date thereafter.)

The tender offer's Expiration Date was extended until March 31, 2009 and then again

until April 17, 2009, as NAF tried to secure the necessary shares.  *Id.* ¶ 44.  As of April 17, 2009,

the necessary shares had been tendered, but Hampshire did not have enough cash on hand to

satisfy a separate condition of the Merger Agreement.  *Id.* ¶ 45.  The NAF Subsidiaries and

Hampshire therefore again extended the Expiration Date, this time to April 24, 2016.  *Id.* ¶ 46.

On April 20, 2016, the NAF Subsidiaries and Hampshire amended the Merger Agreement

to reflect that the BAA with Trading was no longer in force.  *See id.* ¶¶ 47–48; Hay Decl., Ex. G,

---

[5] NAF claims that Trading actually terminated the relationship on March 25, 2009 by advising
Trading personnel to that effect.  Any dispute on this point is not material to this decision.

Def. Ex. 56 ("Amendment").  The Amendment reflected that the NAF Subsidiaries knew of no circumstance suggesting they would be unable to get financing from Wells.  *See* NAF 56.1 ¶ 49.  Apparently anticipating that financing could be promptly secured even though Trading was out of the picture, the Amendment moved the Termination Date—the last date either party could terminate the Merger Agreement—up from June 23, 2009 to April 26, 2009.  *See* Amendment § 2(c).

In the meantime, throughout April 2009, NAF tried to secure financing, taking steps to assure Wells that the Hampshire venture remained viable.  For instance, Gerszberg recruited an individual named Ruby Azrak, who was well regarded by Wells, to replace Trading as a sourcing provider.  *See* Hay Decl., Ex. G ("Gerszberg Dep."), at 482; Trading 56.1 ¶ 51.[6]

On or about April 8, 2009, Gerszberg submitted a proposal to Wells seeking a $40 million loan commitment unconditioned on any participation by Trading.  NAF 56.1 ¶ 50.  On April 24—a Friday, two days before the Termination Date—Wells decided to extend the loan facility, but required additional collateral from NAF in light of Hampshire's deteriorating financial condition.  *See* Trading 56.1 ¶¶ 52–54; Hay Decl., Ex. F ("Austin Decl."), ¶¶ 4–7; Hay Decl., Ex. G, Def. Ex. 76 ("4/24/09 Emails").  A Wells senior vice president, Peter Austin, informed Gerszberg that Wells had the necessary approvals and would begin drafting a revised commitment letter.  NAF 56.1 ¶ 55; *see also* 4/24/09 Emails at 2 (Austin email at 2:20 p.m.).  Gerszberg then asked Austin when the commitment letter would be ready, to which Austin replied "Monday."  4/24/09 Emails at 1–2 (Gerszberg email at 2:50 p.m.; Austin email at 2:51 p.m.).  Gerszberg asked Austin if he could get the commitment letter sooner, explaining, "I have

---

[6] NAF objects to Trading's 56.1 statement regarding Azrak, apparently because that statement does not include the details that Gerszberg's accountants also recommended Azrak and that Azrak "wanted at least 50% of the equity for getting involved."  NAF 56.1 ¶ 51.  The Court's in-text proposition regarding Azrak appears to be undisputed.

to accept the shares [S]unday . . . .  We need to have it to buy the shares."  *Id.* at 1 (Gerszberg email at 3:55 p.m.).  Austin responded, "Earliest Monday on commitment letter.  Needs to be reviewed and signed by appropriate party.  Let me know what you need in lieu of that."  *Id.* at 1 (Austin email at 4:09 p.m.).  The email exchange concludes with Gerszberg and Austin agreeing that the closing could occur on Wednesday, April 29, 2009.  Austin commented, "There are some ends to tie up but we will get there."  Reihner Decl., Ex. U (Austin email at 4:52 p.m.).

### 6.      NAF Terminates the Merger Agreement

Gerszberg, on behalf of the NAF Subsidiaries, terminated the Merger Agreement on April 26, the last day to do so under the April 20 Amendment.  *See* NAF 56.1 ¶ 58.  At or around this time, Gerszberg attributed the termination to *Hampshire*'s breach of various covenants in the Merger Agreement and to Hampshire's eroding financial condition.  *See id.* ¶¶ 59–64; Hay Decl., Ex. G, Def. Ex. 60 ("SEC Filing").  On May 20, 2009, for example, Gerszberg, on behalf of the NAF Subsidiaries, reported to the SEC that Hampshire's representations contained "material inaccuracies" and that its recent balance sheets "evidenced a material deterioration in Hampshire's financial condition."  SEC Filing 5.  Gerszberg did not state at the time that any alleged breach of contract, or for that matter any other conduct by Trading, had caused NAF to decide to terminate the merger.

On the contrary, Gerszberg, NAF, and the NAF Subsidiaries threatened to commence a lawsuit against *Hampshire*, rather than Trading.  NAF 56.1 ¶ 66.  They sent Hampshire a draft complaint setting forth their prospective claims.  *Id.* ¶ 67; *see* Hay Decl, Ex. G, Def. Ex. 63 ("Draft Complaint").  Consistent with the May 2009 SEC Filing, the Draft Complaint alleged, *inter alia*, that in April 2009 Hampshire informed Gerszberg that it had discovered false or misleading internal financial information, among other problems.  *See* NAF 56.1 ¶ 70.  On September 28, 2009, to resolve potential claims, Gerszberg and the NAF Subsidiaries (but not

NAF) entered into a settlement agreement with Hampshire pursuant to which Hampshire paid them $833,000.  *See id.* ¶¶ 68–69; Hay Decl., Ex. G, Def. Ex. 64 ("Settlement Agreement").

### C.    Procedural History

On July 29, 2010, NAF filed the complaint in this case.  Dkt. 1.  On December 16, 2010, and May 13, 2011, respectively, NAF filed an Amended Complaint and a Second Amended Complaint.  Dkts. 8, 18.  On May 31, 2011, Trading answered the Second Amended Complaint, and on January 12, 2012, with the Court's permission, Trading filed an Amended Answer.  Dkts. 20, 29.

On August 15, 2012, Trading moved for summary judgment.  Dkt. 32.  Trading asserted three grounds for summary judgment: (1) lack of causation; (2) lack of standing to bring claims for damages predicated on injuries to a subsidiary; and (3) proper termination of the BAA by Trading.  *See* Dkt. 33.  On February 8, 2013, after briefing and argument, the Court granted summary judgment in favor of Trading on the ground that "the injury upon which NAF seeks to recover fell, if at all, only upon NAF's subsidiaries, not NAF; that any right NAF has to bring suit would therefore be in a derivative, not direct, capacity; and that because NAF's subsidiaries have both expressly relinquished their rights to pursue claims against Trading, NAF may not pursue such a lawsuit."  Dkt. 56, *reported at NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 Civ. 5762 (PAE), 2013 WL 489020, at *4 (S.D.N.Y. Feb. 8, 2013) ("Feb. 2013 Decision").  The Court's decision rested on categorical language in Delaware case law[7] stating that, to bring a direct suit, "the stockholder's [*i.e.*, NAF's] claimed direct injury must be independent of any alleged injury to the corporation [*i.e.*, the NAF Subsidiaries]."  *Tooley v.*

---

[7] Delaware law applied because NAF and the NAF Subsidiaries are organized under the laws of that state.  *See* Feb. 2013 Decision at *5.

*Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (cited by Feb. 2013

Decision at *6).

NAF timely appealed. Dkt. 61. On November 19, 2014, the Second Circuit certified the

following question to the Delaware Supreme Court:

> Where the plaintiff has secured a contractual commitment of its contracting
> counterparty, the defendant, to render a benefit to a third party, and the
> counterparty breaches that commitment, may the promisee-plaintiff bring a direct
> suit against the promisor for damages suffered by the plaintiff resulting from the
> promisor's breach, notwithstanding that (1) the third-party beneficiary of the
> contract is a corporation in which the plaintiff-promisee owns stock; and (ii) the
> plaintiff-promisee's loss derives indirectly from the loss suffered by the third-
> party beneficiary corporation; or must the court grant the motion of the promisor-
> defendant to dismiss the suit on the theory that the plaintiff may enforce the
> contract only through a derivative action brought in the name of the third-party
> beneficiary corporation?

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 750 (2d Cir. 2014). On June 24,

2015, the Delaware Supreme Court, effectively modifying its prior categorical statements, held

that NAF was not barred from bringing a direct action for breach of contract. *NAF Holdings,*

*LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 (Del. 2015). On September 4, 2015, in

light of the Delaware Supreme Court's clarification of Delaware law, the Second Circuit vacated

the grant of summary judgment in favor of Trading. Dkt. 63, *reported at NAF Holdings, LLC v.*

*Li & Fung (Trading) Ltd.*, 801 F.3d 92 (2d Cir. 2015). It remanded the case "for consideration

of whether the Settlement Agreement [between the NAF Subsidiaries and Hampshire] bars this

direct suit (as well as consideration of [Trading's] other two grounds for summary judgment)."

*Id.* at 95.

On November 20, 2015, Trading moved anew for summary judgment. Dkt. 73. In its

brief, Trading argued only one of the two remaining grounds from its original motion (lack of

causation). It did not argue (as the Second Circuit apparently anticipated) that the Settlement

Agreement between the NAF Subsidiaries and Hampshire barred NAF's suit against Trading.

Trading also raised a new ground for summary judgment, namely, failure to prove the amount of damages. *See* Dkt. 75.

NAF promptly filed a letter with the Court objecting to the introduction of this last, new asserted basis for summary judgment. Dkt. 81. The Court then directed Trading to explain its basis for making this new argument and to clarify whether it intended to waive the arguments that Trading properly terminated the BAA and that the Settlement Agreement barred NAF's suit. Dkt. 83. As to the first point, Trading responded that neither the Second Circuit nor this Court had barred it from raising a new ground for summary judgment on remand; as to the second, Trading stated that while it did not "intend to waive" any arguments, it was "not asserting" them. Dkt. 84. The Court thereupon ordered Trading to re-file its motion for summary judgment, directing Trading that its motion "must include all arguments for summary judgment that Trading wishes ever to pursue." Dkt. 85.

On December 9, 2015, Trading re-filed its motion for summary judgment, Dkt. 88, raising only the same two grounds from its November 20 motion: lack of causation and inadequate proof of damages.[8] In support, Trading submitted a memorandum of law, Dkt. 90 ("Trading Br."), as well as the Trading 56.1 and the Hay Declaration. On December 28, 2015, NAF filed a memorandum of law in opposition, Dkt. 95 ("NAF Br."), as well as the NAF 56.1 and the Reihner Declaration. It also submitted a declaration from Gerszberg, NAF's principal. Dkt. 96 ("Gerszberg Decl."). On January 15, 2016, Trading submitted a reply brief, Dkt. 100

---

[8] In light of Trading's decision not to argue that the Settlement Agreement bars this suit, Trading has foregone its right to claim, in this litigation, such a bar. Trading remains at liberty to pursue, in the parallel arbitration it has initiated against Gerszberg, any claims properly brought there. The Court is mindful that Gerszberg's motion for an injunction restraining Trading from pursuing that arbitration is pending. *See Gerszberg v. Li & Fung (Trading) Limited*, 16 Civ. 1182 (PAE). The Court expects to resolve that motion shortly.

("Trading Reply Br."), and the Hay Supplemental Declaration.  On March 11, 2016, the Court held argument.  Dkt. 110.

## II.      Legal Standards on Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.      Discussion

The Court first addresses Trading's challenge to NAF's proof of causation and then proceeds to its challenge relating to damages.

### A.      Causation

First, Trading argues that the undisputed facts establish, as a matter of law, that Trading's breach did not cause the NAF/Hampshire merger to fail.[9]

### 1.      Applicable Law

Under New York law,[10] causation is "an essential element of damages in a breach of contract action." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004). "[A] plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Id.* "Recovery is not allowed if the claimed losses are 'the result of other intervening causes.'" *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 53 (2d Cir. 2011) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)). "To break the legal chain, the intervening act must have been 'of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004) (quoting *Gordon v. Eastern Ry. Supply, Inc.*, 82 N.Y.2d 555, 562 (1993)).

In contract as in tort cases, questions of proximate cause, including intervening cause, "should generally be resolved by the factfinder." *Voss v. Netherlands Ins. Co.*, 22 N.Y.3d 728, 737 (2014); *see also LNC Investments, Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d

---

[9] Trading frames this as two separate arguments: (1) that NAF lacks standing because it has not shown that the claimed injury is fairly traceable to Trading's conduct, and (2) that NAF's claim fails on the merits because, as a matter of law, the undisputed evidence establishes that Trading's breach did not proximately cause the merger to fail. The Court needs to address only the latter argument, because the bar for standing is lower than the standard to establish causation on the merits.

[10] A forum selection clause provides that the BAA "shall be governed by and construed in accordance with the laws of the State of New York." BAA § 18. The parties agree that New York law applies and the Court has previously so held. *See* Feb. 2013 Decision at *5 (holding that "New York law applies to substantive issues relating to the formation, interpretation, and alleged breach of the BAA").

Cir. 1999) (linking causation standards in contract and tort cases).  Proximate cause is left to the factfinder unless "'there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men'" to find for the plaintiff on that issue.  *Equitable Life Assur. Soc. of U.S. v. Nico Constr. Co.*, 666 N.Y.S.2d 602, 604 (1st Dep't 1997) (quoting *Cohen v. Hallmark Cards*, 45 N.Y.2d 493, 499 (1978)) (reinstating jury's finding of liability on contract claim because there was a "rational basis" for the verdict); *Mirand v. City of New York*, 84 N.Y.2d 44, 51 (1994) ("Proximate cause is a question of fact for the jury where varying inferences are possible.").  Of course, if the defendant submits evidence of an independent or intervening cause and the plaintiff submits no conflicting evidence, summary judgment for the defendant may be warranted.  *See Kennedy v. Syracuse Univ.*, No. 94 Civ. 269 (FJS), 1995 WL 548710, at *2 (N.D.N.Y. Sept. 12, 1995) (defendant submitted expert testimony, while plaintiff relied on his own conclusion about cause of a wrist injury); *see also Ravner v. Autun*, 876 N.Y.S.2d 453, 454 (2d Dep't 2009) (any breach by security company of its contractual obligation to supervise school security guards could not be found to be proximate cause of car accident in school parking lot).

### 2.    Application

NAF's theory of causation, as articulated by Gerszberg during his deposition, is that Trading "left me at the altar."  Reihner Decl., Ex. H ("Gerszberg Supp. Dep."), at 432.[11]  NAF asserts that the merger was nearing the point where it could be consummated at the end of March 2009 when Trading, in a breach of the BAA, terminated its relationship with NAF.  This scuttled NAF's financing arrangement for the merger, and the uncertainty of securing financing

---

[11] This exhibit contains certain pages from the transcript of Gerszberg's November 10, 2011 deposition that were omitted from Trading's exhibit, which is denoted as "Gerszberg Dep."

ultimately impelled NAF to terminate the Merger Agreement, causing NAF to lose Hampshire's full value.[12]

Trading's counter-argument is that NAF's principal, Gerszberg, decided to terminate the merger for independent business reasons, and that this intervening cause defeats NAF's claim that Trading's breach caused the merger to collapse. NAF, Trading argues, chose to call off the merger primarily because Hampshire was proving to be a lemon, and NAF demonstrably could have secured the necessary financing from Wells and Keba on or before April 26.

The Court begins by canvassing the record evidence that supports NAF's position. It then turns to evidence supporting Trading's.

### a.    Evidence Supporting NAF's Theory of Causation

At bottom, NAF's theory that Trading's withdrawal scuttled the merger relies on two undisputed facts.

First, the Wells and Keba financing commitments were conditioned on the existence of the BAA with Trading. Trading does not argue that its agreement to provide sourcing services was subjectively immaterial to Wells or Keba, *i.e.*, that, at the point that Trading backed out, Wells and Keba did not actually care whether Trading would provide those services or whether they would be obtained another way. There is also documentary evidence, which a factfinder could credit, supporting the claim that NAF believed that Trading's commitment to provide sourcing services was integral to its financing arrangement. In an email on February 24, 2009, the day after the Merger Agreement was signed, Gerszberg told Trading executives: "Your

---

[12] The Court need not resolve now whether damages ought to be measured at the point of the breach in late March 2009 or at the point of the merger's termination in late April. Because the parties were not ready to perform on the earlier date—Hampshire's shares had not yet been fully tendered—a substantial argument exists that damages must be measured using Hampshire's value as of a later date when (but for Trading's breach) the merger could first have been consummated.

contract and the commitment to us was a critical piece in assembling this deal with Wells Fargo and Hampshire."  *See* Reihner Decl., Ex. N9.

Second, in the roughly four weeks between Trading's breach and NAF's termination of the merger, NAF made various efforts to secure financing for the merger and to keep the merger alive.  These, a finder of fact could conclude, demonstrated NAF's continued interest in closing the Hampshire deal even after Trading had fallen away.  In this period, NAF repeatedly extended the tender offer's Expiration Date while it tried to shore up financing.  For example, on or about April 8, Gerszberg sent Wells a proposal for a $40 million loan facility, one not conditioned on Trading's participation.  NAF 56.1 ¶ 50.  Meanwhile, more Hampshire shares were added to the tender offer throughout April, such that, by April 17, the requisite number of shares had been tendered, *id.* ¶ 45; that day, NAF, arguably reflecting its continued interest in the merger, agreed to extend the Expiration Date again, to April 24.  *Id.* ¶ 46.  On April 20, NAF and Hampshire executed an Amendment to the Merger Agreement, which memorialized this extension of the Expiration Date; moved the Termination Date—NAF's last chance to terminate—up to April 26, less than a week later; and represented that NAF expected to secure financing from Wells (on which the Keba financing hinged).  *See id.* ¶¶ 47–49; Yagoda Decl. ¶ 8 ("[Keba] advised Gerszberg [on April 24, 2009] that Keba would not release the tender offer financing proceeds until post-merger Hampshire had a $40 Million working capital line of credit in place.").

Finally, although the point is factually disputed, there is evidence that NAF did not completely finalize a new financing arrangement before April 26, the new Termination Date.  On April 24, NAF received qualified good news:  Wells agreed to put up the financing, *if* NAF supplied $5 million in additional collateral.  *See* NAF 56.1 ¶¶ 52–53.  Gerszberg thereupon sent Wells emails conveying a sense of urgency and an eagerness to finalize the deal.  *See, e.g.*,

4/24/09 Emails at 12 (Gerszberg email at 12:44 p.m.) ("I'm running out of time.").  However, Gerszberg testified that, over the weekend of April 25–26, NAF confronted two problems: (1) it needed to borrow money to put up the side collateral; and (2) it did not have the documentation of the Wells financing that it needed.  *See* Gerszberg Supp. Dep. 431.  Further, Gerszberg testified, Wells explicitly attributed its reluctance to finance the merger and its requirement that NAF post additional collateral to the fact that Trading was no longer involved.  *See id.* at 432; *see also id.* at 484 ("[T]he banks informed me they would not go forward without [Trading].").[13]

This evidence, viewed alone, is sufficient to support NAF's theory that Trading's breach and the problems it predictably generated with respect to merger financing forced NAF to terminate the Merger Agreement.  The Court now turns to the contrary evidence.

### b. Evidence Opposing NAF's Theory of Causation

Trading, for its part, relies on three sets of facts to support its argument that NAF's own reassessment of Hampshire—and not financing difficulties traceable to Trading's breach— caused NAF to terminate the Merger Agreement.

First, Trading cites emails between Gerszberg and Austin on April 24, which suggest that Wells was prepared to finance the merger *without* Trading.  Second, Trading cites Gerszberg's testimony to the effect that, as of late April, he believed he "could have gotten the financing in place."  *See* Gerszberg Dep. 418.  Third, Trading cites NAF's post-termination statements to the

---

[13] There is, to be sure, contrary evidence regarding Wells's proffered rationale for its reluctance to finance the merger.  Gerszberg himself admitted that Wells VP Austin told him that Wells was concerned about Hampshire's deteriorating outlook.  *See* Gerszberg Dep. 510–11 (acknowledging that Austin, in an April 24 email, told Gerszberg that the reason it insisted on additional collateral was Hampshire's poor projections).  Austin, however, did not state that Hampshire's condition was the *sole* reason for Wells's skittishness.  *See* 4/24/09 Emails at 14 (1:17 p.m. Austin email).  And Gerszberg also testified that Wells told him "all along that it was going to be worse and harder to do" the Wells deal without Trading's participation.  Gerszberg Dep. 511; *see also id.* at 509 (Q. [D]id [Austin] at any time tell you why [additional collateral] was required?  A.  Because they were not [Trading].").  At summary judgment, it is not for the Court to weigh this evidence.

effect that *Hampshire's* conduct and deteriorating condition caused NAF to terminate the Merger Agreement.  The Court reviews these in turn.

*(1)     Gerszberg/Austin April 24, 2009 Emails*

The parties have starkly different interpretations of the emails between Gerszberg and Wells VP Austin.  According to Trading, Austin's statement that he had the necessary approvals and would begin drafting a revised commitment letter effectively communicated to NAF that the Wells financing was, in essence, a done deal.  Keba's financing, contingent on Wells, would necessarily follow.  Thus, the financing that had been scuttled by Trading's breach was restored in full *before* NAF called off the merger.  NAF, in contrast, contends that Austin communicated that a formal commitment letter from Wells would not be forthcoming until Monday, April 27, the day after NAF's last opportunity to terminate the merger under the April 20 Amendment. Thus, NAF argues, it faced the prospect of committing to the merger without the necessary financing in place—and decided to back out rather than gamble on the merger or seek a further extension of the termination deadline.

The Court's assessment is that a reasonable factfinder could find either way.  It could easily find for Trading.  But it could also conceivably conclude that Austin's April 24 emails, despite signifying Wells's approval of the loan, did not make the financing a *fait accompli*. Wells could still back out.  After all, Austin concluded the email exchange by stating that he would not be able to send Gerszberg a commitment letter before, at the earliest, April 27, *see* 4/24/09 Emails at 1 (Austin email at 4:09 p.m.), and by acknowledging that "[t]here are some ends to tie up."  Reihner Decl., Ex. U (Austin email at 4:52 p.m.).  To receive financing from Wells under the late-April arrangement, NAF was also required to put up additional side collateral which it had not yet secured.  *See* 4/24/09 Emails at 7–11; Gerszberg Dep. 508–13; Trading 56.1 ¶ 53.  Thus, whether NAF was certain to receive financing from Wells as of April

24–26 is subject to reasonable debate, depending on disputed inferences and, potentially, witness credibility.  There is thus an issue of fact about whether NAF was motivated to terminate the merger by uncertainty surrounding the Wells financing or, as Trading posits, by a desire to avoid purchasing a deteriorating company.

*(2)     Gerszberg's Deposition Testimony*

Trading separately relies on Gerszberg's repeated testimony to the effect that he "could have gotten the financing in place."  Gerszberg Dep. 418; *see also id.* at 415 ("I didn't have it in place.  I could have gotten it in place."); *id.* at 417 ("We could have got [the financing and side collateral necessary to close]."); *id.* at 422 ("If I chose to do so I could have gotten the financing."); *id.* at 423 ("I could have gotten the financing."); *id.* at 438 ("I could have gotten the deal done.").

Trading treats these statements by Gerszberg insisting that he could have obtained the financing as smoking guns.  In the Court's assessment, they do lend significant support to Trading's factual theory.  The cited testimony is in some tension with NAF's theory that uncertainty about financing, caused by Trading's last-minute withdrawal, motivated the termination of the merger.  However, Gerszberg's deposition statements do not so thoroughly contradict NAF's core theory so as to preclude NAF from making its case to a jury.

The deposition testimony on which Trading seizes must be read in context.  Gerszberg was being questioned about allegations that he and NAF threatened to levy in a lawsuit against Hampshire.  Gerszberg proposed to sue Hampshire for defamation, based on Hampshire's public and allegedly defamatory statement that NAF terminated the Merger Agreement because it did not have the necessary financing.  *See* Draft Complaint ¶ 108 ("On or about April 27, 2009, Hampshire made and published false and defamatory statements . . . such as, 'We believe that your attempt to terminate the Merger Agreement has occurred because *[NAF does] not have the*

*financing in place* necessary to consummate the tender offer and the merger on the terms

agreed.'") (emphasis added); *see id.* ¶ 110 ("NAF advised Hampshire's senior management that

Wells Fargo approved the commitment to finance NAF.").  Pressed about the Draft Complaint

during his deposition in this case, Gerszberg repeatedly testified that NAF did *not* have the

financing in place—essentially backing up Hampshire's supposedly defamatory statement and

undermining his own allegations in the Draft Complaint.  *See* Gerszberg Dep. 415, 422–23.

Alternatively, Gerszberg's testimony could be reconciled with the Draft Complaint if he is

understood as suggesting that Hampshire's statements were false to the extent they implied that

NAF *could not get* the necessary financing.  Either way, Gerszberg's statements that he *could*

*have gotten* the financing need not reflect an ironclad conviction on his part that the financing

was a done deal by April 26.  *See id.* at 423 (acknowledging that Wells approved the loan to

NAF, but adding that it remained to "get all the terms worked out").  Indeed, Gerszberg never

even testified that NAF could have gotten the necessary financing by any particular date (*e.g.*,

April 26), only that NAF *eventually* could have obtained it.

     Trading's bid for summary judgment on this ground therefore must be denied, although it

presents a close question.  Gerszberg's various statements about his ability or inability to secure

financing can be read to support either party's cause.  Among many possible grounds for

impeachment, Gerszberg's deposition testimony supplies a strong basis to argue that his

motivation for scotching the merger had little if anything to do with concerns about securing

financing, and more to do with the diminished attractiveness of Hampshire.  In the end, however,

it is for the jury to assess Gerszberg's multiple statements about his state of mind as of late April.

The jury will be called upon to decide whether his statements can be harmonized, and if not,

which if any among Gerszberg's conflicting statements to credit.  For present purposes, on

Trading's summary judgment motion, it is sufficient to note that his deposition testimony leaves enough space for NAF to claim that uncertainty about financing contributed to the decision to pull the plug on the merger.  And as the record makes abundantly clear, NAF was, reasonably enough, determined to lock down the financing before entering into the merger.  Drawing all permissible inferences in favor of NAF, as the Court must, the Court therefore cannot find that Gerszberg's own words—damaging as they are to NAF's cause and to Gerszberg's credibility—are fatal to NAF's breach of contract claim as a matter of law.

*(3)  NAF's Statements Blaming Hampshire, Not Trading*

Third, Trading relies on the fact that NAF initially blamed Hampshire, not Trading, for NAF's decision to call off the merger.

In the April 26 letter to Hampshire terminating the Merger Agreement on behalf of the NAF Subsidiaries, Gerszberg gave the reason that Hampshire had committed "one or more material breaches of covenants and agreements . . . that are not curable through the exercise of commercially reasonable efforts prior to the date of the closing of the tender offer, as extended." Hay Decl., Ex. G, Def. Ex. 57 ("Termination Letter").  A month later, Gerszberg told the SEC that the reasons for terminating were that (1) Hampshire had furnished information containing "material inaccuracies," (2) there had been "a material deterioration in Hampshire's financial condition," and (3) Hampshire had committed "violations of the covenants, representations and warranties . . . set forth in the [Merger] Agreement."  SEC Filing 5.  In the same vein, NAF later threatened to sue Hampshire, sending it a Draft Complaint before settling for $833,000.  *See* NAF 56.1 ¶¶ 67–69.  At his deposition, Gerszberg embraced the factual allegations in that Draft Complaint, which included the allegation that, on April 18, Hampshire's senior management told Gerszberg that they had discovered false or misleading financial information in Hampshire's

books and that Hampshire had fraudulently induced NAF to terminate the Merger Agreement by falsely promising to pay NAF's expenses. *See* Gerszberg Dep. 421–22 ("Q: Are the factual allegations contained in the complaint or the draft complaint . . . true and accurate? A: Yeah."); Draft Complaint at ¶¶ 67–70.

Trading argues that these statements commit NAF to the position that the sole causes of its termination of the merger were factors relating to Hampshire, *i.e.*, factors exogenous to Trading. NAF counters that while it was legally able to invoke Hampshire's conduct as the basis for terminating the Merger Agreement, the financing problems occasioned by Trading's breach—still unresolved as of April 26, despite Wells's shows of commitment—were the actual motivation. The Termination Letter, NAF notes, does not rule out that theory: Explaining the termination decision, it blames Hampshire's alleged breaches "among other things." Similarly, the May 2009 SEC Filing states that NAF called off the merger "because, *among other things*, certain conditions to the Offer to be satisfied by Hampshire were not satisfied prior to the expiration of the Offer."[14] SEC Filing 5 (emphasis added); *see also id.* at 6 ("*Principally* for the reasons enumerated above . . . ."). Gerszberg certified that the information in the SEC Filing was "true, complete and correct." *Id.* at 7.

As with Gerszberg's deposition testimony, his and NAF's prior statements explaining the termination give Trading substantial ammunition at trial in countering NAF's thesis that the termination is attributable to Trading's breach. However, in the Court's view, these statements do not wholly foreclose NAF's present attempt to blame Trading for the merger's failure. A reasonable factfinder could conclude (1) that NAF had legal grounds for terminating the merger

---

[14] Trading inaccurately represents that the SEC Filing does not contain the phrase "among other things." *See* Trading Reply Br. 5 n.7.

with Hampshire, *and* (2) that Trading's breach (and the financing problems to which it led) was the proximate cause of its decision to do so.

That is because there is record evidence undermining Trading's attempt to blame NAF's independent business judgment for the merger's failure.  After all, NAF received disconcerting omens about Hampshire several *weeks* before it terminated the Merger Agreement, yet it pressed ahead, securing an extension, agreeing to an Amendment, and corresponding urgently with Wells about financing.  Specifically, as NAF noted in its May SEC Filing, on April 3 and 13, Hampshire provided NAF with draft balance sheets that "evidenced a material deterioration in Hampshire's financial condition."  SEC Filing at 5.  And on April 9, Hampshire filed a form with the SEC that reflected much higher losses and lower assets than previously reported.  *Id.* at 6. But, despite having evidence of Hampshire's deterioration, NAF pushed forward with the merger for at least two weeks, and indeed, it committed to an accelerated timetable.  As late as 3:55 p.m. on April 24, Gerszberg sent an email to Austin saying, "I have to accept the shares [S]unday so can we get [the commitment letter] today.  We need to have it to buy the shares."  4/24/09 Emails at 1.  A jury could also choose to credit Gerszberg's testimony that, but for the financing problems attributable to Trading's breach, he would have gone through with the merger notwithstanding the erosion of Hampshire's prospects.  Gerszberg Supp. Dep. 432.  As he explained, he viewed Hampshire as "a free company," *id.*, apparently because the plan was for post-merger Hampshire to immediately repay Keba's loan using Hampshire's cash on hand, and then to proceed with business using the working line of credit from Wells.  *See* Tr. 25.

A jury could also draw competing inferences from the fact that NAF, in February 2009, reduced its offer price for Hampshire from $8 per share to $5.55 per share and attributed this reduction to Hampshire's worsening financial condition.  *See* NAF 56.1 ¶¶ 27–28; Hay Decl, Ex.

G, Def. Ex. 26 ("[T]he head winds facing [Hampshire] have become remarkably stronger.").

Trading could credibly argue that, as Hampshire's condition worsened further in March and

April 2009, NAF was scared away entirely.  But NAF could credibly argue that it had long been

aware of Hampshire's dire straits, and that its response was to renegotiate the merger price, not

to abandon the merger, making it more plausible that the inspiration for its ultimate termination

was something different—Trading's breach and its foreseeable consequences.

Finally, the allegations in the Draft Complaint against Hampshire—including that

Hampshire fraudulently induced NAF to terminate the Merger Agreement—do not foreclose

NAF's claim here.  To be sure, Gerszberg's endorsement of that allegation is in significant

conflict with his attempt to blame Trading for the merger's demise.  Trading is well-positioned to

exploit Gerszberg's conflicting statements in his separate bids for post-termination relief from

Hampshire and Trading, and to argue that they are indicative of opportunism and dishonesty.

Nevertheless, it is not for the Court to decide on which occasion—if any—Gerszberg was

truthful.  Rather, as a general rule, "when a district court is asked to consider contradictory

deposition testimony of a fact witness at summary judgment, 'a district court may not discredit a

witness's deposition testimony . . . because the assessment of a witness's credibility is a function

reserved for the jury.'"  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 206 (2d Cir. 2014)

(quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)).[15]

---

[15] The "sham issue of fact" doctrine—which "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony," *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013)—generally does not apply to seemingly conflicting statements within the same deposition.  *See Crayon v. Hill*, No. 213 Civ. 350 (MCE) (KJN), 2016 WL 282176, at *8 (E.D. Cal. Jan. 22, 2016) (collecting cases), *report and recommendation adopted*, Dkt. 94 (Mar. 4, 2016); *see also O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 592 (6th Cir. 2009) (inconsistency within a deposition "may indicate a lack of credibility . . . or go to the weight of the evidence," but is not dispositive

In sum, a reasonable jury could credit NAF's contention that, whatever its *legal* grounds for termination, the actual cause was its inability to reestablish by April 26 the financing commitments that had been scuttled by Trading's breach.

### c.      Other Issues Relating to Causation

The Court, on its own review of the record, has identified two other questions relating to NAF's theory of causation that merit attention.  First, is there a basis on which a reasonable factfinder could find that, had Trading not breached, NAF could have and would have gone forward with the merger on or before April 26?  Second, did NAF fail to take advantage of an opportunity to extend the Termination Date beyond April 26, which might suggest that NAF was, as Trading argues, uninterested in pursuing the merger?

### (1)      When could/would NAF have closed?

Regardless of Trading's breach, the parties would have been unable to close on the scheduled closing date of March 27 because insufficient Hampshire shares had been tendered. Sufficient shares were not tendered until April 17, at which point Hampshire did not have enough cash on hand to satisfy a different precondition of the merger.  There appears to be little evidence in the record illuminating when NAF would have closed on the Hampshire merger had Trading not breached.  At argument, NAF's counsel pointed to the Gerszberg declaration, submitted by NAF with its opposition brief in December 2015, years after Gerszberg's deposition.  *See* Tr. 43.  Gerszberg stated there that "[i]f Trading had not breached and was still involved in the transaction, NAF would have closed on April 20, 2015."  Gerszberg Decl. ¶ 53; *see also* NAF Br. 13 (citing this paragraph).  This belated factual assertion, however, contradicts Gerszberg's deposition testimony, and for that reason must be rejected.

---

at summary judgment).  Trading has not cited any cases supporting application of the "sham issue of fact" rule in a single-deposition context.

In relevant part, at his 2011 deposition Gerszberg was shown the April 20 press release announcing the Amendment to the Merger Agreement.  *See* Hay Decl., Ex. G, Def. Ex. 55 ("April 20 Press Release").  He acknowledged that the press release stated that the requisite number of shares had been tendered.  *See* Gerszberg Dep. 369; *see also* NAF 56.1 ¶ 45 (sufficient shares were tendered as of April 17, 2009).  Asked why, in that case, the Amendment was necessary, Gerszberg responded, "I don't think [Hampshire] had enough money, cash, at that time, and they didn't have enough cash to pay the agreement.  So I think we amended it and lowered it."  Gerszberg Dep. 369; *see also id.* at 368 ("I said [Hampshire] didn't meet the requirement of 38 million.").  The Amendment, which reduced the necessary cash by $1 million, and the April 20 Press Release confirm that explanation.  Thus, according to otherwise uncontroverted evidence, including Gerszberg's own deposition testimony, NAF could *not* have closed on April 20 because Hampshire did not have enough cash on hand.

The "sham issue of fact" doctrine prevents a party from defeating summary judgment by submitting an affidavit that contradicts previous sworn testimony in a way that is "real, unequivocal, and inescapable."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 696 (2d Cir. 2012); *see supra* note 15.  At the same time, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete."  *Langman Fabrics. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.), *amended*, 169 F.3d 782 (2d Cir. 1998).

There was nothing "ambiguous, confusing, or simply incomplete" about Gerszberg's 2011 deposition testimony.  On the contrary, it accorded with contemporaneous documentary evidence.  And NAF "has not proffered a plausible explanation that would allow a reasonable

jury to reconcile the inconsistencies" between that testimony and Gerszberg's December 2015 attestation that NAF would have closed on April 20 but for Trading's breach.[16]  *Fossamax*, 707 F.3d at 194.  Where the contradiction is "not only unequivocal but is left unexplained—indeed, is inexplicable— a district court may determine that a plaintiff has manufactured a sham issue of fact."  *Id.*  Such is the case here.

However, even if NAF could not have closed by April 20, it could conceivably have closed on a later date.  There does not appear to be direct evidence about whether Hampshire in fact cured its deficient cash problem *after* April 20.  The most on-point evidence is Gerszberg's testimony that, on April 20, Hampshire and NAF moved up the Termination Date to April 26 "because [Hampshire] knew they were going to get the cash" in time.  Gerszberg Dep. 371.  This testimony is, of course, consistent with Hampshire's commitment on April 20 to getting the deal done within a week.  And, although NAF subsequently blamed Hampshire for other asserted failings, NAF never blamed or threatened to blame Hampshire for lacking the necessary cash as of April 26, which, if true, would have provided additional fodder for NAF's threatened lawsuit.  Moreover, under the Merger Agreement, NAF always had the option of waiving the cash requirement.  *See* Merger Agreement § 8.8.

---

[16] The only proffered explanation is a baffling footnote in Gerszberg's Declaration.  He states, "While NAF could have extended the closing because Hampshire did not have enough cash to close, as per the Merger Agreement, Hampshire, did in fact have enough cash to cover all the money needed for NAF to close.  Therefore, had it not been for the breach of the BAA by Trading, NAF would have waived its right to extend, would have closed, and would have owned Hampshire as of April 20, 20[09]."  Gerszberg Decl. ¶ 53 n.4.  This statement is at odds with Gerszberg's 2011 deposition testimony, which made no connection between Trading's breach and the April 20 Amendment.

Given this, the Court concludes that a basis exists on which a reasonable factfinder could find that, had NAF restored the financing that had been scuttled by Trading's withdrawal, it would have and could have gone ahead with the merger on April 26.

*(2)      Could NAF have extended the Termination Date?*

The record is silent about whether NAF could have extended the April 26 Termination Date, so as to enable it to fill the financing hole that assertedly forced it to scotch the merger. Trading could fairly argue that if NAF really was interested in pursuing the merger, it would have sought such an extension, as it had earlier in April.  The Court is unaware of evidence of any effort by NAF to extend the deadline by the one to three days that NAF apparently needed to firm up Wells's financing commitment.  At argument, NAF's counsel essentially conceded that NAF made no such efforts and that the evidence did not address whether Hampshire would have been willing to grant such a limited extension.  *See* Tr. 48–50.  Notably, in his December 2015 declaration accompanying NAF's opposition brief, Gerszberg did not state that NAF made any effort to extend the April 26 deadline to the point when Wells's commitment was expected to be firm and final, so as to allow the merger to be salvaged.

NAF's failure even to try to extend the Termination Date, like other evidence upon which the Court has commented, is in tension with its theory of liability here.  In the end, though, the weight to assign this inference is for the jury to decide in assessing the critical element of causation.  Trading, which bears the burden on summary judgment, has not come forward with evidence affirmatively showing that an extension *was* attainable.  And the record contains some evidence on the basis of which NAF may argue that obtaining a new extension would be a stretch.  Hampshire's conduct, notably the April 20 Amendment, evinced eagerness to close. And Gerszberg testified that the Amendment had moved up the Termination Date by almost two months because Hampshire "didn't want this hanging over their head forever."  Gerszberg Dep.

27

370.  Gerszberg further testified that he had assured Hampshire that financing was forthcoming. *See id.* at 380 ("I'm sure I put on a very positive spin on that.").  NAF is at liberty to argue that, had Gerszberg asked Hampshire for a further extension, Hampshire might have declined or even backed away from the merger itself.

d.      *Apposite Precedent*

In assessing the competing evidence and arguments as to whether there is sufficient proof of causation to permit NAF's claim to go to the jury, the Court finds instructive Judge Crotty's decision denying summary judgment in *Hospital Authority of Rockdale County v. GS Capital Partners V Fund, L.P.*, No. 09 Civ. 8716 (PAC), 2013 WL 840851 (S.D.N.Y. Mar. 6, 2013). There, a plaintiff ("Hospital Authority") sued defendants ("GSCP") for breaching a commitment to secure financing in the amount of $87.7 million, the purchase price of an agreement for the sale of plaintiff's hospital to a buyer ("Signature").  Denying GSCP's summary judgment motion, Judge Crotty found material factual disputes about (1) whether GSCP unequivocally repudiated its commitment; (2) whether GSCP conditioned its subsequent $35 million commitment on the Hospital Authority's agreeing to finance a substantial part of the purchase price; and (3) most pertinent here, whether Signature would have closed on the hospital purchase but for the alleged breach, *i.e.*, if the financing had been in place.  *See id.* at *4–6.  In the Hospital Authority's favor was the testimony of a Signature representative—that, at the time of the alleged breach, it was ready and willing to close, pending financing—and a corroborative letter from Signature to the state attorney general.  *See id.* at *6.  GSCP argued that Signature chose to abandon the deal for business reasons, but, in rejecting the summary judgment motion, Judge Crotty noted that, months after the alleged breach, Signature discussed ways to revive the deal.  *See id.*

28

Judge Crotty's reasoning in *Hospital Authority* resonates here.  Trading is in the position of GSCP:  Trading is alleged to have withdrawn a crucial component of a pending transaction at the last minute.  Like GSCP, Trading blames the collapse of the transaction on another entity's business judgment.  But NAF, like the Hospital Authority, has introduced evidence that (1) the parties to the transaction were ready and willing to go forward at the time of the breach, and (2) they tried to revive the deal post-breach (as corroborated by the Gerszberg/Austin emails of April 24).  While far from conclusive on the issue of causation, this evidence could support a jury verdict in NAF's favor.  Therefore, like Judge Crotty, the Court is constrained to deny the motion for summary judgment.

### 3.  Conclusion

In sum, based on record evidence, a jury could conclude that: (1) Trading's breach scuttled Wells's and Keba's financing commitments, which were conditioned on Trading's serving as sourcing agent for post-merger Hampshire; (2) NAF secured extensions of the merger deadline while trying to get Wells and Keba back on board; (3) as of April 26, however, the new financing arrangement was not finalized and ready to go; and (4) NAF, uncertain about financing and unable to seek another extension, exercised its right to terminate the merger.  While the evidence could easily permit a jury to find otherwise, if a jury took this view of the evidence, it could find a chain of causation leading directly from Trading's breach to the failure of the merger.  Viewing this evidence in light of the principle that causation is generally a jury question, the Court denies Trading's motion for summary judgment to the extent it is based on the claim that NAF cannot establish causation.[17]

---

[17] Several of the causation-related decisions on which Trading relies, *see* Trading Br. 17, are procedurally inapposite because they were rendered *after* factfinding.  *See Diesel Props S.r.l.*, 631 F.3d 42 (appeal after bench trial); *Nat'l Mkt. Share*, 392 F.3d 520 (same); *TD Waterhouse Inv'r Servs., Inc. v. Integrated Fund Serv., Inc.*, No. 01 Civ. 8986 (HB), 2005 WL 13560

### B.      Has NAF Presented Sufficient Evidence of Damages?

The Court now considers Trading's alternative ground for summary judgment: that NAF has failed to prove the amount of damages, *i.e.*, the value of Hampshire at the time of Trading's breach (or the time thereafter when the parties were first prepared to perform, *see supra* note 12).

Trading argues that there is no cognizable evidence that the value of Hampshire exceeded the contractually agreed-upon price of roughly $30 million, and therefore that NAF cannot prove that it missed out on a profitable deal.  *See* Trading Br. 19–20.  NAF's only damages evidence, Trading argues, is the report and testimony of its damages expert, Allen Pfeiffer.  *See* Reihner Decl., Ex. E ("Pfeiffer Report").  But, Trading argues, Pfeiffer's testimony is inadmissible, because it is "predicated on events and occurrences that were significantly after the date of the alleged breach, which is both impermissible and irrelevant under the governing New York law." Trading Br. 21.  NAF counters that, even if *some* of Pfeiffer's methodologies relied on post-breach events, at least one did not.  *See* NAF Br. 23–24.

---

(S.D.N.Y. Jan. 3, 2005), *aff'd sub nom. Nat'l Inv'r Servs. Corp. v. Integrated Fund Servs., Inc.*, 145 F. App'x 696 (2d Cir. 2005) (summary order) (same); *LNC*, 173 F.3d 454 (appeal after jury verdict); *Phoenix Bulk Carriers, Ltd. v. Am. Metals Trading, LLP*, No. 10 Civ. 2963 (NRB), 2013 WL 5863608 (S.D.N.Y. Oct. 31, 2013) (confirmation of arbitration award).  And the decisions cited in Trading's reply brief, *see* Trading Reply Br. 6 n.9 & 7 n.11, are factually far afield.  *See Cooper v. Gottlieb*, No. 95 Civ. 10543 (JGK), 2000 WL 1277593, at *6–7 (S.D.N.Y. Sept. 8, 2000), *aff'd*, 12 F. App'x 28 (2d Cir. 2001) (summary order) (defendants adduced unrebutted evidence that plaintiffs' minority shares could not have affected any corporate transaction during the relevant period); *Borsuk v. Jeffries*, No. 98 Civ. 4088 (WK), 2000 WL 977894, at *2–3 (S.D.N.Y. July 14, 2000) (in suit alleging that immigration attorneys mishandled plaintiff's petition, approval of petition was in discretion of Immigration and Naturalization Service, an independent actor); *Murray v. City of New York*, 333 F. App'x 595, 598 (2d Cir. 2009) (summary order) (police officer who slipped on tugboat introduced no evidence that this incident "could have been avoided with the technical training detailed by [his] expert"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311–12 (2d Cir. 2008) (expert's conclusory disagreement with opposing expert created no factual dispute); *see also Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101 (SHS), 2004 WL 1574629, at *6–7 (S.D.N.Y. June 14, 2004) (contractor whose failure to perform was blamed for destruction of business was only one of many contractors and had access to only about a quarter of franchise locations at relevant time) (cited at Trading Br. 18 n.9).

### 1.    NAF's Proffered Evidence on Hampshire's Value

In New York, a breaching party is liable for all direct and proximate damages caused by its breach that are "reasonably certain," not "merely speculative, possible, and imaginary." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (quoting *Wakeman*, 101 N.Y. at 209) (emphasis omitted).   The governing standards differ depending on whether the damages sought are "consequential" or "general" damages.   "A plaintiff is seeking general damages when he tries to recover the value of the very performance promised. Consequential damages seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach."  *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 370–71 (S.D.N.Y. 2014) (citations and internal quotation marks omitted).  To obtain general damages, the plaintiff "need only show a stable foundation for a reasonable estimate of the damage." *Tractebel Energy*, 487 F.3d at 110 (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)) (internal quotation marks omitted).  To obtain consequential damages, however, the plaintiff must show that (1) the damages sought were "foreseeable and within the contemplation of both parties," and (2) both the *existence* and *amount* of damages can be ascertained with "reasonable certainty."  *Id.* at 111.

The parties have not addressed or briefed the damages issue in light of this distinction between general and consequential damages.  The Court assumes here *arguendo* that the lost value of Hampshire must meet the higher standard for consequential damages.

The first requirement—foreseeability—is easily met here:  Given the nature, purpose, and circumstances of the agreement between Trading and NAF, *see Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989), it was foreseeable to Trading that its breach could jeopardize the entire

Merger Agreement.  (Indeed, as noted, Gerszberg told Trading executives that the BAA was a "critical piece in assembling" the deal.  Reihner Decl., Ex. N9.)

As to the existence and amount of damages, where, as here, a defendant's breach "deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the market value of the asset."  *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) (internal quotation marks omitted); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995).  "If no prior sales history is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced."  *Schonfeld*, 218 F.3d at 178.  As Trading notes, under New York law, "the loss caused by a breach is determined as of the time of breach." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990).

NAF's expert, Pfeiffer, employed four different approaches to estimate the market value of Hampshire.  These are:

(1)     The "Net Asset Value Approach," which involves "adjusting the asset and liability balances on the [company's] balance sheet to reflect their fair value equivalents."  Pfeiffer Report 10.;

(2)     The "Market Transaction Method," which determines the fair market value of a company based on the "market prices in actual transactions and asking prices for businesses currently available for sale," comparing the subject business to similar businesses.  *Id.* at 11.;

(3)    The "Market Comparable Method,"[18] which compares the subject business

to similar publicly traded companies to "yield[] insight into investor

perceptions and, therefore, the value of the subject company."  *Id.*; and

(4)    The "Income Approach," which is "based on the cash flows that a

business can be expected to generate over its remaining life."  *Id.* at 12.

These separate methodologies each produced a different estimated market value for

Hampshire.  *See id.* at 17 (between $15 and $20 million under the Net Asset Value Approach);

*id.* at 19 (between $43 and $48 million under the Market Transaction Method); *id.* at 22 (about

$62 million under the Market Comparable Method); *id.* at 26 (between $37 and $42 million

under the Income Approach).  Pfeiffer then averaged the three higher estimates to conclude that

the fair market value of Hampshire was $49 million.  *See id.* at 27.  While Pfeiffer does not

explain why he excluded the Net Asset Value Approach from this methodology, the answer may

lie in the fact that it yields a valuation below the price NAF would have paid to acquire

Hampshire (over $30 million).

In its opening brief, Trading objected on specific grounds to the Net Asset Value

Approach,[19] the Market Transaction Method,[20] and the Income Approach.[21]  Trading argued that,

because they incorporated some post-breach events, these approaches yielded inadmissible

---

[18] Pfeiffer characterizes the Market Transaction Method and the Market Comparable Method as variations on the "Market Approach," which "indicates the fair value of a business based on a comparison of the subject company to comparable firms in similar lines of business."  Pfeiffer Report 10.

[19] *See* Trading Br. 23.  Trading mistakenly attributes these objections to the Market Transaction Approach.

[20] *See* Trading Br. 23 (citing Pfeiffer Report 18–19).

[21] *See* Trading Br. 24.

evidence.  Trading then argued that "because Mr. Pfeiffer's ultimate damages valuation of $49 million incorporates and is inextricably interwoven with and dependent on [these] Approaches," it is also inadmissible.  Trading Br. 25.  In response, NAF noted that Trading had not raised any objections to the Market Comparable Method, which yielded the highest estimate of Hampshire's value—about $62 million.  *See* NAF Br. 24 n.15.  Trading, in reply, emphasized again that Pfeiffer's ultimate estimate of $49 million was the average of three distinct approaches (including the Market Comparable Method).  *See* Trading Reply Br. 8.  Neither in its reply nor at argument, however, did Trading levy any specific criticisms at the Market Comparable Method.

The Court rejects Trading's invitation to treat the entire Pfeiffer Report as non-cognizable simply because, to produce a single bottom-line estimate, the expert averaged three estimates, two of which Trading assails as defective.[22]  Even assuming *arguendo* that Trading's critique is valid, Trading articulates no reason why NAF could not alternatively rely on the third approach, the Market Comparable Method, whose bona fides it has not challenged.  That estimate ($62 million) exceeds the roughly $30 million that NAF agreed to pay to acquire Hampshire.  Merely because NAF chose ultimately to endorse a valuation that reflected the average of three independent methodologies does not mean that, were two removed from consideration, it could not rely on the third.  Trading's claim that NAF would be left with "no competent evidence" of damages is simply wrong.  Trading Br. 20.

---

[22] The Court has no occasion here to resolve whether these two approaches are actually reliable and admissible.  Trading is free to move to exclude these (or other) valuation approaches from evidence at trial.

Therefore, because the Market Comparable Method is unchallenged and yields a positive

damages figure, NAF has presented sufficient evidence of damages resulting from its lost

opportunity to acquire Hampshire to survive summary judgment.[23]

### 2.    Nominal Damages

Independently, even if Trading had challenged—or later succeeds in excluding—each of

Pfeiffer's valuation approaches as unreliable, NAF could still obtain nominal damages, *e.g.*, $1.

The availability of such damages independently requires denying Trading's summary judgment

motion.

Under New York law, where actual damages have not been proven with the requisite

certainty, and indeed even if the breach of contract caused no loss at all, nominal damages are

available "as a formal vindication of plaintiff's legal right to compensation."  *Freund v.

Washington Square Press, Inc.*, 34 N.Y.2d 379, 384 (1974); *see also T & N PLC v. Fred S.

James & Co. of N.Y., Inc.*, 29 F.3d 57, 60 (2d Cir. 1994) ("[N]ominal damages are always

available for breach of contract."); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993) (same).

For this reason, at least one court in this District has held that a plaintiff "may proceed to trial"

on a breach of contract claim "even if the claim is limited to nominal damages."  *Acumen Re

Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *11

---

[23] The record does not, however, contain adequate evidence to establish out-of-pocket damages.
At argument, after pressing NAF on this issue, the Court directed NAF to submit a letter pointing
to record evidence, if any, of out-of-pocket costs.  On March 14, 2016, NAF submitted a letter
citing snippets of Gerszberg's deposition testimony, particularly his statement that his expenses
were "[a]round $2 million."  Dkt. 107 (citing Gerszberg Dep. 418, 425).  But this statement was
made in the context of discussing Gerszberg's threat to sue Hampshire and the subsequent
settlement.  NAF fails to show how that figure has any bearing on the out-of-pocket damages it
incurred as a result of Trading's alleged breach.

(S.D.N.Y. Sept. 7, 2012), *aff'd on other grounds*, 769 F.3d 135 (2d Cir. 2014).[24]  New York

appellate courts have held the same.  *See Magu Realty Co. v. Spartan Concrete Corp.*, 658

N.Y.S.2d 45, 46 (2d Dep't 1997) (reversing grant of summary judgment even though plaintiffs

"failed to demonstrate that they incurred any actual damages" because there "remain[ed] triable

material issues of fact" and nominal damages remained available); *C.K.S. Ice Cream Co. v.

Frusen Gladje Franchise, Inc.*, 567 N.Y.S.2d 716, 718 (1st Dep't 1991) ("Even if it were shown

[on summary judgment] that no actual damages have been sustained, plaintiff would seem

entitled to proceed to trial at least on its contract cause of action if only to vindicate its right to

nominal damages.").

        The cases cited by Trading are not to the contrary.  Trading cited six cases for the

proposition that, when a plaintiff cannot prove damages, summary judgment may be granted for

the defendant.  *See* Trading Br. 19; Trading Reply Br. 9.  But two did not involve summary

judgment motions at all.  *See LNC*, 173 F.3d 454 (appeal following jury verdict);[25] *Shred-It USA,

Inc. v. Bartscher*, No. 02 Civ. 4082 (JO), 2005 WL 2367613 (E.D.N.Y. Sept. 27, 2005) (decision

following bench trial).  Two other cases stand only for broad and, here, irrelevant propositions.

*See B & M Linen, Corp. v. Kannegiesser USA, Corp.*, No. 08 Civ. 10093 (LAP), 2013 WL

---

[24] Drawing on the same principles, another district court in this Circuit has held that, because of
the availability of nominal damages, summary judgment may be granted *for the plaintiff* where
the defendant challenged plaintiff's case only on the ground that damages were uncertain or
nonexistent.  *McCoy Assocs., Inc. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 293–94 (E.D.N.Y. 2002).
The court referred that case to the magistrate judge for a damages inquest.  *See id.* at 294.

[25] In *LNC*, the Circuit did note that, under New York law, "the failure to prove damages is fatal
to a plaintiff's breach of contract cause of action."  173 F.3d at 465 (quoting *Cramer v. Spada*,
610 N.Y.S.2d 662, 664 (3d Dep't 1994) (alterations and internal quotation marks omitted).
However, tracing this *dictum* back through a chain of New York court decisions, the Court has
located no case addressing the precise question here: whether defendant's motion for summary
judgment may be granted, when it would otherwise be denied, on the grounds of failure to prove
the amount of damages with cognizable evidence.

1142679, at *5 (S.D.N.Y. Mar. 19, 2013) (plaintiff must "demonstrate that [it] has been damaged as a result of [defendant] breaching the [contracts]"); *Fontana v. Potter*, No. 01 Civ. 7002 (SLT) (RML), 2005 WL 2039194, at *5 (E.D.N.Y. Aug. 24, 2005) ("[P]laintiff's failure to prove any one of the elements [of breach of contract] mandates summary judgment for the defendant."). The cited portion of another decision dealt with New York's stricter requirements for proving loss of future profits, which is not at issue here. *See W.S.A., Inc. v. ACA Corp.*, No. 94 Civ. 1493 (CSH), 1998 WL 635536, at *6 (S.D.N.Y. Sept. 15, 1998). Trading ignores that that decision went on to find the loss-of-future-profits cases inapposite and to deny the defendant's motion for summary judgment. *See id.* at *7–8; *see also Schonfeld*, 218 F.3d at 176 (noting that courts "have universally recognized" the distinction between lost-profit and lost-asset damages, even where the lost asset is an income-producing asset).

Only one case Trading cites appears remotely to support its argument. In *New Paradigm Software Corp. v. New Era of Networks, Inc.*, Judge Peck recommended granting defendants' summary judgment motion on the ground that plaintiff had failed to produce any "evidence of the *amount* of [ ] damages (or at least a fair estimation of same)."[26] No. 99 Civ. 12409 (RMB) (AJP), 2002 WL 31749396, at *16 (S.D.N.Y. Dec. 9, 2002) (emphasis in original). But, *New Paradigm*, like Trading's other cases, did not address the precedents relating to nominal damages that the Court cited above. It therefore does not avail Trading on the question that the Court here resolves: whether summary judgment may be granted for defendant where plaintiff putatively failed to prove the amount of damages, but the breach of contract claim would otherwise survive summary judgment.

---

[26] Judge Berman adopted Judge Peck's recommendation "in all material respects." Dkt. 39, No. 99 Civ. 12409 (RMB) (AJP).

Thus, for two independent reasons, the Court rejects Trading's contention that NAF's failure to prove its damages requires summary judgment in favor of Trading.

## CONCLUSION

For the foregoing reasons, the Court denies Trading's motion for summary judgment. In a separate order to follow shortly, the Court will set a schedule for the prompt submission of a joint pretrial order (including fully briefed motions *in limine*). The Clerk of Court is respectfully directed to close the motions pending at docket numbers 73 and 88.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: June 1, 2016
       New York, New York

38